IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| SUSAN TATE, ) | |
| ) | |
| Plaintiff, ) | CASE NO. B-02-103 |
| ) | |
| v. ) | |
| ) | **DEFENDANT THE WILLIAM** |
| WILLIAM CARTER COMPANY, ) | **CARTER COMPANY'S MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| Defendant. ) | |

COMES NOW Defendant, The William Carter Company (hereinafter "William Carter"),

by and through counsel, and files this Motion For Summary Judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure on the grounds that there are no genuine issues of material fact

and that Defendant is entitled to judgment as a matter of law. In support of this motion,

Defendant asserts the following:

      1.     Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, are

barred because it is undisputed that Plaintiff entered into an agreement in which she released any

and all Title VII claims she may have had against William Carter relating to her employment and

covenanted not to bring suit over them. Plaintiff's tort claims under Texas law relating to her

employment are likewise barred by the release and covenant not to sue.

1

2.      Plaintiff is estopped from denying the validity of the release agreement and its covenant not to sue because she has retained the payment offered in consideration and has thereby ratified the agreement.

3.      William Carter is not liable for any of the alleged intentionally tortious conduct in this case that occurred after the execution of the release agreement, all of which is attributed to a former a manager, because such acts, if committed, were not within the course and scope of the manager's duties.

4.      William Carter is entitled to summary judgment on its Counterclaim on the grounds that by instituting this lawsuit, Plaintiff breached the covenant not sue which is contained in the release agreement.  Accordingly, William Carter is entitled to its damages, including its costs and fees, that are proven to flow from that breach.

5.      This Motion and the accompanying Brief are supported by the following Exhibits, which are incorporated into this Motion as if fully contained herein:

Exhibit A      Joint Affidavit of Nellie L. Askey, Tammie T. Merritt, and Clyde D. Stutts.

Exhibit B      Affidavit of James M. Powell, Esq.

Exhibit C      Deposition of Susan Tate, Plaintiff (Volumes 1 and 2).


For the reasons stated herein, William Carter respectfully requests that the Court grant summary judgment in its favor and dismiss all of Plaintiff's state and federal claims, that the Court grant summary judgment in its favor on its Counterclaim, and that the Court award William Carter its attorney's fees and costs incurred in the defense of this case as a prevailing

party under Title VII and as actual damages for Plaintiff's breach of the release agreement and covenant not to sue.

      This the **25**ᵗʰ day of November, 2002.

                                  Respectfully submitted,

                                  James M. Powell
                                  N.C. State Bar No. 12521
                                  P.O. Box 13310
                                  Greensboro, NC  27415-3310
                                  Telephone:  336.375.9737
                                  Telecopier:  336.375-4430

                                  **Attorney-In-Charge for Defendant**
                                  **William Carter Company**

OF COUNSEL:

**MEREDITH, DONNELL & ABERNATHY**
Jose L. Gamez
Texas Bar No. 07607100
Southern Dist. No. 6151
Water Tower Centre
612 Nolana, Suite 560
McAllen, TX  78504
Telephone:  956.618.4477
Telecopier:  956.618.4557

**ATTORNEY FOR DEFENDANT**
**WILLIAM CARTER COMPANY**

3

party under Title VII and as actual damages for Plaintiff's breach of the release agreement and covenant not to sue.

Respectfully submitted,

*James M. Powell* /pp

James M. Powell
N.C. State Bar No. 12521
P.O. Box 13310
Greensboro, NC  27415-3310
Telephone:  336.375.9737
Telecopier:  336.375-4430

**Attorney-In-Charge for Defendant**
**William Carter Company**

OF COUNSEL:

**MEREDITH, DONNELL & ABERNATHY**
Jose L. Gamez
Texas Bar No. 07607100
Southern Dist. No. 6151
Water Tower Centre
612 Nolana, Suite 560
McAllen, TX  78504
Telephone:  956.618.4477
Telecopier:  956.618.4557

**ATTORNEY FOR DEFENDANT**
**WILLIAM CARTER COMPANY**

3

## CERTIFICATE OF SERVICE

I do hereby certify that I have this day served a copy of the foregoing document upon the

following person(s), by placing a copy of the same in the United States Mail, (certified) properly

addressed and with the correct amount of postage affixed thereto:

> Susan Tate
> 2925 Jacaranda
> Harlingen, TX 78550

Dated this the _26th_ day of November, 2002.

MEREDITH, DONNELL & ABERNATHY

Jose L. Gamez

Water Tower Centre
612 Nolana, Suite 560
McAllen, TX 78504
956.618.4477

4

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUSAN TATE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. B-02-103 |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM CARTER COMPANY, | ) | **JOINT AFFIDAVIT** |
| | ) | |
| Defendant. | ) | |

The following Joint Affidavit is made under oath by Nellie L. Askey, Tammie T. Merritt and Clyde D. Stutts.

## AFFIANTS

1.     Nellie L. Askey is the Director of International Human Resources and Compliance for The William Carter Company. In this position, Askey is responsible for overseeing and administering the Company's affirmative action and social compliance policies. In addition, Askey is responsible for all Human Resources matters for the Company's overseas plants, and she was responsible for all Human Resources matters for the Company's plant in Harlingen, Texas prior to its closing in May 2001. Askey has held this position since January 2001. Prior to that, she was the Company's Manager of Human Resources and Compliance. In these positions,

1

Askey was Susan Tate's ("Plaintiff") immediate supervisor from October 2000 until Plaintiff's termination on May 11, 2001.

2.      Clyde D. Stutts is the Vice President of Human Resources for The William Carter Company. Stutts has held this position since he joined the Company in 1998. In this position, Stutts is responsible for all Human Resources matters and personnel for the Company.

3.      Tammie T. Merritt has worked for The William Carter Company for twenty-five years. Merritt is presently the Director of Employee Relations for the Company, a position she has held since November 1999. As Director, Merritt is responsible for implementing and interpreting Company policy, ensuring uniform application of Company policy, mediating disputes, conducting investigations, and many other duties incident to ensuring positive employee relations at the Company. Prior to becoming Director, Merritt worked for over ten years as a Human Resources Manager for the Company.

## FACTS

A.    William Carter's Equal Opportunity, Anti-Harassment, and Employee Conduct Policies.

4.      At all times during the employment of Tate, and at all times since, The William Carter Company ("William Carter" or "Company") has maintained an Equal Employment Opportunity Policy. This policy reaffirms the Company's commitment to nondiscriminatory employment practices, and states that William Carter will not tolerate discrimination or sexual harassment in the workplace. Attachment 1 to this joint affidavit contains a true and accurate copy of the Company's Equal Employment Opportunity Policy which was in effect at the time of Plaintiff's termination.

5.      At all times during the employment of Tate, and at all times since, the Company

has maintained a Harassment-Free Workplace Policy.  This policy expressly prohibits any form

of sexual harassment of its employees in the workplace.  The policy informs employees that the

Company will not tolerate any form of sexual harassment, which includes physical assault and

unwanted or offensive physical, verbal or sexually oriented conduct.  The policy imposes an

obligation on its employees to report any instances of such conduct to the their supervisor or the

facility manager.  If the employee is not comfortable approaching those individuals, the policy

includes the name and phone numbers of four human resources employees that the employee may

contact, including both Askey and Merritt.  The policy also includes the phone number for Stutts

in the event the employee does not feel comfortable approaching those four identified human

resources employees.

6.      The Harassment-Free Workplace Policy states that William Carter will thoroughly

and promptly investigate all such complaints.  If the investigation confirms the complaint, the

Company will take appropriate corrective and disciplinary action necessary to remedy the

situation.  Under the policy, complaints of "assault or the threat of assault, if proven, will result

in termination of employment."  Attachment 2 to this joint affidavit contains a true and accurate

copy of the Company's Harassment-Free Workplace Policy which was in effect at the time of

Plaintiff's termination.

7.      The sexual harassment policy is also reviewed with each new employee during an

orientation process at the time of hire.  Attachment 3 to this joint affidavit contains a true and

accurate copy of the acknowledgment contained in Susan Tate's personnel file, which has been

3

maintained by William Carter in the normal course of the Company's regularly conducted business, which shows that the sexual harassment policy was reviewed with her.

8.      At all times during the employment of Tate, and at all times since, the Company has maintained an Employee Performance and Conduct Improvement Policy.  This policy includes a list of intolerable offenses which will generally result in termination.  Included among this list of conduct not tolerated by William Carter is "intimidating or threatening a fellow employee or supervisor with bodily harm."  Attachment 4 to this joint affidavit contains a true and accurate copy of the Company's Employee Performance and Conduct Improvement Policy.

B.      Background.

9.      The William Carter Company is a national manufacturer of infants' and children's clothing.  The Company maintains multiple manufacturing facilities in the United States and abroad.  Until May 2001, the Company operated a manufacturing facility in Harlingen, Texas, where it employed more than 460 workers.  However, the Company closed the plant in May 2001 for business reasons, and terminated every employee at the facility except for the plant manager.

10.     The Plaintiff, Susan Tate, worked at the Harlingen facility in the position of Occupational Plant Nurse.   William Carter hired Plaintiff in 1992.  Except for a brief, four month period when she left to pursue another employment opportunity in 1996, Plaintiff held that same position until her termination in the plant closing in May 2001.

11.     Gary Butts was the plant manager for the Harlingen facility at the time of the closing.  William Carter hired Butts in 1993, and he worked at a number of different facilities for the Company until he was made the plant manager of the Harlingen facility in August 1998.

4

Following the Harlingen plant closing in May 2001, Butts transferred to the Company's corporate office in Griffin, Georgia, where he worked until his termination in August 2001.

12.    Nellie Askey is currently the Company's Director of International Human Resources and Compliance and works in the corporate office in Griffin, Georgia. In Plaintiff's position as plant nurse, she reported directly to Askey. Butts was Plaintiff's "indirect supervisor" in that he was the plant manager, but Plaintiff coordinated her work duties, schedule, and other personnel matters through Askey.

C.    The Anonymous Complaints.

13.    In late January 2001, William Carter's Human Resources Department received a two-page anonymous letter making numerous allegations of misconduct against Butts. The allegations in the letter included claims that Butts was having affairs with and giving preferential treatment to unnamed female employees, that he had a drug problem and was using shipments on Company trucks to smuggle drugs, that he used Company vehicles and workers for his own personal benefit, that he was prejudiced against Hispanics, and that he listened in on employees' personal phone calls. Attached hereto as Attachment 5 is a true and accurate copy of the anonymous letter, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

14.    In response to the anonymous letter, Nellie Askey traveled to Harlingen from the corporate office to investigate the anonymous complaints. Over the course of three days, Askey privately interviewed office workers and supervisors at the facility. Askey did not tell either Butts or any of the employees at the plant about the anonymous letter. Askey told Butts only that she was there to perform an assessment of the plant to determine if the Human Resources

5

Department needed to conduct training in Company policy or employee relations. In the employee interviews, Askey sought the employees' opinions on general matters related to the plant, but also asked the employees such things as how they felt about the Human Resources Department, whether they were treated fairly, and how they felt about Butts as a plant manager. Askey did not speak with either the Plaintiff or the plant's Human Resources Administrator because, as their direct supervisor, they were in regular contact. Because of their working relationship, Askey believed if Plaintiff had a problem in the plant, Plaintiff would have told her.

15.     While in Harlingen conducting this investigation, Askey received an anonymous note addressed directly to her. The note began by telling Askey "Do not believe Gary [Butts] or Susan [Tate, the Plaintiff] . . . . Everyone knows about the affairs Gary is having with [Plaintiff and another employee]." The anonymous note alleged that Butts was "the worst manager we ever had" and hoped Askey was at the plant "to look into all the things that are going on here." In addition, this note to Askey also stated "everyone" at the plant knew about the anonymous letter. Because of the anonymity of the allegations in this note, neither Butts nor Plaintiff was questioned about their rumored affair. Attached hereto as Attachment 6 is a true and accurate copy of the anonymous note to Askey, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

16.     The employees Askey interviewed indicated that Butts was considered aloof and did not often socialize with plant employees. Several employees expressed their personal belief that Butts was prejudiced or not very nice, but none made any allegation Butts took any adverse employment action against them. Indeed, most of the employees said they did not have much direct interaction with Butts and that he tended to stay in his office. In sum, Askey found no

6

evidence or witnesses whatsoever to corroborate any of the allegations in the anonymous letter and anonymous note.

D.      Rumors about the Harlingen Plant Closing.

17.     In early 2001, William Carter determined that it would close the Harlingen plant due to business reasons. In January or February 2001, before the decision to close the plant was announced, Plaintiff telephoned the Company's Human Resources Department in Griffin, Georgia. In this call, which occurred late in the afternoon, Plaintiff told Tammie Merritt, Human Resources Manager, that she had heard a rumor that the plant was going to close and she asked if it were true. Plaintiff told Merritt she needed an answer before the close of business that day because she had a pending job offer, but that she wanted to stay with William Carter if the plant were to remain open.

18.     As it was inappropriate to give Plaintiff this information since no other employees had been told and the Company was not in a position to publicly announce the closing, Merritt advised Plaintiff that she could not provide her with an answer. With respect to the pending job offer, Merritt told Plaintiff she should do what she thought was best for her and her family. At no point in these discussions with Merritt did Plaintiff make any allegation or complaint whatsoever that Butts was harassing her in any way.

E.      The Plant Closing Announcement.

19.     In March 2001, the plant closing was announced to the employees at the Harlingen facility and the proper notices given as required by law. The employees were advised that the plant would close on or about May 11, 2001. With the exception of Butts, all of the

7

other 466 employees at the plant, including Plaintiff, were advised that they would be terminated as a result of the closing.

20.    William Carter offered a severance pay package to the supervisors and office workers at the plant, including Plaintiff, affected by the plant closing. Pursuant to the plan, thirty-nine (39) such employees at the plant were eligible for severance pay. Plaintiff, who worked in the office as the plant nurse, was one of these thirty-nine employees eligible for severance under the plan. As a condition to be eligible for and receiving this offered severance pay, the eligible employees first had to agree to enter into a form contract entitled "Election Form and Agreement for Severance Pay Plan." Under its terms, the employees who accepted the agreement released all legal claims they might have had against William Carter relating to their employment in exchange for severance pay.

F.    Plaintiff's First Expression of her Unwillingness to Work with Butts and Her Refusal to Make Specific Allegations Against Him.

21.    The first indication William Carter had that Plaintiff had any problem working with Butts came shortly before the plant closed. On or about April 25, 2001, Plaintiff telephoned Askey and stated that she wished to work from home until the closing because she was not comfortable working with Butts. However, Plaintiff told Askey that she did not wish to discuss the matter until after the plant closed and Butts had left the Harlingen area.

22.    In response to Plaintiff's concerns, Askey gave Plaintiff permission to work from home. Thus, after April 25, 2001 until her termination, Plaintiff never worked at the plant again and had no work-related contact whatsoever with Butts. In accord with Plaintiff's request, Askey agreed to wait until Butts left Harlingen to discuss the matter.

8

G.    Plaintiff's Execution of the Release Agreement on May 2, 2001.

23.    On May 2, 2001, a week after indicating she had a problem working with Butts, Plaintiff signed the Election Form and Agreement for Severance Pay Plan.  Under the terms of this agreement, Plaintiff agreed to release William Carter from all "claims, liabilities, demands and causes of action, known or unknown, fixed or contingent, which [she] may have or claim to have against William Carter relating in any way to [her] employment or to the termination of [her] employment."  The agreement provided that Plaintiff had forty-five (45) days to consider the agreement, the right to consult an attorney, and seven (7) days after signing it in which to revoke.  In consideration for Plaintiff's release, William Carter agreed to pay Plaintiff $3910.40 in severance.

24.    Attached hereto as Attachment 7 is a true and accurate copy of the Election Form and Agreement for Severance Pay Plan signed by Susan Tate, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

25.    Attached hereto as Attachment 8 is a true and accurate copy of the Personnel Action Form indicating the severance payment for Tate, which was created and maintained by William Carter in the normal course of the Company's regularly conducted business.

26.    On that same date, May 2, 2001, Askey and Plaintiff met at two different times away from the Harlingen plant.  First, Askey and Plaintiff met for lunch at a local restaurant.  At this lunch meeting, Plaintiff reviewed and signed the release and did not raise the issue of her request to work at home or any matter regarding Butts.  Later that evening, Askey stopped by Plaintiff's home to drop off some work for her to do.  Plaintiff's husband was present and the meeting was cordial.  Plaintiff introduced Askey to her children and showed her around her

9

home. Again, Plaintiff did not raise the issue of her request to work at home or any matter regarding Butts.

**H.**    **The Plant Closing and Plaintiff's Revelation of Her Specific Complaints about Butts.**

27.    The Harlingen plant closed on May 11, 2001, and, with the exception of Butts, all of the other 466 employees at the plant were terminated. Butts was to transfer to William Carter's office in Griffin, Georgia after winding up the closing. Plaintiff did not revoke the agreement during the seven-day period provided under the agreement, and Plaintiff was terminated effective May 11, 2001.

28.    After winding up matters in Harlingen, Butts moved to Georgia in or about the first week of July 2001. Having honored Plaintiff's request, Askey then called Plaintiff to determine what had prompted Plaintiff's request to work from home just before the plant closing. Plaintiff informed Askey that she had received phone calls from Butts at her home, a fact that she claimed William Carter could verify from its phone records. However, Plaintiff would not say any more and told Askey that she would only discuss the matter with Dave Brown, William Carter's Executive Vice President of Business Planning and Administration. As Plaintiff asked, Askey referred the Plaintiff's request to senior management.

29.    In mid-July, Clyde Stutts, William Carter's Vice-President of Human Resources, called Plaintiff on behalf of Brown. Plaintiff and her husband both spoke to Stutts and they made a series of allegations about Butts that went back over two years. They alleged Butts was harassing them by repeatedly calling them and hanging up, that he had treated Plaintiff and other employees in a harsh and disrespectful way, and that he was using drugs and that an employee saw Butts with a gun and bag of drugs in the plant. With respect to the phone calls, they alleged

10

they had proof that some of the calls had been traced to Butts' cell phone. Plaintiff also alleged that Butts had asked her about a rumor that her first husband caught her and her present husband in bed together, and that Butts once asked Plaintiff's husband to go to a strip club with him. Plaintiff and her husband told Stutts they were afraid of Butts.

30.    Stutts expressed to Plaintiff that William Carter took her allegations very seriously and made the commitment to her that the Company would investigate the matter thoroughly and take appropriate action. He also advised Plaintiff of the need for some evidence or witnesses to substantiate her allegations, since at that point, he could not act on the basis of her allegations alone. He requested that Plaintiff provide him with a written statement detailing her allegations. Plaintiff agreed to do so.

31.    On July 16, 2001, Plaintiff submitted a seven (7) page written statement to the Company detailing her allegations against Butts. Attached hereto as Attachment 9 is a true and accurate copy of the July 16, 2001 letter from Plaintiff, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

32.    On July 18, Stutts called Plaintiff to gather more specific information from Plaintiff about her allegations. Plaintiff provided her cell phone and pager numbers to compare against Butts' phone records. Stutts asked Plaintiff about the anonymous rumor alleging that she and Butts had an affair, and Plaintiff denied having any relationship with Butts. Stutts also asked Plaintiff why she had not taken the job offer she revealed to Tammie Merritt when she called about the plant closing rumor in January or February 2001, if at that time Butts was harassing her as she claimed and made her fearful of her safety. Plaintiff became upset at this point, and Stutts

11

explained to her that he had to ask such questions in order to properly investigate her claims. Stutts also advised Plaintiff that he would be interviewing Butts in order to unravel the matter.

33.    About ten minutes after this call ended, Plaintiff called Stutts back and told him she believed he was turning the situation around on her. Plaintiff told Stutts he was not permitted to contact her any more and that she was going to retain an attorney and sue William Carter. Thereafter, Plaintiff failed to provide any evidence to the Company and stopped cooperating in the Company's efforts to substantiate her allegations against Butts.

I.    William Carter's Investigation into Plaintiff's Claims.

34.    In the face of Plaintiff's refusal to cooperate, William Carter nonetheless continued its investigation. In August 2001, Askey retrieved and reviewed the cell phone records that Butts had submitted to the Company over the previous two years as expenses for reimbursement. Askey compared the numbers in the records with Plaintiff's home and mobile phone numbers. Askey's review of the available records did not reveal a single call by Butts to any of Plaintiff's numbers. In addition, Askey interviewed the employee that Plaintiff claimed had seen Butts in the plant with a gun. The employee unequivocally denied that he ever witnessed Butts with a gun in the plant or anywhere else. In sum, Askey did not uncover any evidence to support any of Plaintiff's allegations of harassment or mistreatment by Butts.

35.    Thereafter, William Carter interviewed Butts to get his side of the story. Butts adamantly denied Plaintiff's allegations against him and those contained in the anonymous letters to the Company and Askey. Butts specifically denied making any harassing phone calls to Plaintiff, and said his only relationship with her had been a professional relationship. Butts stated that he believed Plaintiff made the allegations because her husband disliked him. Butts

12

explained that soon after arriving in Harlingen, he informed Plaintiff that a co-worker told him

that Plaintiff's first husband had found Plaintiff and her current husband in bed together. He told

Plaintiff about this rumor because he thought she should be aware that the co-worker was making

such statements. Butts stated that Plaintiff's husband heard part of the conversation and became

upset. Butts said he tried to apologize and explain the situation to him, but that Plaintiff's

husband disliked him from that point onward.

      36.    In sum, all of Plaintiff's claims were adamantly denied by Butts. William Carter's

investigation into Plaintiff's claims did not reveal any evidence or witnesses to substantiate any

of Plaintiff's allegations against Butts.

J.      <u>The Termination of Butts.</u>

      37.    While the Company never uncovered any evidence to substantiate Plaintiff's

allegations against Butts, during the investigation the Company discovered that Butts could not

properly account for the proceeds of a cash sale for which he was responsible. In addition, the

Company's investigation suggested that Butts possibly misappropriated some office furniture

following the plant closing. While no clear evidence of misconduct by Butts was ever found, the

investigation raised significant questions about his credibility and the Company involuntarily

terminated Butts as a result. However, given the lack of unequivocal evidence and at Butts'

request, the Company agreed to record the reason for his termination as "workforce reduction."

Butts' termination was effective August 31, 2001.

K.      <u>Plaintiff's First Claim of Sexual Harassment.</u>

      38.    On September 24, 2001, still having failed to cooperate with William Carter or

provide any evidence to support her unsubstantiated claims against Butts, the Company received

13

a letter from Plaintiff addressed to the Company's CEO asking for compensation for Butts' alleged mistreatment of her. Additionally, Plaintiff for the first time alleged that she was sexually harassed by Butts. Up until this time, more than four months after her termination and two months after providing a detailed statement to the Company, Plaintiff had never included sexual harassment among her allegations against Butts. In this letter, Plaintiff also claimed to have documentary evidence consisting of phone records that proved Butts made the alleged calls to her. Attached hereto as Attachment 10 is a true and accurate copy of the September 24, 2001 letter from Plaintiff, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

39.    Stutts replied by letter and advised her that the Company had undertaken an investigation, but was surprised to learn of the new allegations of sexual harassment. Stutts requested that Plaintiff cooperate with the Company so that the investigation could go forward, and to provide the phone records that allegedly proved Butts was calling her. Attached hereto as Attachment 11 is a true and accurate copy of this letter from Stutts to Plaintiff, which has been maintained by William Carter in the normal course of the Company's regularly conducted business.

40.    Plaintiff never responded to this letter and never provided the phone records she claimed to have. To this date, Plaintiff has not produced any phone records which demonstrate that Butts made even a single call to the Plaintiff.

14

## VERIFICATION OF NELLIE L. ASKEY

I, Nellie L. Askey, am over the age of eighteen and competent to give this affidavit.

Under oath, I depose and state that I have read the foregoing Joint Affidavit of forty (40)

paragraphs and that the statements contained in paragraphs 1, 4-16, 19-28, and 34-36 are true and

correct based upon my personal knowledge and based upon the information available to me in

my official capacity with The William Carter Company.

Dated this the 21st day of November 2002.

Nellie L. Askey

Sworn to and Subscribed before me this
the 21st day of _November_ , 2002.


Notary Public  R. Diane Yancey

My Commission Expires:

Notary Public, Lamar County, Georgia
My Commission Expires Sept. 23, 2006

## VERIFICATION OF TAMMIE T. MERRITT

I, Tammie T. Merritt, am over the age of eighteen and competent to give this affidavit.

Under oath, I depose and state that I have read the foregoing joint affidavit of forty (40)

paragraphs and that the statements contained in paragraphs 3, 17, and 18 are true and correct

based upon my personal knowledge and based upon the information available to me in my

official capacity with The William Carter Company.

Dated this the _21_ day of November 2002.

_Tammie T. Merritt_
Tammie T. Merritt

Sworn to and Subscribed before me this
the 21st day of _November_, 2002.

_Robin K Owen_
Notary Public

My Commission Expires:

Notary Public, Henry County, Georgia
My Commission Expires Jan. 27, 2003

## VERIFICATION OF CLYDE D. STUTTS

I, Clyde D. Stutts, am over the age of eighteen and competent to give this affidavit.

Under oath, I depose and state that I have read the foregoing joint affidavit of forty (40)

paragraphs and that the statements contained in 2, 29-33, 35-36, and 37-40 are true and correct

based upon my personal knowledge and based upon the information available to me in my

official capacity with The William Carter Company.

Dated this the _25_ day of November 2002.


_____
Clyde D. Stutts

Sworn to and Subscribed before me this
the 25 day of _November_, 2002.

_____
Notary Public

My Commission Expires:

Notary Public, Henry County, Georgia
My Commission Expires Jan. 27, 2003

# Attachment 1

| *Carter's*<br><br>**Human Resources<br>Policies and Procedures** | **Title**<br>EQUAL EMPLOYMENT OPPORTUNITY | **Effective Date**<br>7-1-92 |
|---|---|---|
| | **Supersedes dated 11-15-82<br>and all other previous revisions** | **Page**<br>1 of 1 |
| | **Authorized by: Exec. V.P. - Retail Stores &<br>Administration** | |
| | **Vice President - Human Resources** | |

## PURPOSE

The intent of this policy is to reaffirm the Company's position regarding non-discrimination in all matters relating to employment.

## POLICY

It is the policy of the Company, consistent with the objectives set forth in the Presidential Executive Order 11246, as amended, Section 402 of the Vietnam Era Veterans Readjustment Act of 1972, as amended, Section 503 of the Rehabilitation Act of 1973, as amended, the Americans with Disabilities Act of 1990, and related rules and regulations of the Department of Labor and the Office of Federal Contract Compliance Programs to provide equal opportunity to all employees and applicants for employment without regard to race, color, religion, age, national origin, sex, physical or mental disability or status as a disabled Veteran or Veteran of the Vietnam Era.

All employees will be treated the same during their employment without regard to their race, color, religion, national origin, sex, physical or mental disability or status as a disabled Veteran or Veteran of the Vietnam Era in all matters, including compensation, benefits, promotions, transfers, layoffs, return from layoff, company sponsored training, education, tuition assistance, social and recreation programs.

It is the policy of the Company to maintain a work place free of sexual harassment. Sexual harassment may be described as any unwelcome verbal or physical conduct of a sexual nature, unwelcome sexual advances, or unwelcome requests for sexual favors.

The Company will not tolerate any form of employment discrimination, including sexual harassment.

The full cooperation of all employees and all levels of management and supervision is expected.

## RESPONSIBILITY

The Human Resources Department is assigned the responsibility of insuring that all phases of personnel administration are in complete accord with this policy, and of maintaining our Affirmative Action Program with a current Analysis and Review of the program.

Each manager and supervisor is assigned the responsibility of carrying out the policy within his/her department of work group.

# Attachment 2

| | Title<br>HARASSMENT-FREE WORKPLACE POLICY | Effective Date<br>11/15/98 |
|---|---|---|
| **The William Carter Company** | Supersedes policies dated   11/1/95<br>and all other previous revisions | Page<br>1 of 3 |
| Personnel Policies and<br>Procedures | Authorized by:  Executive V.P. - Business Planning and<br>Administration | |
| MANUFACTURING, OPERATIONS<br>AND MORROW, GA OFFICE | Vice President - Human Resources | |

## POLICY

It is the policy of The William Carter Company to detect, prohibit, and correct any incident of harassment of our employees by any party employed by, representing, or visiting the Company.  This policy is to be complied with in all of our facilities and activities.

A.  The Company's Position on Harassment

The William Carter Company is committed to maintaining a work environment that is free from discrimination where employees at all levels of the Company are able to devote their full attention and best efforts to the job.  Harassment, either intentional or unintentional, has no place in the work environment. Accordingly, the Company does not authorize and will not tolerate any form of harassment of or by any employee (supervisory or non-supervisory,) vendor, customer, or contractor based on sex, race, religion, color, national origin, age, disability, or any other factor protected by law.  The term "harassment" for all purposes includes but is not limited to offensive language, jokes, or other verbal, graphic or physical conduct relating to an employee's sex, race, religion, color, national origin, age, disability, or other factor protected by law which would make a reasonable person experiencing such harassment uncomfortable in the work environment or which could interfere with the person's job performance.  This policy will be posted and communicated to all employees.

B.  Definition of Sexual Harassment

Sexual harassment includes, but is not limited to:

(1) Physical assaults or physical conduct that is sexual in nature;

(2) Unwelcome sexual advances or comments or requests for sex or sexual activities concerning one's employment or advancement, regardless of whether such advances or comments are accompanied by promises or threats;

(3) Sexual displays or publications such as calendars, cartoons or graffiti;

(4) Other verbal or physical conduct of a sexual nature which has the purpose or effect of interfering with an individual's work performance, or creating an intimidating, hostile, or offensive work environment; and

(5) Retaliation for complaints of harassment.

The Company regards all such conduct as creating a hostile and offensive work environment in violation of this policy, regardless of whether submission to such conduct is made either explicitly or implicitly a term or condition of employment, and regardless of whether such conduct is directed toward a member of the same or opposite sex.  Examples of sexual harassment include but are not limited to sexual propositions, sexual innuendo, sexually suggestive comments, sexually-oriented "kidding", "teasing" or "practical jokes," jokes about gender-specific traits, foul or obscene language or gestures, displays of foul or obscene printed or visual material, and physical contact, such as patting, pinching, or brushing against another's body; or reading or otherwise publicizing in the work environment materials that are sexually suggestive or revealing.

D0166

| | Title **HARASSMENT-FREE WORKPLACE POLICY** | **Effective Date** 11/15/98 |
|---|---|---|
| *The William Carter Company* | Supersedes policies dated   11/1/95 and all other previous revisions | Page 2 of 3 |
| Personnel Policies and Procedures | Authorized by:  Executive V.P. - Business Planning and Administration | |
| MANUFACTURING, OPERATIONS AND MORROW, GA OFFICE | Vice President - Human Resources | |

**C.**   <u>How to Report Instances of Harassment</u>

The Company cannot resolve matters that are not brought to its attention.  Any employee, regardless of position, who has a complaint of or who witnesses harassment at work by anyone, including supervisors or managers, employees, vendors, customers, or contractors, has a responsibility to immediately bring the matter to the Company's attention.  Employees may bring their complaint or observation of harassment to their Supervisor, Department Manager, or Facility Manager.  If an employee is uncomfortable bringing a complaint to the attention of one of those individuals, the employee should contact the following person:

| <u>NAME</u> | <u>TITLE</u> | <u>LOCATION</u> | **TELEPHONE** <u>NO.</u> |
|---|---|---|---|
| | | Facility | |

or any of the following persons in the Corporate Human Resources Department:

| | | | |
|---|---|---|---|
| Nellie Askey | EEO/AAP Coordinator | Griffin, GA | (770) 228-0930 |
| Tammie Merritt | Human Resources Manager | Griffin, GA | (770) 228-0930 |
| Marlin Gilbert | Human Resources Manager | Griffin, GA | (770) 228-0930 |
| Alejandra Bailon | Human Resources Manager | Griffin, GA | (770) 228-0930 |

If the complaint or observation of harassment involves someone in the employee's direct line of command, or if the employee is uncomfortable discussing the matter with his or her Supervisor, Department Manager, or Facility Manager, the employee is urged to go to another supervisor, one of the human resources officials listed above, or the official listed in the final paragraph of this policy.

**D.**   <u>How the Company Will Investigate Complaints</u>

A representative from the Company's Human Resources Staff will thoroughly and promptly investigate all claims of harassment.  Upon completing the investigation the Human Resources representative will meet with the complaining employee to discuss the results of the investigation and, where appropriate, review the proposed resolution of the matter.  If an investigation confirms that harassment has occurred, the Company will take appropriate corrective action, including such discipline up to and including termination of employment when warranted.  Claims of assault or the threat of assault, if proven, will result in termination of employment.

Complaints of harassment will be kept as confidential as possible.  Information will be released only on a "need to know" basis and no employee will be subjected to retaliation by the Company because he or she has reported what he or she believes to be an incident of harassment.  The Company will not tolerate harassment or retaliation by another employee when an incident of harassment is reported.

D0167

| | Title<br>HARASSMENT-FREE WORKPLACE POLICY | Effective Date<br>11/15/98 |
|---|---|---|
| **The William Carter Company** | Supersedes policies dated  11/1/95<br>and all other previous revisions | Page<br>3 of 3 |
| Personnel Policies and<br>Procedures | Authorized by:  Executive V.P. - Business Planning and<br>Administration | |
| MANUFACTURING, OPERATIONS<br>AND MORROW, GA OFFICE | Vice President - Human Resources | |

E.    <u>Our Commitment to an Effective Harassment-Free Workplace Policy</u>

Finally, if you feel that the Company has not met its obligations under the policy, you should contact:

| <u>NAME</u> | <u>TITLE</u> | <u>LOCATION</u> | <u>TELEPHONE NO.</u> |
|---|---|---|---|
| Clyde Stutts | Vice President -<br>Human Resources | Carver Road Office<br>Griffin, GA | (770) 228-0930 |

An effective Harassment-Free Workplace Policy depends on all of us working together to address this very important subject.

D0168

# Attachment 3

# *The William Carter Company*

## EQUAL OPPORTUNITY POLICY STATEMENT

It is the policy of this facility of The William Carter Company to afford equal opportunity for employment to all individuals regardless of race, color, religion, age, national origin or sex. The Company is strongly bound to the policy by the fact that adherence to the principles involved is the only acceptable way to operate a successful business. Therefore, this Plant will take affirmative action to insure that we will (1) Recruit, hire, and promote persons in all job titles without regard to race, color, religion, age, national origin, sex, physical or mental handicap or status as a disabled Veteran or Veteran of the Vietnam Era; (2) Base decisions on employment so as to further the principle of equal employment opportunity; (3) Insure that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid requirements for promotional opportunities; (4) Insure that all personnel actions such as compensation, benefits, transfers, layoffs, return from layoff, company sponsored training, education, tuition assistance, social and recreation programs, will be administered without regard to race, color, religion, age, national origin, sex, physical or mental handicap or status as a disabled Veteran or Veteran of the Vietnam Era; (5) Recognize each employee's individual dignity. The Company will not tolerate the harassing of individuals with words or signs relating to racial, religious, or sexual activities. Unwanted requests for sexual favors are forbidden in the Company and employees found to be harassing other employees sexually will be disciplined whether the harassment does or does not involve "hands-on" situations. In the event of an occurrence of sexual harassment any employee may contact her (his) Personnel Director to report the incident.

The successful achievement of a non-discriminatory employment program requires a maximum of cooperation between management and employees. In fulfilling its part in this cooperative effort, management is obliged to lead the way by establishing and implementing affirmative procedures and practices which will insure our objective, namely, equitable employment opportunity for all.

I have appointed the Personnel Administrator at this facility as EEO Coordinator to direct the establishment of and to monitor the implementation of personnel procedures to guide our affirmative action program.

This individual is charged with designing and implementing audit and reporting systems that will keep management informed on a Quarterly basis of the status of the equal employment opportunity area. Our Affirmative Action Compliance Programs may be reviewed during normal working hours by contacting this individual.

Name: _Susan A. Tate_

Signature: _Sus Tate_

Date: _4/24/97_

V.P.-Human Resources: _S. Paul Seal_

D0057

# Attachment 4

| | Title<br><br>**EMPLOYEE PERFORMANCE AND<br>CONDUCT IMPROVEMENT POLICY** | Effective Date<br><br>6/1/94 |
|---|---|---|
| *The William Carter Company* | Supersedes policies dated   10/1/89<br>and all other previous revisions | Page<br>1  of  6 |
| **Personnel Policies and<br>Procedures** | Authorized by: Executive V.P. - Business Planning & Administration | |
| MANUFACTURING & OPERATIONS | Vice President - Human Resources | |

## EMPLOYEES AFFECTED

All non-exempt factory, office, and non-exempt technical employees who have completed their probationary period of employment and have been classified as a regular employee.  (Probationary employees are covered under the Company's "Probationary Period Policy".)

## OUTLINE OF POLICY

## TYPES OF OFFENSES

1.    Intolerable Offenses (See Page 5 of Policy)
2.    Correctable Offenses (See Page 6 of Policy)

## INTOLERABLE OFFENSES

Infractions of rules listed under "Intolerable Offenses" in this Policy are grounds for termination in the absence of extenuating circumstances and do not require corrective interviews.

## CORRECTABLE OFFENSES-OUTLINE OF INTERVIEW SEQUENCE

See policy for details.  *The normal corrective interview sequence for rules infractions for other than intolerable offenses and/or deficiencies is as follows:

A.    **REGULAR EMPLOYEE**

1.    Verbal Improvement Interview (Document but employee not asked to sign).

2.    Written Improvement Interview (Document on record of interview form-Employee asked to sign) can result in final warning depending on the seriousness of the offense, after review with the appropriate Human Resources Manager.

3.    Written Improvement Interview resulting in final warning or termination depending upon the seriousness of the offense or performance deficiency (Document on record of interview form-Employee asked to sign if termination does not occur).

4.    Written Record of Interview and termination (Document on form.  Terminated employee not asked to sign) .

B.    **PROBATIONARY EMPLOYEE**

See "Probationary Period Policy" for details.                                 D0169

1.    Written Improvement Interview (Document on record of interview form-Employee asked to sign-can be used as final warning).

| | Title | Effective Date |
|---|---|---|
| *The William Carter Company* | **EMPLOYEE PERFORMANCE AND CONDUCT IMPROVEMENT POLICY** | 9/1/96 |
| | **Supersedes policies dated** 6/1/94 and all other previous revisions | **Page** 2 of 6 |
| **Personnel Policies and Procedures** | **Authorized by:** Executive V.P.- Business Planning & Administration *David H Brown* | |
| MANUFACTURING & OPERATIONS | Vice President - Human Resources *Paul Seal* | |

2.  <u>Written</u> Record of Interview resulting in <u>termination</u> <u>or</u>
    <u>final warning</u> depending on seriousness of the offense or performance deficiency (Document on record of interview form-Employee asked to sign if termination does not occur).

<u>NOTES:</u>

<u>Suspension</u>

\*An employee may be suspended at any point in the above sequence where termination is pending and additional time is needed to further investigate the case to decide appropriate action.

<u>Termination or Interview Sequence not followed</u>

In cases where the above sequence is not followed or <u>in all cases pointing to termination</u>, the appropriate Human ResourcesRepresentative or V.P. of Human Resources is to be contacted to review the circumstances of the case before final action or termination occurs.

<u>Combining Corrective Interviews</u>

In addition to the normal corrective interview sequence shown above, receipt of a combination of three (3) documented Improvement Interviews for conduct and/or for performance and/or second written improvement interview for absenteeism in a six (6) months period, as interpreted in V. below, is grounds for termination unless the employee requests that his/her entire record be reviewed by the Plant Manager, appropriate Staff Manager and/or Personnel Representative to give the employee the chance to bring out facts to show why he/she feels that termination is not appropriate.  If after review, the employee still feels the decision is not appropriate, he/she can appeal the decision using the Company's "Appeal Procedure".

<u>Length of Time for which Improvement Interviews are Valid</u>

-   Each Performance Improvement Interview is valid for 12 (twelve) months.

-   Each Conduct Improvement Interview is valid for 12 (twelve) months.

| | Title | Effective Date |
|---|---|---|
| | **EMPLOYEE PERFORMANCE AND CONDUCT IMPROVEMENT POLICY** | 6/1/94 |

| *The William Carter Company* | Supersedes policies dated   3/1/91 and all other previous revisions | Page<br>3 of 6 |
|---|---|---|

| **Personnel Policies and Procedures** | **Authorized by:** Executive V.P.- Business Planning & Administration<br><br>*David H Brown* |
|---|---|
| MANUFACTURING & OPERATIONS | Vice President - Human Resources<br><br>*Paul Seal* |

## PURPOSE

Where there is a group of people working together it is necessary to have certain rules and procedures for the protection of the group and for the orderly conduct of the business.  These procedures are to be applied whenever problems arise as to Employee Performance or Conduct which can be corrected by counseling.  Another purpose of these rules and procedures is to notify employees that infractions of certain rules are intolerable and normally result in termination of employment.

## POLICY

I.    **EMPLOYEE RESPONSIBILITY**

Employees are expected to follow policies, performance standards and work rules established by the Company for the safe and efficient operation of its business.

II.    **TYPES OF OFFENSES-INTOLERABLE AND CORRECTABLE**

In cases of infractions of certain rules or policies which are considered intolerable, corrective measures will normally not be applied.  Corrective guidelines outlined herein will be applied for infractions of certain rules and policies or for failure to meet normal performance standards.

III.    **INFRACTIONS OF COMPANY RULES**

The following table of offenses and penalties is set forth as a guideline only.  Each case involves its own peculiar facts and circumstances, and in every case the Company must try to impose a penalty that is appropriate for the facts of that case.  Therefore, each case will be reviewed on its own merits under the general guidelines set forth in this policy.

**INTOLERABLE OFFENSES**

Infractions of the following rules are considered intolerable offenses and in most cases are grounds for termination in the absence of extenuating circumstances.

1.    Insubordination-Refusal to follow reasonable orders or instructions of supervisor(s).

2.    Fighting on Company premises or intimidating or threatening a fellow employee or supervisor with bodily harm.

3.    Possession or use of firearms or weapons, non-prescription habit forming or illegal drugs, narcotics, alcoholic beverages on Company premises or in Company vehicles and/or resultant inability to perform normal duties due to being under the influence of drugs, narcotics, alcoholic beverages or other intoxicants.

D0171

| Title | Effective Date |
|---|---|
| **EMPLOYEE PERFORMANCE AND CONDUCT IMPROVEMENT POLICY** | 4/1/95 |

*The William Carter Company*

**Personnel Policies and Procedures**

MANUFACTURING & OPERATIONS

| Supersedes policies dated   6/1/94 and all other previous revisions | Page 4 of 6 |
|---|---|

Authorized by: Executive V.P. - Business Planning & Administration

Vice President - Human Resources

---

4.  Any drug related accident or repeated violation of safety rules, procedures or instructions.

5.  Refusal to submit to drug testing after a work-related accident; when negligence, demonstrated performance or lack of performance or unsafe practices suggest the probability of legal or illegal drug use; or during random drug testing.

6.  Tampering with or altering of the drug testing specimen so as to render it untestable or to distort the results will be grounds for termination and treated the same as a positive test.

7.  Unauthorized possession, use, or removal of Company property or another employee's property; unauthorized destruction or defacement of Company property or another employee's property.  NOTE: Examples of unauthorized possession of Company property or another employee's property include but are not limited to having it concealed at the possessor's work station, on his/her person, or in his/her automobile.

8.  Failure or refusal to cooperate with Company inspection procedures (which includes, but is not limited to, inspection of vehicles, purses, lockers, lunch boxes or other containers during the investigation of unauthorized possession, use, or removal of Company property or another employee's property or the possession of prohibited substances on Company premises.)

9.  Falsification of Company records including, but not limited to, employment applications or other documents presented by employee, production records and time cards or tampering with production or time recording devices, or falsification of information with willful intent to defraud for gain.

10. Leaving the facility during working hours without supervisor's permission.

11. Unauthorized access, or the attempt to access confidential Company files to include, but not limited to, computer, personnel and financial files.

12. Willful unauthorized release or discussion of confidential company information.

**CORRECTABLE OFFENSES**

Infractions of the following rules are considered corrective.

13. The violation of established safety, health or facility protection rules, including failure to report a personal accident or injury.

14. Failure to meet and maintain performance standards to include production or quality standards.

15. Excessive absenteeism and tardiness (see Absenteeism Policy).

16. Violation of the Company's posted rules on solicitation, distribution or collection of funds.

D0172

| Title | Effective Date |
|---|---|
| **EMPLOYEE PERFORMANCE AND CONDUCT IMPROVEMENT POLICY** | 4/01/98 |

| *The William Carter Company* | Supersedes policies dated  6/1/94 and all other previous revisions | Page 5  of 6 |
|---|---|---|
| **Personnel Policies and Procedures** | **Authorized by:** Executive V.P. Business Planning & Administration | |
| MANUFACTURING & OPERATIONS | Vice President - Human Resources | |

17.    Neglect of one's own work or interference with the work of a fellow employee (includes sleeping on the job [when deliberate, may be considered an intolerable offense], overextending breaks, failure to be at work station, etc.).

18.    Immoral or indecent conduct on Company property (including the use of obscene, threatening or abusive language).  Violation of sexual harassment policy.  (Depending on the circumstances, violation of the Company's sexual harassment policy may be deemed an intolerable offense which is grounds for termination.)

19.    Refusal to work assigned schedules including overtime.

IV.    RECORD OF PERFORMANCE AND/OR CONDUCT IMPROVEMENT INTERVIEW

A.    Verbal performance and/or conduct Improvement Interviews are appropriate, in most instances for first or infrequent infractions of rules which may be addressed by corrective counseling.

B.    Written performance and/or conduct Improvement Interviews may be given for more serious rules infractions, frequently repeated infractions (not necessarily of the same rule), or for misconduct which may be addressed by corrective counseling.

1.    Written records of Performance and/or Conduct Improvement Interviews are to be recorded on the "Record of Improvement Interview Form".  It is also suggested that a verbal performance and/or Conduct Improvement Interview be recorded on the form.  (NOTE:  Employee is not required to sign the documentation of a verbal interview.)

2.    The employee receiving a corrective interview will be counseled by the supervisor and will be asked to commit to a corrective course of action which will be recorded.  (NOTE:  When an employee disagrees with the supervisor's corrective course of action, the Personnel Representative must be notified so an appropriate course of action can be initiated.

3.    The Corrective Interview form contains space for the employee to write in any comments he/she wishes.  The employee should then sign the form to acknowledge receipt and review of the corrective interview and/or review of previous corrective interviews (if the employee refuses to sign, note on the form that "Employee Refused to Sign").

4.    The "Record of Performance and/or Conduct Improvement Interview Form" will be forwarded to the Personnel Department to become a part of the employee's record.

INTERPRETATION AND APPLICATION OF CORRECTIVE INTERVIEWS

A.    The normal corrective interview sequence will be applied to rules infractions regarding Performance.

D0173

| | Title<br>**EMPLOYEE PERFORMANCE AND<br>CONDUCT IMPROVEMENT POLICY** | **Effective Date**<br>4/01/98 |
|---|---|---|
| *The William Carter Company* | **Supersedes policies dated**   4/01/95<br>and all other previous revisions | **Page**<br>6 of 6 |
| **Personnel Policies and<br>Procedures** | **Authorized by:** Executive V.P. Business Planning &<br>Administration | |
| **Manufacturing & Operations** | Vice President - Human Resources | |

B.  The normal corrective interview sequence will be applied to rules infractions regarding Conduct (minor safety violations, overextending breaks, etc.).

C.  The normal corrective interview sequence for absenteeism will be applied as defined in the Absenteeism Policy.

D.  Corrective interviews will not be required in cases of intolerable offenses.

NOTE:  Each of the above are treated separately and should not be combined in the normal corrective interview sequence except as set forth in the section titled "Combining Corrective Interviews" in the notes at the end of the outline of this Policy.

VI.  RESPONSIBILITY FOR CONSISTENT APPLICATION OF POLICY

It is the responsibility of the Plant Personnel Representative, Plant or Staff Manager and Human Resources Representative together to carefully examine the circumstances of any employee's misconduct or performance deficiency in reviewing the appropriate action to be taken. Similarly, they are responsible for consistency in application of this policy for all employees. It is our policy to try to administer our policies properly and consistently, while keeping in mind the fact that each individual situation must be weighed by itself to determine if there are any significant extenuating circumstances.

VII.  SUSPENSION WHILE INVESTIGATING FACTS

When circumstances dictate that additional time is needed to further investigate the case prior to a final decision, the employee is to be suspended pending the outcome of the investigation and review of the findings by the employee's Supervisor, or Manager and the Human Resources Representative.

VIII.  REVIEW BY PERSONNEL BEFORE TERMINATION

In all cases pointing to termination, the Human Resources Representative or V.P. of Human Resources is to be contacted and he/she is to review the circumstances of the case before any termination becomes final. When circumstances dictate that additional time is needed to further investigate the case prior to a final decision, the employee is to be suspended pending the outcome of the investigation and review of the findings by the employee's supervisor, the Staff/Plant Manager, and the Human Resources Representative. No termination will be final without the approval of the Human Resources Representative or the Vice-President of Human Resources.

IX.  APPEAL PROCEDURE

In the event an employee believes a Company Policy has not been applied properly or consistently our internal "appeal procedure" is the exclusive remedy to bring the matter to the attention of higher management. Our internal "appeal procedure" will provide the employee with ample opportunity to present his/her position and demonstrate to higher management why he/she feels the decision being appealed was arbitrary and should be corrected. The employee's position will be given careful consideration by higher management in making the final decision.

We have attempted to cover only the most common rules consistent with good Management and Employee conduct. Any other conduct which is disruptive of the Company's business or to other employees will be viewed to be intolerable or correctable depending on the offense.

D0174

| Title  EMPLOYEE PERFORMANCE AND CONDUCT IMPROVEMENT POLICY | Effective Date 2/15/95 |
|---|---|

**The William Carter Company**

| Supersedes policies dated  6/1/94 and all other previous revisions | Page 7 of 7 |
|---|---|

**Personnel Policies and Procedures**

Authorized by: Sr. V.P.-Retail Stores & Administration

*David A Brown*

Vice President-Human Resources

*Paul Seal*

MANUFACTURING & OPERATIONS

employee is to be suspended pending the outcome of the investigation and <u>review of the findings by the employee's supervisor</u>, the Staff/Plant Manager, and the Employee Relations Representative.  No termination will be final without the approval of the Employee Relations Representative or the Vice-President of Human Resources.

IX.    **APPEAL PROCEDURE**

In the event an employee believes a Company Policy has not been applied properly or consistently our internal "appeal procedure" is the exclusive remedy to bring the matter to the attention of higher management.  Our internal "appeal procedure" will provide the employee with ample opportunity to present his/her position and demonstrate to higher management why he/she feels the decision being appealed was arbitrary and should be corrected.  The employee's position will be given careful consideration by higher management in making the final decision.

We have attempted to cover only the most common rules consistent with good Management and Employee conduct.  Any other conduct which is disruptive of the Company's business or to other employees will be viewed to be intolerable or correctable depending on the offense.

D0175

**Attachment 5**



S. Tate
EXHIBIT NO. 5
BRYANT-STINGLEY

Dear Human Resourses,

I think you should know about the things that go on here at
harlingen. The favuritism has gotten way out of hand.
There is no way that a person can be promoted here unless
they wear short miniskirts or do sex favers for Gary - the
perfect plant manager. Openings here are not posted and all
of us allowed to try out for them. Not here. Gary picks
whoever he thinks is the cutest or "easiest" for the job. I
guess those payoffs are real good.. Some of us more
qualified with longer service are not given a chance and the
ones laid off have not been treated with respect at all. A
person is given no notice, until the day before that there
position is being done away with and we are being moved to
sometimes a lower paying position. We have families and
children to take care of. We give you our service and we are
not even layed off in a respectful way. Unless of course
you are one of Gary's girlfriends then you can be moved
ahead of everyone else and given a raise. I hear that it
pays well to be his best friend too. Like David Chapa who
runs the cafeteria here and is allowed to cook and cater out
of carters kitchen for different places and serve us the
leftovers for another profit. I bet he and Gary have a sweet
little deal going there. And it only hurts we the
employees, the reason he even has a job. There is no
consideration from Gary for we employees. He did not even
attend 25 years service awards this year because he was
"sick", yet many of us saw the company truck at the plant
that evening so he must not have been that sick. We hear he
made the christmas party for the office and supervisors
becuz word here is that he gets a free weekend at the island
for taking our busnies there for the 2 year. Of course there
is something there for him. Our Christmas money drawing or
safety drawing as he calls it - he was not even here to hand
out gifts or tell one of us Merry Christmas. If it werenot
for Clara we probably would not have gotten a turkey either
but she knows some guy that gets them for us cheap- I'm
sure. At least she , the nurse and supervisors handed them
to us. That was the only merry Christmas we got from
managment. This man has no thought for employees. He is
always locked in his office smoking so that the entire fromt
office smells like cigarette and we hear usually David Chapa
is in there with him. Doing what who knows. Word out here
on the floor is he has a drug problem or they both have a
drug problem. But the rest of us wetbacks have to be drug
free. yeah right. Why don't you clean up his act first.
Maybe that is why he is so moody and avoids everyone but
David. The girls in the front or the recepchionist are not
allowed to go through the mail until he doesfirst and then
gives it to them. We guess he likes to go through others
maito check it out to. What is he looking for ? Others say
that he and david are hauling drugs to georgia on carter
trucks. What an idea. They probably dont have any problem
going through the chckpoint in our trucks. We wonder how

much he's getting paid.

No telling what can be found in that company truck - probbly thats why hardly anyone gets to use it. What is in there? He doesn't like to let our employees use it they say he tells them to use their own car and he will pay them for themiles. That is so nice of him. If it were not for company busines they would not be needing to use it. We never had that problem with Ms Lenora or Mr Vance. When he goes onvacation or trips he doesn't even leave it for the company use. Is that the way others managers are treated? They get a free company vehicle to drive with free gas, free everything and don't let the employees use it. He calls it His Truck. Where can we signup for that job? He also has the shop employees put together his kids christmas presents in the shop - can we bring ours to? I didnt know we got paid to do that. We all have plenty of our own work. Are we going to do his shopping next year? I guess carters is paying for his cell fone to. What a deal. We wonder how many calls are carters busines.

He is screening all the phone calls personals and others that come in. Supervisors say we can't get persnal calls only emergensy. If something happens to one of our children becuz of this we are going to get a lawyer quick. We think that the old phones from his other plant was put in so he could listen to us talk because there wasnt anything wrong with the other phones we had. But of course he will come up with a excuse and deniy it. The phone line makes a sound when it is being picked up. He thinks us wetbacks down here are stupid because we are brown. He's a prejudise. Except for the women he loves the women. Espesially the ones that are willing to do anythang to move up. Wait till one of them gets pissed off and sues carters.

He's got everything goin just right down here - don't you worry. He is taking care of himself good. What about therest of us? We dont ask for much. Just treat us fairely.

I wish someone up there will help us before it gets worse and don't let him smooth talk his way out like he always does. Please come down here and ask us. I dont think Mr. Whetsel Mr Farmer or Mr. Stutts are that kind of man to let this go on. He is a poor cheap person to reprsent the carter family name and values.

# Attachment 6

S. Tate
EXHIBIT NO. 6
BRYANT-STINGLEY

Nellie,

Do not trust Gary or Susan. I hope that you are here to look into all the things that are going on here. Everyone knows about the affairs Gary is having with Susan and Belinda. Everyone knows about the letter that was found in the ladies restroom and what it said. It is true. Have you heard that David Chapa is running his catering business thru Carter's. That he comes in here and cooks everything and then takes it to other businesses? Ask Gary he should know because he is probably getting a good share of the money. He thinks we do not know what is going on, well we do. We also know about the confrontation between Susan's husband and Gary. Gary thinks that people on the floor do not find out, but he is wrong we here everything right away.

And he is the worst manager we have ever had and we hope that something is done about it.

**Attachment 7**

**THE WILLIAM CARTER COMPANY**
**ELECTION FORM AND AGREEMENT FOR SEVERANCE PAY PLAN**
**HARLINGEN, TEXAS PLANT CLOSING**

**Date Distributed:  May 2, 2001**

**Distributed to:     Susan Tate**

**PLEASE READ CAREFULLY.  THIS FORM INCLUDES A RELEASE OF KNOWN AND UNKNOWN CLAIMS.**

**YOU SHOULD CONSULT WITH AN ATTORNEY BEFORE SIGNING THIS FORM.**

I acknowledge that a copy of The WILLIAM CARTER COMPANY SEVERANCE PAY PLAN (the "Plan") has been given to me.  I also acknowledge that the Plan has been explained to me to my satisfaction.  If I accept the severance payments of the Plan by signing this Election Form and Agreement (the "Agreement"), severance pay will be provided to me in the amounts and for the periods of time as determined under the Plan.  I understand that my election to accept the severance payments of the Plan will settle fully any and all claims I might have relating to my employment and to the termination of my employment with The William Carter Company ("William Carter" or the "Company").  I recognize that I am under no obligation whatsoever to accept the severance payments of the Plan, and that I may request a copy of this Agreement and delay my decision whether or not to accept for up to forty-five (45) days for any reason, including to confer with any lawyer or other advisor I may wish to consult.  By signing this Agreement, I confirm that I have obtained whatever legal or other advice I felt necessary.

I also acknowledge that I have received a document identifying the job title and age of each employee in the decisional unit, and whether or not each employee was selected for termination.  Additionally, I acknowledge that I have received an Employee Severance Summary, identifying the total severance compensation I am entitled to under the Plan in exchange for signing this Agreement.

In consideration of the severance pay offered me under the Plan, I hereby release and discharge William Carter, its subsidiaries and affiliates, and their employees, officers and directors, from all claims, liabilities, demands and causes of action, known or unknown, fixed or contingent, which I may have or claim to have against William Carter relating in any way to my employment or to the termination of my employment, and I covenant not to file a lawsuit asserting any such claims.  This release includes but is not limited to claims arising under federal, state or local laws prohibiting employment discrimination (including the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, and the Americans With Disabilities Act) or claims growing out of any legal restrictions on the Company's rights to terminate its employees.  This release does not have any effect on any benefits I may be entitled to receive under other employee benefit plans maintained by the Company or on any right or claim that may arise after I sign this Agreement.

I have carefully read and fully understand all the provisions of this Agreement, which, together with the Plan and Employee Severance Statement, sets forth the entire agreement between me and the Company.  I have not relied upon any statement or representation, written or oral, not set forth in this document, the Plan, or Employee Severance Statement.

Signed this ___2___ day of __May__, 2001.

_____
Employee Signature

_____
Print Name

**NOTICE:  YOU HAVE THE RIGHT TO REVOKE THIS AGREEMENT AND YOUR ACCEPTANCE OF SEVERANCE PAY.**
**TO EXERCISE YOUR RIGHT TO REVOKE, YOU MUST NOTIFY THE COMPANY IN WRITING OF YOUR DECISION TO**
**REVOKE WITHIN SEVEN (7) DAYS FROM THE DATE YOU SIGN THIS AGREEMENT.**

**ACKNOWLEDGMENT OF RECEIPT:** The employee has acknowledged to me that he/she has carefully read and fully understands each provision contained in this Agreement.

Received this __14th__ day of __May__, 2001.

By: _____
William Carter Company Representative

Signed Agreements should be returned to the Human Resources Department.

**Attachment 8**

# PERSONNEL ACTION FORM

| FULL NAME Susan Tate | JOB CLASSIFICATION Occupational Health Nurse | DIVISION Mfg | LOCATION #12 |
|---|---|---|---|
| ADDRESS | CITY, STATE, ZIP CODE | SOCIAL SECURITY NUMBER 450 51 7240 | HIRE DATE 4/9/97 |
| BIRTH DATE | TAX W/HOLDING STATUS | SEX | MARITAL STATUS | PRIOR SERVICE TIME | ADJUSTED SERVICE DATE |

Location: Hillsboro, TX

**INSTRUCTIONS FOR THE FOLLOWING SECTION** IF THIS FORM PERTAINS TO A NEW EMPLOYEE, ALL INFORMATION IN THE "NEW" COLUMN MUST BE COMPLETED. IF THE FORM PERTAINS TO A PRESENT EMPLOYEE, COMPLETE ONLY THAT INFORMATION WHICH REQUIRES A CHANGE IN THE EMPLOYEE'S RECORDS. THE EFFECTIVE DATE FOR ANY DEDUCTION SHOULD BE THE DATE THE FIRST DEDUCTION IS TO BE MADE.

## NEW HIRES & TRANSFERS

| | OLD | NEW | EFF. DATE | DEDUCTIONS | OLD | NEW | EFF. DATE |
|---|---|---|---|---|---|---|---|
| STARTING SALARY/WAGE | $ | $ | / / | LIFE INSURANCE | $ | $ | / / |
| DIVISION | | | / / | HEALTH INSURANCE | $ | $ | / / |
| PLANT | | | / / | UNITED FUND | $ | $ | / / |
| ACCOUNT NO. | | | / / | SAVINGS BONDS | $ | $ | / / |
| CLOCK NO. | | | / / | SAVINGS ACCOUNT | $ | $ | / / |
| EMPLOYEE STATUS CODE | | | / / | INA (IN-HOSP.) | $ | $ | / / |
| PAYROLL CODE | | | / / | A & S | $ | $ | / / |
| SHIFT NO. | | | / / | OTHER | $ | $ | / / |

## TERMINATION AND LAYOFF DATA

RESIGNED ☐ DISCHARGED ☐ EFFECTIVE DATE 5/11/01 LAST DAY WORKED 5/11/01 WAGES PAID UP TO 5/11/01 ___ A.M. P.M.

RETIREMENT ☐ OTHER ☑ Plant Shut Down (Layoff)

PLUS VACATION ALLOWANCE FOR 10 DAYS UP TO 5/25/01 PLUS ADDITIONAL VACATION ALLOWANCE FOR ___ DAYS UP TO ___

WAS EMPLOYEE OFFERED ANOTHER JOB? ☐ YES ☐ NO

DATE OFFERED / /

ELIGIBLE FOR REHIRE ☑ YES ☐ NO • ☐ CONDITIONAL •

EXPLAIN FULLY IN REMARKS SECTION REASON FOR ALL TERMINATIONS AND LAY-OFFS.

| RATING FACTORS | EXCEEDED | FULLY MET | PARTIALLY MET | DID NOT MEET | RATING FACTORS | EXCEEDED | FULLY MET | PARTIALLY MET | DID NOT MEET |
|---|---|---|---|---|---|---|---|---|---|
| PRODUCTION | | | | | ADHERENCE TO WORK RULES | | | | |
| QUALITY | | | | | | | | | |
| ATTENDANCE | | | | | OVERALL RATING | | | | |

## LEAVE OF ABSENCE (MUST BE REQUESTED IN WRITING) (TO BE ACCOMPANIED BY PHYSICIAN'S STATEMENT IF MEDICAL)

TYPE OF LEAVE: _____ BEGINNING DATE / / ENDING / / RETURNED TO WORK ON / /

## SALARY WAGE ADJUSTMENT DATA

| | EFF. DATE | JOB CLASSIFICATION | GRADE | % INC. | TYPE | INCREASE AMOUNT | RATE OF PAY WK MO YR |
|---|---|---|---|---|---|---|---|
| PREVIOUS | / / | | | % | | $ / | $ / |
| PRESENT • | / / | | | % | | $ / | $ / |
| PROPOSED • | / / | | | % | | $ / | $ / |

• PRESENT GRADE: MIN $ | POSITION $ (JOB WORTH) | MAX. $

• PROPOSED GRADE: MIN $ | POSITION $ (JOB WORTH) | MAX. $

| | BUDGETED | | EFFECTIVE DATE OF SALARY/WAGE ADJUSTMENT |
|---|---|---|---|
| | AMOUNT | DATE | |

## REMARKS

REMARKS (• EXPLAIN FULLY IN THIS SECTION):

Please pay: Severance = $3910.40 (4 weeks) 6/22/01

Retention Bonus = ~~XXXXXXXXX~~ $6354.40

PERFORMANCE RATING

D0001

## APPROVALS

| PROPOSED BY | DATE | APPROVED DATE 5/23/0 | APPROVED DATE | APPROVED DATE | APPROVED DATE |
|---|---|---|---|---|---|

**EMPLOYEE STATUS CODES**
- NP – NEW POSITION
- R – REPLACEMENT
- HE – HOURLY EMPLOYEE
- EX – EXEMPT
- NEX – NON-EXEMPT
- RG – REGULAR
- T – TEMPORARY
- PT – PART TIME

**PAYROLL CODES**
- N – NEEDHAM PAYROLL
- F – FACTORY PAYROLL

**SALARY/WAGE TYPE**
- M – MERIT
- P – PROMOTION
- D – DECREASE
- O – OTHER ADJUSTMENTS (EXPLAIN IN REMARKS SECTION)

**Attachment 9**

*ent by E-mail*
*CC: Dave Brown*
*President Human Reso.*
*William Carter Co.*
*Fred Rowan*
*CEO William Carter C.*

TO:    **Clyde Stutts**
       *V.P. Human Resources*
       *William Carter*
FROM:  **Susan Tate**

RE:    **Gary Butts**

Three or four months after Mr. Butts took over the plant manager position in Harlingen an anonymous letter concerning his favoritism to Clara Perez was received in personnel in Griffin and forwarded to him for him to see. After reading the letter he called Clara Perez, Connie Mejia, and myself into his office and closed the door. He read the letter to us and asked if we knew who wrote it and he said that he was going to find out who wrote it and make sure that he fired them. Out on the floor and in the office he let every one know that he and Charlie Whetzel were friends and led people to believe that he was untouchable.

By the time he had been here six months he took the liberty of calling my home phone when he was away at a couple of plant manager's meetings (without my permission), to ask how was everything going at the plant? I wondered why he was calling me at home as I am not involved in production or production management.

Then a month or so afterwards he broke his arm and called our home phone and got my husband's pager number off the phone message on the answering machine. He paged him and asked him to bring him some pain medication to the hospital Emergency Room. We wondered why he calling us . There again we felt obligated because of his authority so my husband and I dropped off some medication. A couple of weeks later he called our home, left a message because we were out and paged my husband again because his kids were sick and he needed some medication for vomiting. My husband and I dropped off some phenergan suppositories that we keep on hand for our children.

The next thing we knew he was calling my husband about selling his van, being that my husband had previously owned a Ford Dealership. My husband returned his phone call to his cell phone after getting his page and no one answered the phone. Then ten minutes later Connie Butts, his wife, called my husband's cell phone and asked if he had just called Gary's cell number. My husband stated yes, he had just paged him to this number. She wanted to know who he was and he told her and she said Gary wasn't in at the time. My husband turned to me and said this is very strange that she is checking who is calling his phone. My husband and I then discussed and agreed and reiterated why is he calling us. We do not want to be that personable with them. My husband stated he didn't know him and didn't want to get to know him and could not understand why he kept calling us. My husband and I did not know how to tell him without it offending him and affecting his attitude towards me at work due to what I had seen go on in the workplace.

S. Tate
EXHIBIT NO. 1
BRYANT-STINGLEY

During this time I knew that Nora Barrios, Sr. Cost Analyst had complained to Nicole Peyton about Gary sending in his Harlingen Country Club membership dues to Shelton for payment. When she brought it to Nicole Peyton's attention and Nicole questioned Gary he began to treat Nora Barrios badly and her first merit review after his arrival reflected that because she told everyone that she went from an exceeded rated job performance to needs improvement when rated by him due to his retaliation against her for doing her job. She has performed the same job for many years.

A few months later while Gary was in Griffin at a manager's meeting, he called the plant around 4:30 p.m. Harlingen time and I answered the phone. He said "How are things there?" " How is Clara?" I said, " fine". Then he said, "You know, the other day Clara told me that the reason that you and your first husband divorced is because he caught you and Brett together in bed ". I was shocked, embarrassed, and so mad I could not think straight by his remarks. I replied that is a lie! He asked me questions and I felt like I should reply and defend myself. Knowing all along it was none of his business but I felt embarrassed and humiliated. "What type of person do you think I am," I replied. All he would reply was , "Oh, now I've gone and upset you". I ended the phone conversation. My husband walked in at this time to pick me up and overhead what I was saying and immediately noticed that I was upset. Then my husband immediately called Gary's cell phone number and asked him why he was discussing personal matters that were none of his business , and none of the William Carter Company's business and he replied, " What do you mean?" My husband then told him what I had said and what he had heard and Gary tried to deny the conversation at first. My husband replied don't even try to lie to me. The he proceeded to admit that he was just trying to let me know what Clara had said. My husband stated that it was none of his business, and I knew what type of person Clara was and the question he had asked me did not have anything to do with the William Carter Company or my job duties and did not warrant an explanation. My husband then threw it back into his lap and said let me call your wife and ask her personal information concerning you and hers personal life –how would you feel? My husband asked him, "What kind of plant manager are You?" All you are trying to do is stir up trouble and wanting my wife to reply to your question which is none of your damn business. He knew that Clara and I had to work together. My husband told him that he was going to ask Clara Perez if she had said these false and rude comments about me. Gary blew up. He informed my husband that he was the plant manager and Harlingen was his plant and he would do things his way. He told my husband that he was never to come into the plant again and Brett replied ,"I don't know who you think you are but I don't think that you can keep me from picking up my wife for lunch or at the end of the day". My husband told him never to call our house or my pager, or my cell phone again. Brett then told him that I was there to do my job and that was it and that we did not want to be friends. We tried to keep it on a business level and he kept calling and no matter what we did it was never enough.

I was going to quit my job, however; my husband had had numerous surgeries and had just recently fallen out of a tree and broken all of his spinal transverse processes in his spinal column and we needed my insurance to cover the ongoing medical treatment.

A few days later when Gary arrived back at the plant he tried to apologize and said that he had said things that he regretted saying. My husband left it at that and did not pursue asking the question of Clara Perez. But like in the past it was never good enough.

When my husband called me to pick me up for lunch or to bring me something Gary always made it a point to be in my office or to go back to my office when he arrived. A day or so later he would say to me,"Did I upset yall ". Gary knew when my husband was coming over because he always telephoned me before he came by and Gary had the habit of listening to our personal phone calls. We noticed the clicking on the phone line when he picked up the line. Then numerous times he inadvertedly repeated what we had talked about. It was well known in the plant that he listened to everyones personal phone calls and even confirmed by Arnold the phone technician from ADT at the very end when the plant was going to close when he came to repair a broken line.

I felt uncomfortable at work because I did not want to be the only one working there in the afternoon with him there by myself. I called my husband to come pick me up and went outside and waited for him and there again Gary came outside so he could be outside with me with a big smile on his face when my husband picked me up. My husband had had enough he told me that he was going to call Lawson and tell him what was going on down here. I told him that because I knew of the numerous complaints about Gary that were sent to Griffin and there was never anything done that I would just be another statistic. I knew if he called Lawson that Gary would lie and do whatever he could do to make sure that he had me replaced and what would we do right now without my medical insurance. Brett always wanted to confront Gary but never ran into him off of Carter's property. Gary knew what he was doing. He was trying to provoke my husband into an altercation on William Carter property so he could deny Brett access into the plant or to pick me up. Brett and I had an argument over this one night and Brett called Gary up at 10:30 p.m. on that Friday night and asked him if he would come out of his house and settle this matter. Gary replied, "I don't know what you are talking about". Like always one lie after another. Time went on and the same things happened. There was all but one time when my husband was arriving at the plant that Gary was not in my office or came to my office. Like in the past he was going to show us. Then the anonymous phone calls became 6 or 7 calls at our house daily. This played hell on our family life and scared our children. The same pattern every time, he would call, we would answer, he would listen and hang up. He also called my cell phone and did the same thing. This continued for over a year and a half until my husband went down to Southwestern Bell Mobile systems and asked for the cellular records of incoming phone calls on my cell number and my husband's cell number. We found out that we could not obtain our personal phone records due to past legal complications at Southwester Bell Mobile systems without a legal supoena. All the time we wanted to change our phone numbers but with my husbands business and my case management business we felt that everyone knew our cell numbers and that is how we were contacted. My husband then took a different avenue and approached his friend, the manager, and after he had gone to the store at eleven p.m. in my vehicle and Gary had called my cell phone and Brett recognized Gary's disguised voice. Brett then went down to Southwestern Bell Mobile Systems and prior doing so Gary had called it again the next day and my husband

happened to be in my vehicle because I was home sick. Brett and the manager of Southwestern Bell Mobile went to the Central office and verified that it was the William Carter Company plant cell phone assigned to Gary Butts that was making the anonymous calls to my cell phone.

Brett came home, told me the news and called Connie Butts and informed her of what had been going on, the phone calls, the problems in the past, his question regarding our personal sex life, etc, and she was embarrassed and said she would talk to him when he got home. She also informed me that he had told her that he was on his way to Mexico with Connie Mejia and that she would talk to him when he came home. We knew that Gary had lied to her because Connie Mejia had left for Chile 2 days prior to that.
Brett told her that the reason for this phone call was that it had better stop or our next step was to call Lawson Farmer, Clyde Stutts, Dave Brown, and Fred Rowan and we knew that it was going to effect their whole family, not just Gary. Two weeks later Carters had their Annual Family Picnic – Brett finally met up with Gary outside of the pavilion and confronted him and asked him if he had had enough. He admitted to making the phone calls and tried to tell Brett that it was a mistake and my husband told him that he need not to start his lies again. The whole time that we were at the company picnic he stared at my husband and I and made us feel very uncomfortable so we exited early.

Prior to the picnic after my husband called Connie Butts, the retaliation against me in my workplace began. Connie Mejia and I were assigned by Alejandra Baillon to manage and organize the company picnic. Connie M. and I had discussed going to pick up more supplies for the company picnic and when Connie called to inform Gary that we were going to pick up piñatas and more supplies he informed Connie that she and I were not to leave the plant that he would get piñatas himself in a very ugly tone of voice and I knew right then and there why and what was going on but I did not tell Connie what had been going on with Gary Butts. She was very upset and replied to me, Fine!, he can do it himself, and she did not even attend the picnic.

Then there was an anonymous letter about Gary found in the ladies restroom on the sewing floor. A week or two later Nellie Askey came down, unannounced about why she was coming, and spoke with numerous employees including Connie Mejia. All the while Gary was walking in on some of the conversations and hanging out outside the door to see who went in and out of the conference room. Connie later called me after Nellie had left and told me that Nellie had asked her questions and Gary had seen her coming out of the conference room and gave her an ugly look. A couple of days later in the afternoon I was on the phone and Connie Mejia came into my office and looked very pale and shaky. I said what is wrong? She said he threatened me. He went into her office when she was alone and he asked her," What are you up to ? She replied, "Nothing". He told her," I know what you are up to and I am going to get your ass!! " She went home and called Her supervisor Steve, who told Her to stay away from him that he, Gary, was dangerous. Steve told her to go back the next day and pack up her things from her office and she could work out of her home but to not go back to the Harlingen plant after that. She called Lawson Farmer and Nellie Askey to inform them of what had happened. There

again nothing was done.  The innocent employee was retaliated against and Gary got away with it.

During that same time period Michelle Gil, the receptionist for the past three years was demoted down to sewing machine operator due to the phone conversation that she had with Gary's wife when Gary's wife called up to the plant looking for him.  Gary told Michelle that his wife had called and her van had broken down and he was going to be out the rest of the day to pick her up and fix the van.  Soon after he left Connie Butts called the plant looking for Gary and Michelle replied , "He is on his way to pick you up". Not knowing that Gary had lied to her about  his wife's van being broken down. He arrived back at the plant several hours later, took Michelle in his office and closed the door and let her have it.  He approached Michelle on a personal level and told her that he and his wife were having problems etc. and Michelle was very upset about it and went home and told her husband, Roman Gil , who also worked at Carters.  Roman went into Gary's office and confronted him  about getting personal with his wife and knew where he was going with this line of talk and Roman told him that he should not put Michelle into the middle of his lies and problems with his wife and they did not want to know about his personal problems or be on a personal level with him.  I knew that Michelle was upset about being demoted and I knew that she had written a long exit interview report and had called Nellie Askey because she had not been allowed to apply for the two other job positions that were open because Gary would not let her.  I did not know the real reason behind Michelle's demotion until later  after the plant closed because she was afraid to tell anyone at the plant, including her mother, who was a supervisor,  because she feared that Gary would  retaliate against her more.  Her husband quit his job and left Carters because of the daily conflicts with Gary.  There again nothing was done.

Soon after that I was approached by friends of ours that went to the Baptist Church with Gary and Connie and asked if I would consider working for them since Gary had told them at church that the plant was going to close soon.  I replied that I was not aware of that.  I  got up my courage to call Griffin to ask and tried to call Lawson Farmer, however, he was not in,  I did get to speak with Tammie Merritt, Dir. Of  Human Resources about what I was told and she informed me not that she knew of but she would ask you, Clyde Stutts, and call me back.  She called you,  and told you about her and my conversation and you in turn called Gary Butts within 5 minutes and told him what I had said.  Within ten minutes of my first call Gary Butts called my desk outraged and wanted to know why I had called Griffin etc..  I was scared and I immediately left the plant and went home.  Upon arriving home I had three messages on my home phone from Tammie Merritt  requesting that I call her back because she was concerned about me. She left her home phone number on my answering machine.  She later called me back and apologized and said that she was sorry, she did not want me to think that she had given Gary Butts my name or told him what I had said , but that you, Clyde Stutts had. She also said she knew how Gary was and to what extreme he would take things and she mentioned that she knew about him listening to the phone conversations at the plant so she called me at home.  I knew from my previous trips to the Missis. Plant that he had banned her from coming back to his plant based upon a personal confrontation also.  This confirmed what had been happening and what I though all along.  If I complained or said

something nothing would have ever been done but the retaliation would have been against me.

Clyde, after knowing all of the complaints about Gary Butts, the anonymous letters, the complaint from Pat Castro concerning Gary trying to get her drunk so that could go into her hotel room, Nora Barrios complaints, Connie Mejia's complaint, Nicole Peyton's complaint, Tammie Merritts experience, Michelle Gils' complaint, Roman Gils complaint, and Gary's retaliation and mental instability and his inability to tell the truth WHY WOULD YOU GIVE HIM MY NAME? WHAT DIFFERENCE DID IT MAKE WHO SAID IT? ALL YOU DID WAS SET ME UP FOR THE KILL WITH GARY WHILE YOU ARE UP THERE 1500 MILES AWAY AND HE IS HERE UNSUPERVISED. YOU WANT TO KNOW WHAT THE STRAW WAS THAT BROKE THE CAMELS BACK ? IT WAS YOU AND YOUR LACK OF ABILITY TO KEEP MY QUESTIONS AND COMMENTS TO YOU CONFIDENTIAL...THINGS GOT WORSE FOR ME DAILY AND I CALLED YOU ON YOUR PHONE AND LEFT A VOICE MAIL ASKING YOU TO CALL ME BACK AND YOU MUST HAVE FELT LIKE IT WAS NOT THAT IMPORTANT BECAUSE YOU DID NOT RETURN MY CALL FOR TWO WEEKS. WHEN YOU DID RETURN MY CALL YOUR RESPONSE TO ME WAS " I TOLD GARY THAT HE SHOULD NOT BE UPSET WITH YOU!" WHAT KIND OF ANSWER IS THAT KNOWING WHAT YOU KNOW ABOUT GARY?

As per our phone conversation of July 12, 2001, at which time you told my husband and I that you are on our side ....Actions speak louder than words! What does it take for Carters to take action? My last three months at Carters were pure hell and I never had a comfortable moment. I changed my working hours and came in earlier and left earlier just to avoid being around Gary. I felt more threatened and uncomfortable as the days went by and I felt that he was working up to the Grand Finale. When he sent me that last E-mail informing me that I had to come in the following day on Thursday and I knew that there would be no SMO's there,( Nellie had told me we would be working Mon,Tues, and Weds. Of every week only until shutdown ), I knew that he had something planned for me because I was the only one affected by the E-mail, but there again I had no one to call to tell because I was afraid for my life and my family's lives. You had shown me that I could not trust you. I had no choice but to call Nellie Askey, my supervisor, on Thursday and tell her that I needed to speak with her about an very important matter as soon as possible and that I was unable to return to the Harlingen plant and would discuss this matter with Dave Brown only and only after Gary Butts and his family had been moved from this state because I felt that if I came forward at that time with the information that maybe there would have been a chance that he would not have been relocated back to Griffin and would have been left here in Harlingen for all of us to have to continue to deal with and worry about. I want to let you know that the following Monday when Nellie went to the plant after she told Gary that I would not be returning to the plant for personal reasons and Dave Brown was aware and had approved, we have not received another anonymous phone call at our home phone to this day . I am aware that Gary was quite bothered by my not returning to the plant and continued to question Nellie about what my personal reasons were until she finally told him that I did not report

to him but to her and she was satisfied with my reasons at this time. She told him that I would be finishing up my work at home and he commented that it was not fair to the other employees that I be allowed to work at home, I should have to come in just like everyone else. He was going to show me until the very end.

As for my cell phone and the anonymous calls to my cell phone, they stopped after my husband had my number changed after he confirmed that it was Gary making the anonymous phone calls.

As per my information concerning Michelle and Roman Gil, I heard from a very reliable source that they had experienced the same problems with Gary and I touched base with them not knowing the shocking similarity of the two.

Nellie Askey contacted me letting me know that Gary and his family had moved and asked me if I still wished to speak with Dave Brown and Clyde Stutts and I replied," Yes!" She informed me that Dave had asked her to obtain two or three times that would be convenient for my husband and me to attend a conference call and I informed her that we could work around Dave Brown's schedule so she said she would call me back later to give me a date and time for the call. She called me back and I wrote down the date and time. She called me back two hours later and changed the date and time due to Dave or your inability to attend at that time. Amy, Dave Brown's secretary called me to reschedule the day before the then rescheduled call and rescheduled again due to Dave tied up. On the day before this conference call on July 11, 2001 Amy called that afternoon and told me that our meeting still was not confirmed with Dave and she would call us back in the morning and let us know for sure. Amy called the morning of July 12, 2001 and confirmed that we would have the conference call as planned. At 1:00 p.m. You ,Clyde, called us and informed us that Dave Brown was unable to attend due to a meeting. But informed us that you would be conducting the meeting yourself and taking notes and of course Dave Brown may call us back with questions. My husband and I did not feel comfortable discussing this matter with you Clyde and told you so because of the lack of confidentiality from the past incident.

This letter confirms what I thought all along – Those who speak up face retaliation alone.

Now that he is up there in Griffin you will finally get to see the real Gary Butts.

I approached Mr. Butts and asked him to stop calling my cellular phone, pager, and home phone and leave my family alone and he insisted that he was not calling my phones. I informed him that we were having all calls traced and that I did plan to press charges. The calls continued , but, this time he went and bought a calling card to call our home phone with so that the caller ID service and tracing service could not trace the calls. My cell phone number was changed to deter him. My husband and I did inform Mrs. Connie Butts of Gary Butts' actions and asked that she please speak to him about at as we knew that she and her three children are dependent on him due to him being sole provider. She indicated that she was not aware of these happenings and was upset about the situation and would speak with him about it when he got home. She informed us that he was currently away from the plant because he and Connie Mejia were on their way to Mexico however; we knew that Connie Mejia had left for Chile two days earlier. During that conversation we also informed her that he was listening to our private phone calls.

My husband occasionally dropped me off at work and we occasionally had to switch automobiles and my husband would always telephone me beforehand to let me know when he would be there so he would not interrupt any patient care or my work. Mr. Butts would listen to our personal phone calls and would make it a point to be either in my office when my husband got there or he would walk when he got there – just to harass me and cause problems between my husband and I. Then the next time he saw me alone he would say "I didn't get you in trouble did I?" and just snicker. One time we were bidding on a real estate purchase and because of the phone situation did not want to talk over the phone so my husband came to my office

# Attachment 10



S. Tate

EXHIBIT NO. 3

BRYANT-STINGLEY

September 24, 2001

Fred Rowan
CEO
William Carter Company
First Shelton Place
1000 Bridgeport Avenue
Shelton, Ct. 06484


Mr. Rowan:

In regards to my previous E-Mail to you, Dave Brown, and Clyde Stutts concerning the sexual harassment which was perpetuated by Gary Butts in the Harlingen, Texas plant toward me and my family.   I have been informed by legal counsel that I have the ability to breach my severance plan pay agreement with regard to my emotional and mental status at that time which is well documented by my physician..  I have obtained the phone records with proof of the harassing phone calls and I have completed the Texas Human Rights Commission allegation forms as well as the EEOC Information forms regarding all incidents of sexual harassment . Before I retain legal representation I would like to know if The William Carter Company is willing to mediate these issues with me and if so, how you are going to compensate me and my family for the trauma that we endured at the hands of Gary Butts for two and one-half years?

If I do not receive a written response from you by October 12, 2001 I will assume that you are unwilling to mediate and will retain legal representation.


Sincerely,

Susan Tate

Susan Tate

**Attachment 11**

Carter's Atlanta
1170 Peachtree Street
Suite 900
Atlanta, GA 30309
Ph: 404.745.2700

October 3, 2001

Ms. Susan Tate
2925 Jacaranda
Harlingen, TX 78550

Dear Ms. Tate:

We have received your letter dated September 24, 2001 to Mr. Fred Rowan, CEO. In
your letter you express allegations of sexual harassment against you by Mr. Gary
Butts. Frankly, we are very surprised to hear about these new allegations.

You had previously complained that Mr. Butts had made telephone calls you felt
were inappropriate and had taken actions you felt were retaliatory, and provided us
with information concerning these events. We undertook an immediate investigation
of these matters, and during the course of our investigation, we contacted you on
several occasions to request further information regarding your complaints. During a
telephone conversation on July 18, 2001 you instructed me not to call you again.
Nellie Askey called you subsequent to that conversation to confirm Mr. Butts'
telephone number and you reminded her that you had given me instructions not to
call you.

Again, we need your cooperation in order to investigate these new allegations of
sexual harassment. We request that you provide us with specific dates and factual
information about the sexual harassment incidents, and copies of the telephone
records mentioned in your letter. This information should be mailed to my attention
at our new office address at 1170 Peachtree Street, Suite 900, Atlanta, GA 30309.

We are concerned about your welfare and the allegations of sexual harassment, and
we will definitely investigate these new issues once we have received the requested
information. Obviously, since we had no knowledge of these issues, we do not feel
that we are in a position to mediate the allegations you are now making.

Regards,

Clyde D. Stutts, PhD
Vice President Human Resources

S. Tate
EXHIBIT NO. 4
BRYANT-STINGLEY

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| SUSAN TATE, | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. B-02-103 |
| | ) | |
| v. | ) | |
| | ) | **AFFIDAVIT OF** |
| WILLIAM CARTER COMPANY, | ) | **JAMES M. POWELL, ESQ.** |
| | ) | |
| Defendant. | ) | |
| | ) | |

1.    My name is James M. Powell.   I am currently employed by the law firm of Haynsworth Baldwin Johnson & Greaves LLC as an attorney.  I am licensed to practice law in the States of North Carolina, South Carolina, and Alabama.

2.    Defendant The William Carter Company retained me and my firm to defend it against the claims brought by Plaintiff Susan Tate in the above-captioned lawsuit.  I am the Attorney in Charge for Defendant, admitted <u>pro hac vice</u> to practice before this Court on June 17, 2002.

3.    This lawsuit was filed on May 17, 2001.  Since that time, my firm has devoted significant time to the defense of The William Carter Company against Plaintiff's allegations in this lawsuit.

4.    Attached hereto as Attachment 1 is a true and accurate copy of a report of the attorney's fees charged to The William Carter Company in this case as of November 20, 2002. This report was created and maintained by my firm in the course of its regularly conducted

1

business activity. These fees represent legal work that was necessarily conducted in the defense of this lawsuit.

5.    Attached hereto as Attachment 2 is a true and accurate copy of a report of the expenses charged to The William Carter Company in this case as of November 20, 2002. This report was created and maintained by my firm in the course of its regularly conducted business activity. These expenses were necessarily incurred in the defense of this lawsuit.

6.    As this case is ongoing, additional fees and expenses have been, and are continuing to be, incurred since November 20, 2002. However, these fees and expenses are capable of easy and reliable ascertainment in the form of reports such as those attached to this affidavit.

7.    After receiving Plaintiff's Complaint, I prepared Defendant's Answer and Counterclaim. In the Counterclaim, Defendant seeks to recover damages caused by Plaintiff's breach of an agreement releasing Defendant from any legal claims Plaintiff may have had against Defendant and covenanting not to bring suit over them. Defendant alleges that Plaintiff's lawsuit in this matter is a breach of that agreement.

8.    This Answer and Counterclaim was timely filed in the United States District Court for the Southern District of Texas, Brownsville Division, on June 11, 2002. Plaintiff was duly served on that same day, June 11, 2002.

9.    As of today, Plaintiff has not served a Reply to this Counterclaim upon me, nor has she filed a Reply with the Clerk of the United States District Court for the Southern District of Texas, Brownsville Division.

I, James M. Powell, am over the age of eighteen and competent to give this affidavit.

Under oath, I depose and state that I have read the foregoing affidavit and that the statements

contained in it are true and correct based upon my personal knowledge.

Dated this the __25th__ day of November 2002.

James M. Powell, Esq.

Sworn to and Subscribed before me this
the __25__ day of __November__ , 2002.

_____
Notary Public

My Commission Expires: __12-10-05__

DEIRDRE M. STALEY
NOTARY PUBLIC
RANDOLPH COUNTY, NC
My Commission Expires 12-10-05

3

**Attachment 1**

```
PROGRAM: GENIRG-2053620                                 HAYNSWORTH BALDWIN JOHNSON & GREAVES                           PAGE: 1
SESSION: RP-IRG/24462/2                          Client/Matter Timeslip Report 1 Sorted by Employee, Date, Code        DATE: 11/20/02
REPORT : CMTSLIP1-15915                    All Timeslips with Effective Dates From: 05/17/2002 To: 11/20/2002          TIME: 14:18:58
```

| Client/Matter Employee | Date | Code | Billed | Hours | Rec. Amount | Description |
|---|---|---|---|---|---|---|
| 643850 The William Carter Company | | | | | | |
| 020 Susan Tate, C.A. # B-02-103 | | | | | | |
| 0016 | 05/28/02 | | Yes | 1.00 | 245.00 | Legal review of complaint and file information relating to charge of discrimination. |
| 0016 | 06/10/02 | | Yes | 1.00 | 245.00 | Preparing answer to complaint. |
| 0016 | 06/19/02 | | Yes | 1.50 | 367.50 | Legal review of file materials on case. |
| 0016 | 07/25/02 | | Yes | .80 | 196.00 | Preparing Rule 16 discovery plan. |
| 0016 | 08/02/02 | | Yes | 1.30 | 318.50 | Preparing interrogatories and requests for documents. |
| 0016 | 09/05/02 | | Yes | 1.00 | 230.00 | Outlining issues for deposition of Plaintiff. |
| 0016 | 09/11/02 | | Yes | .80 | 184.00 | Preparing documents for Plaintiff's deposition. |
| 0016 | 09/15/02 | | Yes | 5.70 | 1,311.00 | Legal review of file materials and documents relating to Plaintiff's complaints of harassment. Preparing for Plaintiff's deposition. |
| 0016 | 09/16/02 | | Yes | 9.00 | 2,070.00 | Preparing documents for Plaintiff's deposition. Taking deposition of Plaintiff. Outlining issues for follow up. |
| 0016 | 09/17/02 | | Yes | 11.00 | 2,530.00 | Taking deposition of Plaintiff and legal review of documents produced by Plaintiff. |
| 0016 | 09/18/02 | | Yes | 1.90 | 437.00 | Preparing summary on status of case. Conference to review issues for summary judgment. |
| 0016 | 09/19/02 | | Yes | 2.20 | 506.00 | Preparing status report to Company. |
| 0016 | 09/24/02 | | Yes | 1.20 | 276.00 | Telephone conference with C. Stutts about status of lawsuit. Telephone conference with L. Long about issues involving insurance coverage of claims. |
| 0016 | 10/07/02 | | Yes | 2.00 | 460.00 | Outlining issues for summary judgment. Legal review of tape transcript of telephone conference between C. Stutts and Plaintiff and her husband. |
| 0016 | 10/09/02 | | Yes | 1.70 | 391.00 | Preparing outline for summary judgment. |
| 0016 | 10/15/02 | | Yes | 1.40 | 322.00 | Preparing information to support summary judgment. |
| 0016 | 10/28/02 | | Yes | 2.10 | 483.00 | Preparing statement of facts for brief in support of summary judgment. |
| 0016 | 11/17/02 | | No | 1.00 | 230.00 | Preparing brief in support of summary judgment. |
| Total 0016 JM Powell | | | | 46.60 | 10,802.00 | |
| 0072 | 06/04/02 | | Yes | 1.00 | 200.00 | Review of complaint and revision of answer. |
| Total 0072 DR Hamilton | | | | 1.00 | 200.00 | |
| 1047 | 06/03/02 | | Yes | 1.10 | 126.50 | Reviewing case file in preparation for filing answer. |
| 1047 | 06/04/02 | | Yes | 5.30 | 609.50 | Preparation of answer and counterclaim. |
| 1047 | 06/05/02 | | Yes | .30 | 34.50 | Preparation of answer. |
| 1047 | 06/07/02 | | Yes | 2.00 | 230.00 | Preparation of answer and counterclaim. Legal research regarding attorneys' fees as damages under Texas law. |
| 1047 | 06/10/02 | | Yes | 1.60 | 184.00 | Preparation of joint scheduling/discovery report. Legal research regarding pro hac vice admission and form of pleadings under local court rules. |
| 1047 | 06/19/02 | | Yes | .40 | 46.00 | Legal research regarding pre-trial scheduling under local rules. |
| 1047 | 06/28/02 | | Yes | .50 | 57.50 | Preparation of correspondence to pro se plaintiff requesting |

```
PROGRAM: GENIRG-2053620                          HAYNSWORTH BALDWIN JOHNSON & GREAVES                                    PAGE: 2
SESSION: RP-IRG/24462/2                       Client/Matter Timeslip Report 1 Sorted by Employee, Date, Code           DATE: 11/20/02
REPORT : CMTSLIPI-15915                     All Timeslips with Effective Dates From: 05/17/2002 To: 11/20/2002         TIME: 14:18:58
```

| Client/Matter | Employee | Date | Code | Billed | Hours | Rec. Amount | Description |
|---|---|---|---|---|---|---|---|

643850 The William Carter Company (Continued)
  020 Susan Tate, C.A. # B-02-103 (Continued)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1047 | 07/05/02 | Yes | | 1.30 | 149.50 | Rule 26(f) conference. Preparation of correspondence to EEOC requesting Plaintiff's file under FOIA. Preparation of memo to file summarizing time line of events in the case. |
| | 1047 | 07/08/02 | Yes | | 5.20 | 598.00 | Preparation of correspondence to Texas Commission on Human Rights requesting a copy of Plaintiff's file. Preparation of memorandum summarizing chronology of events in Plaintiff's employment. |
| | 1047 | 07/16/02 | Yes | | .40 | 46.00 | Telephone conference with pro se Plaintiff regarding Rule 26(f) conference and report. |
| | 1047 | 07/22/02 | Yes | | 1.40 | 161.00 | Preparation of case status summary for client. Preparation of joint discovery/case management plan. |
| | 1047 | 07/23/02 | Yes | | 1.40 | 161.00 | Preparation of proposed joint discovery/case management plan. Preparation of correspondence to Plaintiff regarding same and seeking schedule for Rule 26(f) conference. Reviewing local court rules on pro hac vice admission. Preparation of motion for pro hac vice admission (JEP). |
| | 1047 | 07/24/02 | Yes | | 1.10 | 126.50 | Preparation of correspondence to local counsel regarding filing of motion for pro hac vice admission (JEP). Reviewing and revising joint discovery/case management plan per Plaintiff's proposals. Preparation of correspondence to Plaintiff regarding same. |
| | 1047 | 07/26/02 | Yes | | .40 | 46.00 | Appearance at Rule 26(f) conference via telephone. |
| | 1047 | 07/26/02 | Yes | | .20 | 23.00 | Preparation of correspondence to Plaintiff regarding joint discovery/case management plan. |
| | 1047 | 08/01/02 | Yes | | 3.00 | 405.00 | Preparation of first set of interrogatories and document requests to Plaintiff. Preparation of notice of deposition of Plaintiff. Reviewing investigative materials in preparation for conference call with N. Aakey. |
| | 1047 | 08/02/02 | Yes | | 2.70 | 364.50 | Preparation of notice of deposition of Plaintiff. Preparation of first set of interrogatories and request for production of documents to Plaintiff. Telephone conference with N. Aakey regarding Plaintiff's claims. |
| | 1047 | 08/09/02 | Yes | | 1.30 | 175.50 | Preparation of correspondence to Texas HRC obviated by receipt of investigative file. Reviewing Plaintiff's allegations to the Texas HRC. |
| | 1047 | 08/12/02 | Yes | | 1.50 | 202.50 | Revision to timeline of events in the case incorporating Plaintiff's allegations made to the Texas HRC. |
| | 1047 | 08/29/02 | Yes | | 1.10 | 148.50 | Preparation of Defendant's Rule 26 initial disclosures. Telephone conference with Plaintiff regarding extension of time for both parties to serve initial disclosures. |
| | 1047 | 09/03/02 | Yes | | 1.30 | 208.00 | Preparation of correspondence to Plaintiff regarding same. Preparation of Rule 26(a) initial disclosures. Telephone conferences with G. Miller regarding production of documents relevant to matter. |
| | 1047 | 09/05/02 | Yes | | .60 | 96.00 | Telephone conference with N. Aakey regarding disclosure and production of relevant documents. Preparation of Rule 26 |

```
PROGRAM: GENRG-2053620                                                                    PAGE: 3
SESSION: RP-IRG/24462/2                                                                    DATE: 11/20/02
REPORT : CMTSLIP1-15915                                                                    TIME: 14:18:58

                            HAYNSWORTH BALDWIN JOHNSON & GREAVES
                        Client/Matter Timeslip Report 1 Sorted by Employee, Date, Code
                        All Timeslips with Effective Dates From: 05/17/2002 To: 11/20/2002
```

643850 The William Carter Company (Continued)
020 Susan Tate, C.A. # B-02-103 (Continued)

| Client/Matter Employee | Date | Code | Billed | Hours | Rec. | Amount | Description |
|---|---|---|---|---|---|---|---|
| 1047 | 09/06/02 | | Yes | 2.60 | | 416.00 | initial disclosures. Preparation of Rule 26 initial disclosures. Telephone conference with N. Askey regarding Company documents relevant to matter and upcoming deposition of Plaintiff. |
| 1047 | 09/09/02 | | Yes | 1.50 | | 240.00 | Telephone conference with I. Long regarding EPL coverage. Legal research regarding elements of Plaintiff's state law tort claims. Preparation of examination outline for Plaintiff's deposition. |
| 1047 | 09/10/02 | | Yes | 7.10 | | 1,136.00 | Preparation of examination outline for Plaintiff's deposition. Preparation of exhibits for Plaintiff's deposition. Telephone conferences with Officer Williams and Detective Turner regarding Plaintiff's claims against former manager. |
| 1047 | 09/11/02 | | Yes | 6.20 | | 992.00 | Preparation of examination outline and exhibits for Plaintiff's deposition. Preparation of memoranda to file regarding conferences with Det. Turner and Officer Williams. Telephone conference with local counsel regarding subpoenas for police records. |
| 1047 | 09/13/02 | | Yes | 3.90 | | 624.00 | Preparation of documents to be disclosed pursuant to Rule 26. Preparation of examination outline for deposition of Plaintiff. Preparation of exhibits for Plaintiff's deposition. Preparation of correspondence to Plaintiff regarding her failure to respond to discovery. |
| 1047 | 09/30/02 | | Yes | 1.30 | | 208.00 | Preparation of internal memorandum regarding schedule for filing motion for summary judgment and supporting brief. Reviewing EEOC investigative file. Preparation of memorandum to file incorporating Plaintiff's allegations to EEOC. |
| 1047 | 10/01/02 | | Yes | 5.70 | | 912.00 | Reviewing Plaintiff's discovery responses. Reviewing audiotape of phone conversation with C. Stutts, Plaintiff, and Plaintiff's husband. Reviewing Plaintiff's deposition. Revisions of memorandum recording timeline of events in case. |
| 1047 | 10/02/02 | | Yes | 4.50 | | 720.00 | Legal research regarding effective date of legal release, continuing violations under Title VII, vicarious liability for acts of employees, and emotional distress in the employment context under Texas law. |
| 1047 | 10/03/02 | | Yes | 5.30 | | 848.00 | Legal research regarding vicarious liability, continuing violations under Title VII, intentional infliction of emotional distress under Texas law, validity of release agreements, and recovery of attorneys fees for breach of a release agreement. |
| 1047 | 10/04/02 | | Yes | 5.30 | | 848.00 | Reviewing and annotating transcript of Plaintiff's deposition. Legal research regarding release of claims in the context of continuing violations. |
| 1047 | 10/07/02 | | Yes | 4.90 | | 784.00 | Reviewing and annotating deposition of Plaintiff. Preparation of list of facts to be established by affidavit |

```
PROGRAM: GENIRG-2053620                    HAYNSWORTH BALDWIN JOHNSON & GREAVES                          PAGE: 4
SESSION: RP-IRG/24462/2                 Client/Matter Timeslip Report 1 Sorted by Employee, Date, Code    DATE: 11/20/02
REPORT : CMTSLIP1-15915             All Timeslips with Effective Dates From: 05/17/2002 To: 11/20/2002    TIME: 14:18:58
```

| Client/Matter Employee | Date | Code | Billed | Hours | Rec. Amount | Description |
|---|---|---|---|---|---|---|
| 643850 The William Carter Company (Continued) | | | | | | |
| 020 Susan Tate, C.A. # B-02-103 (Continued) | | | | | | |
| | | | | | | by Company witnesses. |
| 1047 | 10/08/02 | | Yes | .30 | 48.00 | Preparation of correspondence requesting audiotape of phone conversation. |
| 1047 | 10/09/02 | | Yes | 6.20 | 992.00 | Legal research on harassment claims under Texas law. Preparation of affidavit of C. Stutts and N. Askey. Preparation of brief in support of motion for summary judgment. |
| 1047 | 10/10/02 | | Yes | 4.80 | 768.00 | Preparation of summary judgment brief. Preparation of joint affidavit of N. Askey and C. Stutts. |
| 1047 | 10/11/02 | | Yes | 6.80 | 1,088.00 | Preparation of summary judgment brief. Telephone conference with N. Askey to prepare affidavit in support of summary judgment. Preparation of joint affidavit of N. Askey and C. Stutts in support of summary judgment. |
| 1047 | 10/13/02 | | Yes | 1.00 | 160.00 | Preparation of status report to AIG. |
| 1047 | 10/14/02 | | Yes | 6.00 | 960.00 | Preparation of status report to AIG. Preparation of joint affidavit. Telephone conference with C. Stutts to prepare joint affidavit. Telephone conference with Plaintiff regarding audiotape of phone conversation. Preparation of correspondence to Plaintiff regarding same. |
| 1047 | 10/15/02 | | Yes | 3.70 | 592.00 | Telephone conference with T. Merritt to prepare joint affidavit. Revision to status report to AIG. Preparation of joint affidavit. Preparation of summary judgment brief. |
| 1047 | 10/16/02 | | Yes | 5.30 | 848.00 | Legal research regarding acts within the scope of employment under Texas law. Preparation of joint affidavit. Preparation of summary judgment brief. |
| 1047 | 10/17/02 | | Yes | 3.20 | 512.00 | Preparation of memorandum to file summarizing legal research for summary judgment. Preparation of summary judgment brief. |
| 1047 | 10/18/02 | | Yes | 3.90 | 624.00 | Preparation of summary judgment brief. |
| 1047 | 10/21/02 | | Yes | 5.30 | 848.00 | Preparation of summary judgment brief. |
| 1047 | 10/22/02 | | Yes | 2.60 | 416.00 | Preparation of summary judgment brief. Telephone conference with T. Merritt to prepare joint affidavit. |
| 1047 | 10/23/02 | | Yes | 4.20 | 672.00 | Preparation of summary judgment brief. Legal research regarding validity of releases of Title VII claims. |
| 1047 | 10/24/02 | | Yes | 4.80 | 768.00 | Legal research regarding competency to contract under Texas law. Preparation of summary judgment brief. |
| 1047 | 10/25/02 | | Yes | 5.60 | 896.00 | Preparation of summary judgment brief. |
| 1047 | 10/27/02 | | Yes | 3.20 | 512.00 | Preparation of summary judgment brief. |
| 1047 | 10/28/02 | | Yes | 5.00 | 800.00 | Preparation of summary judgment brief. |
| 1047 | 10/30/02 | | Yes | 2.80 | 448.00 | Preparation of summary judgment brief. Telephone conference with T. Merritt to prepare joint affidavit of Askey, Merritt and Stutts. |
| 1047 | 10/31/02 | | Yes | 3.50 | 560.00 | Preparation of summary judgment brief. Preparation of joint affidavit of Askey, Merritt and Stutts. |
| 1047 | 11/04/02 | | No | .70 | 112.00 | Preparation of joint affidavit of Askey, Stutts, and Merritt. |
| 1047 | 11/05/02 | | No | 1.70 | 272.00 | Preparation of summary judgment brief. |

```
Total 1047 JB Pueschel              163.00      24,823.00
                                   ---------     ---------
```

```
PROGRAM: GENIRG-2053620                    HAYNSWORTH BALDWIN JOHNSON & GREAVES                        PAGE: 5
SESSION: RP-IRG/24462/2            Client/Matter Timeslip Report 1 Sorted by Employee, Date, Code       DATE: 11/20/02
REPORT : CMTSLIP1-15915       All Timeslips with Effective Dates From: 05/17/2002 To: 11/20/2002        TIME: 14:18:58

Client/Matter Employee   Date    Code  Billed    Hours     Rec. Amount   Description
=================================================================================================================
643850 The William Carter Company (Continued)
  020 Susan Tate, C.A. # B-02-103 (Continued)
                                                  --------   ---------
  Total 020 Susan Tate, C.A. # B-02-103           210.60    35,825.00

                                                  --------   ---------
  Total 643850 The William Carter Company         210.60    35,825.00
                                                  ========   =========

  GRAND TOTALS                                    210.60    35,825.00
                                                  ========   =========

** Report Arguments **

Starting   Ending                Starting  Ending                       Timekeeper  Date   Report   Sort   Use     Report
Date       Date      Starting    Ending    Matter ID Matter ID          ID          Basis  Option   Order  Current Level
                     Client ID   Client ID
---------- ---------- ---------- --------- --------- ---------           ----------  -----  ------   -----  ------- ------
05/17/2002 11/20/2002 643850     643850    020       020                            E      A        1      N       1

** Report Times **

Started: 14:18:58, Ended: 14:19:05, Elapsed: 00:00:07, Total Rows: 73.
```

**Attachment 2**

MATTER INQUIRY Expense List
pense List

643850      William Carter Co.          020        Susan TateCA#B02-103

| BILLED | EXPENSE DATE      ID | DESCRIPTION            | RECORDED VALUE | BILLING VALUE |
|--------|---------------------|------------------------|----------------|---------------|
| 'Yes   | 06/10/2002FE        | Federal Express        | 11.48          | 11.48         |
| INV #  | ANS/0182267233      |                        |                |               |
| 'Yes   | 06/10/2002C         | Computerized Legal Rese | 23.80         | 23.80         |
| INV #  |                     |                        |                |               |
| 'Yes   | 08/06/2002FE        | Federal Express        | 22.83          | 22.83         |
| INV #  | 99082               |                        |                |               |
| 'Yes   | 08/06/2002FE        | Federal Express        | 11.48          | 11.48         |
| INV #  | 19082               |                        |                |               |
| 'Yes   | 08/26/2002P         | Postage                | 19.27          | 19.27         |
| INV #  | SD18876             |                        |                |               |
| 'Yes   | 08/27/2002R         | Copying                | 79.75          | 79.75         |
| INV #  |                     |                        |                |               |
| 'Yes   | 08/30/2002AT        | Air Travel             | 40.00          | 40.00         |
| INV #  | 22000               |                        |                |               |
| 'Yes   | 08/30/2002AT        | Air Travel             | 40.00          | 40.00         |
| INV #  | 22001               |                        |                |               |
| 'Yes   | 09/09/2002C         | Computerized Legal Rese | 142.73        | 142.73        |
| INV #  | 22002               |                        |                |               |
| 'Yes   | 09/15/2002AT        | Air Travel             | 326.00         | 326.00        |
| INV #  | 22004               |                        |                |               |
| 'Yes   | 09/15/2002H         | Lodging                | 282.50         | 282.50        |
| INV #  | 22005               |                        |                |               |
| 'Yes   | 09/16/2002ME        | Meals                  | 49.90          | 49.90         |
| INV #  | 22006               |                        |                |               |
| 'Yes   | 09/17/2002ME        | Meals                  | 98.00          | 98.00         |
| INV #  | LMF/April 1999      |                        |                |               |
| 'Yes   | 09/17/2002OP        | Outside Printing       | 10.57          | 10.57         |
| INV #  | JJM/April 1999      |                        |                |               |
| 'Yes   | 09/17/2002AT        | Air Travel             | 293.00         | 293.00        |
| INV #  | ANS/0191799603      |                        |                |               |
| 'Yes   | 09/17/2002RC        | Rental Car             | 66.42          | 66.42         |
| INV #  |                     |                        |                |               |
| 'Yes   | 09/18/2002PR        | Parking                | 18.00          | 18.00         |
| INV #  | 20318               |                        |                |               |
| 'Yes   | 09/18/2002ME        | Meals                  | 23.44          | 23.44         |
| INV #  |                     |                        |                |               |
| 'Yes   | 09/25/2002CR        | Court Reporter         | 1145.40        | 1145.40       |

INV #

'Yes    09/30/2002R    Copying              179.75      179.75

INV #   20318

'No     10/27/2002L    Long Distance Calls   26.68       26.68

INV #

'Yes    10/28/2002P    Postage               10.88       10.88

INV #

'Yes    10/30/2002R    Copying               32.50       32.50

INV #

'No     10/31/2002C    Computerized Legal Rese  928.84   928.84

INV #

GRAND TOTALS:                              3883.22     3883.22

# Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3   SUSAN TATE,                )(
                    Plaintiff   )(
 4                              )(
     VS.                        )(   CASE NO. B-02-103
 5                              )(
     WILLIAM CARTER COMPANY,    )(
 6                  Defendant   )(
     ------------------------------------------------
 7
                        ORAL DEPOSITION OF
 8                          SUSAN TATE
                       SEPTEMBER 16, 2002
 9                          VOLUME 1

10   ------------------------------------------------
```

11      ORAL DEPOSITION OF SUSAN TATE, produced as a

12   witness at the instance of the DEFENDANT, taken in

13   the above styled and numbered cause on SEPTEMBER

14   16, 2002, reported by ELIZABETH F. TORRES,

15   Certified Court Reporter No. 5516, in and for the

16   State of Texas, at the law offices of Meredith,

17   Donnell & Abernethy, Water Tower Centre, 612 Nolana

18   Street, Suite 560, McAllen, Texas, pursuant to the

19   Federal Rules of Civil Procedure.

20

21

22

23

24

25                              *ORIGINAL*

1                            APPEARANCES

2    PLAINTIFF PRO SE:

3              SUSAN TATE
               PLAINTIFF
4              2925 Jacaranda
               Harlingen, Texas  78550
5
     COUNSEL FOR DEFENDANT:
6
               JAMES M. POWELL
7              HAYNSWORTH, BALDWIN, JOHNSON &
               GREAVES, L.L.C.
8              2709 Henry Street
               Greensboro, North Carolina  27405-3669
9

10   ALSO PRESENT:  NELLIE LUJAN ASKEY

11
                               INDEX
12                                                    PAGE

13   Appearances.................................. 2

14   VOLUME 1
     SUSAN TATE:
15   Examination by Mr. Powell.................... 3

16   Errata Sheet/Signature Page................. 156
     Reporter's Certificate..................... 157
17   Attached to the end of the transcript:
     Stipulations
18
                             EXHIBITS
19                                                    PAGE
     NUMBER     DESCRIPTION                          MARKED
20
     1          Letter dated July 16, 2001.......... 37
21   2          Election Form and Agreement for
                Severance Pay Plan.................. 57
22   3          Letter dated September 24, 2001.... 139
     4          Letter dated October 3, 2001....... 140
23   5          Letter to Human Resources.......... 141
     6          Letter to Nellie................... 142
24   7          Charge of Discrimination........... 144
     8          Equal Opportunity Policy
25              Statement.......................... 145

                    BRYANT & STINGLEY, INC.
         McAllen        Harlingen         Brownsville
       (956)618-2366   (956)428-0755    (956)542-1020

1          <u>SUSAN TATE</u>,

2    having been duly sworn, testified as follows:

3                    EXAMINATION

4    BY MR. POWELL:

12:56:50   5       Q.    If you'll state your full name for the

12:56:52   6    record, please.

12:56:52   7       A.    Susan Ann Tate.

12:56:52   8       Q.    And your address?

12:56:54   9       A.    2925 Jacaranda, Harlingen, Texas, 78550.

12:56:58  10       Q.    Ms. Tate, my name is Jim Powell, I'm an

12:57:00  11    attorney, and I represent the William Carter

12:57:02  12    Company.  I'm going to ask you questions about the

12:57:06  13    lawsuit that you filed against the William Carter

12:57:08  14    Company.  And before I get into the questions,

12:57:12  15    there are a couple of just preliminary matters I'd

12:57:14  16    like to go over.  I know, as far as all the

12:57:18  17    documents and paperwork I have, that you're

12:57:20  18    representing yourself and you do not have an

12:57:22  19    attorney.  And is that still correct today?

12:57:24  20       A.    I am seeking an attorney, but he has been

12:57:26  21    out of town.  I did find someone that I'm

12:57:30  22    interested in, and I will approach him.  I did not

12:57:32  23    have time.  He came back to his office today, and I

12:57:34  24    didn't have time before I came here.

12:57:36  25       Q.    Are you asking this deposition be

12:57:40  1  discontinued, then, until you get an attorney?

12:57:40  2      A.   No.

12:57:42  3      Q.   Okay.  The -- in answering my questions,

12:57:46  4  if you will, if your answer is a yes or no, I'll

12:57:48  5  ask you to state that verbally as opposed to just

12:57:52  6  nodding your head to indicate yes or no.  I can

12:57:56  7  obviously see you, and I'll know if you're shaking

12:57:58  8  your head to say yes or no --

         9      A.   Yes, sir.

12:58:02 10      Q.   -- but the court reporter will need to get

12:58:04 11  down your answer in a verbal fashion.

12:58:06 12      A.   Okay.  I understand.

12:58:08 13      Q.   And if you forget to do that, I may remind

12:58:10 14  you during the course of the deposition, because

12:58:12 15  it's very easy for -- for you not to remember that

12:58:14 16  every time.  And I hope you don't take any offense

12:58:18 17  to you if I remind you.  That's just so the court

12:58:20 18  reporter can get your answers correctly.

12:58:20 19      A.   That's fine.

12:58:20 20      Q.   If you have any questions about -- if you

12:58:22 21  do not understand my question or if you have any

12:58:26 22  concern about the question I'm asking you, ask me

12:58:28 23  to repeat it or explain it, and I'll be glad to do

12:58:32 24  so.  Okay?  Have you ever had your deposition taken

12:58:32 25  before?

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

```
12:58:32  1      A.    No, sir.

12:58:36  2      Q.    Okay.  Have you ever given testimony?

12:58:36  3      A.    I don't think so.

12:58:36  4      Q.    Okay.

12:58:38  5      A.    If I did, it would have been for the

12:58:40  6  William Carter Company.

12:58:42  7      Q.    Okay.  You understand that your testimony

12:58:44  8  today is under oath?

12:58:44  9      A.    Yes, sir.

12:58:48 10      Q.    Okay.  I want to get some background

12:58:50 11  information from you, first of all.  Where were you

12:58:50 12  born and raised?

12:58:54 13      A.    I was born in Harlingen, Texas.

12:58:54 14      Q.    Okay.

12:58:58 15      A.    Raised in Wilson County, Raymondville,

12:58:58 16  Texas.

12:59:02 17      Q.    Okay.  Where did you go to high school?

12:59:04 18  Where did you finish high school?

12:59:06 19      A.    Lyford High School.

12:59:06 20      Q.    And where is that?

12:59:08 21      A.    Lyford, Texas.

12:59:10 22      Q.    Okay.  And after -- and I want to just get

12:59:12 23  some information about your educational

12:59:14 24  background.  After high school, what did you do, as

12:59:16 25  far as formal education?
```

| | | |
|---|---|---|
| 12:59:18 | 1 | A.   I completed an LVN, license vocational |
| 12:59:22 | 2 | nursing program, Valley Baptist Medical Center in |
| 12:59:22 | 3 | Harlingen, Texas. |
| 12:59:26 | 4 | Q.   Anything else formally? |
| 12:59:30 | 5 | A.   Following that, I went to University of |
| 12:59:34 | 6 | New York, which is Regents College, and completed a |
| 12:59:36 | 7 | registered nurse course there and received -- till |
| 12:59:40 | 8 | I received my registered nurse license in 1990. |
| 12:59:42 | 9 | Q.   You received your registered nurse license |
| 12:59:44 | 10 | in 1990? |
| 12:59:44 | 11 | A.   Yes, sir. |
| 12:59:46 | 12 | Q.   Okay.  Any other formal education? |
| 12:59:48 | 13 | A.   I completed a Ph.D. program at -- with |
| 12:59:50 | 14 | La Salle University. |
| 12:59:52 | 15 | Q.   And do you have a Ph.D.? |
| 12:59:54 | 16 | A.   Yes, sir.  The degree was conferred. |
| 12:59:56 | 17 | Q.   When was that? |
| 13:00:00 | 18 | A.   September of '95 or '96.  Sorry. |
| 13:00:02 | 19 | Q.   And what is your Ph.D. in? |
| 13:00:04 | 20 | A.   Health services management. |
| 13:00:12 | 21 | Q.   And that was at La Salle? |
| 13:00:14 | 22 | A.   Yes, sir. |
| 13:00:18 | 23 | Q.   La Salle University or La Salle College? |
| 13:00:18 | 24 | A.   La Salle University. |
| 13:00:18 | 25 | Q.   Okay.  In where? |

13:00:20  1      A.    Louisiana.

13:00:24  2      Q.    Okay.  Where is that in Louisiana?

13:00:28  3  La Salle, Louisiana?  Where?

13:00:30  4      A.    No.  I don't remember the name of the

13:00:30  5  town.

13:00:32  6      Q.    You were doing this through --

13:00:34  7      A.    It was distance.

13:00:36  8      Q.    -- correspondence?

13:00:36  9      A.    Yes, it's distance.

        10       Q.    I got you.

13:00:40 11      A.    As was Regents College.  It's a distance

13:00:40 12  learning program.

13:00:44 13      Q.    I got you.  Okay.  So I take it, you were

13:00:48 14  still living in Texas at the time?

13:00:48 15      A.    Oh, yes, sir.

13:00:50 16      Q.    Any other formal education?

13:00:50 17      A.    No, sir.

13:00:54 18      Q.    Okay.  Let me get some information about

13:01:00 19  your employment background.  Before you -- you

13:01:04 20  initially went to work with William Carter in what

13:01:04 21  year?

13:01:04 22      A.    1992.

13:01:06 23      Q.    Okay.

13:01:08 24      A.    July of '92.

13:01:12 25      Q.    And prior to July of '92, had you been

| | | |
|---|---|---|
| 13:01:14 | 1 | employed on a full-time, part-time basis? |
| 13:01:18 | 2 | A.   Yes, sir.  I was full-time Director of |
| 13:01:20 | 3 | Nurses for ARA Living Centers. |
| 13:01:24 | 4 | Q.   ARA Living Centers? |
| 13:01:26 | 5 | A.   Yes, sir. |
| 13:01:26 | 6 | Q.   Okay. |
| 13:01:30 | 7 | A.   The facility name was Retama Manor. |
| 13:01:32 | 8 | Q.   And this was as Director of Nursing? |
| 13:01:32 | 9 | A.   Yes, sir. |
| 13:01:34 | 10 | Q.   And where is that located? |
| 13:01:36 | 11 | A.   Harlingen, Texas. |
| 13:01:38 | 12 | Q.   And about how long were you working for |
| 13:01:40 | 13 | ARA Living Centers? |
| 13:01:44 | 14 | A.   As the Director of Nurses, I was there, I |
| 13:01:46 | 15 | believe, a year as that title at that time -- |
| 13:01:46 | 16 | position. |
| 13:01:48 | 17 | Q.   Okay.  Had you worked with them longer |
| 13:01:48 | 18 | than a year? |
| 13:01:50 | 19 | A.   Yes, as a staff nurse on and off. |
| 13:01:56 | 20 | Q.   Okay.  Any other full-time employment |
| 13:01:58 | 21 | prior to that? |
| 13:01:58 | 22 | A.   Prior to that, I was the Director of |
| 13:02:06 | 23 | Resident Services for Camelot Retirement Community |
| 13:02:06 | 24 | in Harlingen, Texas. |
| 13:02:12 | 25 | Q.   And how long did you work for that |

13:02:12  1  organization?

13:02:14  2      A.    Approximately four-and-a-half years.

13:02:22  3      Q.    So did you -- you were working there

13:02:24  4  before you got your RN degree, I assume?

13:02:26  5      A.    Yes, sir.

13:02:26  6      Q.    Okay.

13:02:28  7      A.    And then I worked for ARA before I

13:02:30  8  received my RN, as well.  That was after.

13:02:32  9      Q.    Any other significant employment?

13:02:36 10      A.    Valley Baptist Medical Center, staff LVN.

13:02:40 11      Q.    And about how long did you work with

13:02:42 12  Valley -- Valley Baptist Medical Center, is that

13:02:44 13  it?

13:02:46 14      A.    Valley Baptist Medical Center in

13:02:48 15  Harlingen.  That's been a long time ago, and I'm

13:02:52 16  not sure exactly the dates on that.  It would have

13:03:00 17  been probably from '83, '84, around that time

13:03:00 18  period.

13:03:02 19      Q.    For about how long?

13:03:04 20      A.    Probably about a year and a half, two

13:03:04 21  years.

13:03:14 22      Q.    Any other significant periods of

13:03:16 23  employment?

13:03:16 24      A.    No, sir.

13:03:22 25      Q.    Okay.  You went -- excuse me.  If I

13:03:24  1    understand correctly, you worked with the William

13:03:26  2    Carter Company on two occasions.

13:03:26  3        A.    Yes, sir.

13:03:30  4        Q.    The first time began in July of 1992.

13:03:30  5        A.    Yes, sir.

13:03:36  6        Q.    Is that correct?  And when did you cease

13:03:38  7    employment on the first occasion?

13:03:42  8        A.    I believe it was in October or November of

13:03:42  9    '96.

13:03:48  10       Q.    Okay.  And during the period of July of

13:03:50  11   '92 through 1996, what was your position?

13:03:54  12       A.    The same, occupational health nurse.

13:03:54  13       Q.    Okay.

13:03:56  14       A.    Plant nurse.

13:04:02  15       Q.    And during the period of July '92,

13:04:04  16   November '96, was this at the Harlingen, Texas

13:04:06  17   plant?

13:04:06  18       A.    Yes, sir.

13:04:10  19       Q.    Were there any other facilities that you

13:04:12  20   were the occupational health nurse for during that

13:04:12  21   period?

13:04:16  22       A.    During that period, no, just mainly

13:04:16  23   Harlingen.

13:04:18  24       Q.    When you left in November -- October or

13:04:20  25   November of 1996, where did you go?

13:04:22  1       A.   I went to San Antonio.

13:04:28  2       Q.   Okay.  And were you employed in San

13:04:30  3   Antonio?

13:04:32  4       A.   I worked for about four months there with

13:04:34  5   Genex Services as a case manager, a nurse case

13:04:34  6   manager.

13:04:38  7       Q.   Okay.  And -- I'm sorry.  I did not catch

13:04:38  8   the name.

13:04:42  9       A.   Genex, G-e-n-e-x.  General rehab.

13:04:52 10       Q.   And then you came back to work with

13:04:54 11   William Carter on the second occasion in when?

13:04:58 12       A.   April of '97.  About four months later.

13:05:02 13       Q.   Okay.  And continued to work with William

13:05:04 14   Carter from April '97 until when?

13:05:08 15       A.   Until May the 8th or 9th.

13:05:08 16       Q.   Okay.

13:05:10 17       A.   Until the plant closed.

13:05:12 18       Q.   Of 2001?

13:05:12 19       A.   That's correct.

13:05:14 20       Q.   Okay.  And was your last day of employment

13:05:18 21   -- I'm sure it's on the records, but it's around

13:05:20 22   May 8th or 9th of 2001?

13:05:22 23       A.   Yes, sir.

13:05:26 24       Q.   Okay.  Why did you leave on -- why did you

13:05:30 25   leave in October or November of 1996?

13:05:32  1      A.    My husband's job.  He was an insurance

13:05:34  2  adjuster, and he was having to drive all over the

13:05:36  3  state of Texas.  And San Antonio offered a middle

13:05:40  4  ground where he didn't have to drive quite as much.

13:05:42  5      Q.    Okay.  And why did you return, then, in

13:05:44  6  April of '97?

13:05:46  7      A.    He was still having to drive.  It did not

13:05:50  8  solve the situation or the problem, because being

13:05:54  9  up there, then they just sent him further, to New

13:05:58 10  Mexico or -- it really did not solve anything.

13:06:00 11      Q.    Did you -- I assume from what you're

13:06:02 12  saying, that in '96, that you relocated your

13:06:04 13  residence to San Antonio?

13:06:04 14      A.    Yes, sir.

13:06:06 15      Q.    And then in April or so of 1997, you

13:06:12 16  relocated your residence from San Antonio to

13:06:12 17  Harlingen?

13:06:12 18      A.    That's correct.

13:06:22 19      Q.    Okay.  Let me get just information about

13:06:24 20  your family.  Your husband's name?

13:06:30 21      A.    Brett, B-r-e-t-t, Tate, T-a-t-e.

13:06:32 22      Q.    And you and Mr. Tate were married

13:06:32 23  approximately when?

13:06:36 24      A.    January of eighty- -- '89.  Sorry.

13:06:38 25      Q.    Children?  Are there any children of this

```
13:06:40  1    marriage?
13:06:40  2        A.    Regan Nicole.
13:06:46  3        Q.    And how old is she?
13:06:46  4        A.    She's 10 years old.
13:06:46  5        Q.    Okay.
13:06:50  6        A.    And I have another daughter named
13:06:56  7    Christina Krupala, K-r-u-p-a-l-a.
13:06:58  8        Q.    And how old is she?
13:06:58  9        A.    She's 16.
13:07:00 10        Q.    Is she from a previous marriage?
13:07:02 11        A.    Yes, she is.
13:07:08 12        Q.    Okay.  Your first husband's name was?
13:07:10 13        A.    Gary Krupala.
13:07:14 14        Q.    You and Mr. Krupala were married
13:07:14 15    approximately when?
13:07:16 16        A.    Six-and-a-half years.  From June of '81
13:07:22 17    to, I believe, August of '87.
13:07:34 18        Q.    And your husband, Brett, is employed with
13:07:34 19    whom?
13:07:36 20        A.    He's self-employed.
13:07:40 21        Q.    And what's his occupation or what's he do?
13:07:44 22        A.    He owns a heavy equipment rental
13:07:52 23    business.  We also own a home health.
13:07:52 24        Q.    I'm sorry?
13:07:56 25        A.    We also own a home health agency.
```

13:07:56   1        Q.    And -- I'm sorry.  There was some noise.
13:08:00   2   I didn't catch your -- what you said.  You also own
13:08:00   3   what?
13:08:02   4        A.    A home health agency.
13:08:04   5        Q.    Home health agency.
13:08:04   6        A.    Uh-huh.
           7        Q.    Okay.
13:08:04   8        A.    We do private home health.
13:08:12   9        Q.    The heavy equipment rental business, are
13:08:14  10   you speaking like Caterpillars, backhoes?
13:08:14  11        A.    Yes, sir.
          12        Q.    Is that what it is?
13:08:18  13        A.    Four-wheel drive forklifts, things of that
          14   nature.
13:08:20  15        Q.    Is what -- for construction business?
13:08:24  16        A.    For the construction down here.
13:08:26  17        Q.    Okay.  And the home health agency, do I
13:08:28  18   assume from what you're saying, that that's --
13:08:30  19   you're involved in that part of the business?  Are
          20   you involved in both parts?
13:08:32  21        A.    We both -- we both are.  Both parts.
13:08:34  22        Q.    Both parts.  Okay.  And about how long
13:08:38  23   have -- is that what you're doing now?  Are you
13:08:38  24   employed otherwise?
13:08:40  25        A.    I'm working as a case manager and doing

13:08:42  1    private home health.

13:08:44  2        Q.    Okay.  Let me go back for a second.  You

13:08:48  3    left William Carter in May of 2001.

13:08:48  4        A.    That's correct.

13:08:54  5        Q.    And as far as being -- owning your own

13:08:56  6    business, being self-employed -- I'm not asking

13:08:58  7    about that -- but have you been employed with

13:09:00  8    someone else since --

13:09:02  9        A.    I work contract with Concentra Managed

13:09:08 10    Care as a contract case manager whenever they need

13:09:08 11    me.

13:09:14 12        Q.    Concentra Managed Care?

13:09:14 13        A.    Yes, sir.

13:09:16 14        Q.    And this is a case manager?

13:09:18 15        A.    It's a case management company.

13:09:20 16        Q.    Okay.  And have you done that on

13:09:24 17    occasions, then, since May?

13:09:26 18        A.    I've been doing that since 1997.

13:09:28 19        Q.    Okay.  You were still doing that when you

13:09:30 20    were employed with William Carter?

13:09:30 21        A.    Right.

13:09:32 22        Q.    Okay.  And then you've continued to do

13:09:36 23    that.  Have you done it more since you left William

13:09:38 24    Carter, do I assume?

13:09:42 25        A.    Well, probably about the same.  About the

13:09:44  1    same amount.  It really depends on what -- what

13:09:48  2    they have coming in.  They have full-time employees

13:09:50  3    here, and it would depend on what they can't

13:09:52  4    handle, how many files I actually get to work on.

13:09:56  5        Q.    Sure.  And who do you report to in

13:09:58  6    connection with Concentra Management Care?

13:10:00  7        A.    There was a supervisor in Houston that I

13:10:04  8    send my -- my reports to.  Her name is Ruth

13:10:04  9    Hampton.

13:10:14  10       Q.    Okay.  And then anyone else that you have

13:10:16  11   worked with since May of 2001?

13:10:16  12       A.    No, sir.

13:10:22  13       Q.    Okay.  Since then, I assume that your --

13:10:24  14   whatever employment, income you've had is from --

13:10:26  15   any occupation has been through your -- the heavy

13:10:28  16   equipment rental business and the home health care

13:10:28  17   agency?

13:10:30  18       A.    That's true.

13:10:32  19       Q.    Okay.  Did you start the home health care

13:10:36  20   agency after you left William Carter or was that

13:10:40  21   something that had been started before you left?

13:10:42  22       A.    No.  That was after.

13:10:42  23       Q.    Okay.

13:10:44  24       A.    Afterwards.

13:10:48  25       Q.    Does that business go by -- do you have a

| | | |
|---|---|---|
| 13:10:50 | 1 | business name for it? |
| 13:10:54 | 2 | A.   Bay Brook Home Health.   Bay Brook. |
| | 3 | Q.   Bay Brook. |
| | 4 | A.   Bay Brook. |
| 13:10:54 | 5 | Q.   One word? |
| 13:10:56 | 6 | A.   Two words. |
| 13:10:58 | 7 | Q.   Bay Brook Home -- |
| 13:11:00 | 8 | A.   Home Health. |
| 13:11:00 | 9 | Q.   Home Health.   Is that incorporated? |
| 13:11:02 | 10 | A.   Yes, it is. |
| 13:11:10 | 11 | Q.   And about when was that incorporated?   And |
| 13:11:12 | 12 | I'm not asking you just the specific date.   You can |
| 13:11:14 | 13 | just tell me approximately when that would have |
| | 14 | been. |
| 13:11:18 | 15 | A.   I believe it was fall of last year. |
| 13:11:20 | 16 | Q.   Fall of 2001? |
| 13:11:20 | 17 | A.   Uh-huh. |
| 13:11:20 | 18 | Q.   Okay. |
| 13:11:20 | 19 | A.   Yes, sir. |
| 13:11:24 | 20 | Q.   And I assume from that that that's -- you |
| 13:11:26 | 21 | and your husband are the primary owners or sole |
| 13:11:28 | 22 | owners -- |
| 13:11:28 | 23 | A.   That's correct.   Sole owners. |
| 13:11:30 | 24 | Q.   -- of the business.   Okay.   Do you have a |
| 13:11:34 | 25 | -- do you operate that out of your home?   Or do |

13:11:34  1    you have a business location?

13:11:36  2        A.    It is operated out of our home.  It is a

13:11:38  3    small business.

13:11:40  4        Q.    Okay.  The heavy equipment rental

13:11:42  5    business, does that have a business name?

13:11:44  6        A.    No, sir.

13:11:48  7        Q.    Okay.  What kind of -- what do you go by?

13:11:50  8    It may not be incorporated, but --

13:11:54  9        A.    No, it's not incorporated.  It really

13:11:58  10   doesn't go by anything.  I guess you could say BDR

13:11:58  11   Services.

13:12:00  12       Q.    BBR?

13:12:02  13       A.    BDR.  D.

          14       Q.    BDR.

13:12:02  15       A.    BDR.

13:12:08  16       Q.    Okay.  And what does BDR stand for?

13:12:12  17       A.    My husband and two of his friends.  They

13:12:14  18   collectively own this equipment.

13:12:20  19       Q.    Okay.  And about how long has your husband

13:12:24  20   been in that -- in the heavy equipment rental

13:12:24  21   business?

13:12:28  22       A.    They began that at the beginning of this

13:12:32  23   year.  I would say around February or March of this

13:12:34  24   year, of 2002.

13:12:38  25       Q.    What was your husband's occupation prior

```
13:12:40  1   to 2002?

13:12:42  2        A.    Insurance adjuster.

13:12:46  3        Q.    Okay.  And who was he working for?

13:12:54  4        A.    Various -- various companies.  He was

13:12:56  5   self-employed and they called him to go around and

13:13:00  6   look at crops.  He's a crop adjuster.

13:13:06  7        Q.    Who was he primarily working for then?

13:13:08  8   During the last year or two years of your

13:13:12  9   employment with William Carter, who did he

13:13:12 10   primarily work for?

13:13:14 11        A.    On and off, he was -- he was not working,

13:13:18 12   because he was disabled.  He's had four major

13:13:20 13   surgeries since we've moved back.

13:13:32 14        Q.    What happened to your husband?  He had a

13:13:32 15   back injury?

13:13:32 16        A.    He broke all of his right transverse

13:13:34 17   processes on the right side of his back.  And he

13:13:38 18   had -- he had had surgery six weeks before that,

13:13:44 19   major surgery, and he's had four surgeries since

13:13:46 20   we've moved back.  I don't remember exactly the

13:13:50 21   dates of the surgeries.  If you're interested in

13:13:52 22   that, I'm sure he would sign a release for you, but

13:13:56 23   that information would be with the William Carter

13:13:58 24   Company, because we were self-insured for our

13:14:00 25   insurance.  All the claims would have gone through
```

13:14:00  1    there.

13:14:04  2        Q.    Was the back injury as a result of an

13:14:04  3    accident?

13:14:04  4        A.    Yes, it was.

13:14:08  5        Q.    Okay.  And do you remember --

13:14:08  6        A.    Helping our neighbor.

          7        Q.    -- about when that was?

13:14:12  8        A.    Yes, sir.  Being a good neighbor, being in

13:14:14  9    someone's tree trying to help them -- help them

13:14:18 10    trim the tree, and he fell about 15 feet on his

13:14:18 11    back.

13:14:20 12        Q.    Got you.  And about when would that

13:14:20 13    occur?

13:14:24 14        A.    I believe it was in January.

13:14:26 15        Q.    Of what year?

13:14:26 16        A.    '99.

13:14:30 17        Q.    Okay.  So he was injured in January of

13:14:32 18    '99, and since that time has had about four

13:14:34 19    surgeries?

13:14:36 20        A.    He's had two before that, and probably two

13:14:38 21    after that.

13:14:40 22        Q.    Oh, he'd had back surgery --

13:14:40 23        A.    He's had surgery -- he did not have

13:14:42 24    surgery on his back.  There was no way that they

13:14:46 25    could repair it.  He had other abdominal surgeries,

13:14:48  1    major abdominal surgeries.

13:14:52  2         Q.   Let me ask you.  I didn't quite

13:14:54  3    understand.  Had your husband had some kind of

13:14:58  4    surgeries prior to falling in January of 1999?

13:15:00  5         A.   Yes.  Yes, he had.

          6         Q.   Okay.

13:15:02  7         A.   But I really do not understand why that's

13:15:04  8    part of this.  I don't understand your interest in

13:15:08  9    my husband's medical background.  I don't know what

13:15:08  10   bearing it has on this case.

13:15:10  11        Q.   Well, part of -- yeah, I'll be glad to

13:15:12  12   explain that under the court rules, this is what's

13:15:14  13   called a discovery deposition.

13:15:16  14        A.   Uh-huh.

13:15:18  15        Q.   Which means that we get to ask questions

13:15:20  16   or permitted to ask questions about things.  And it

13:15:22  17   may have -- quite frankly, may end up having

13:15:26  18   nothing to do with this case.  On the other hand,

13:15:28  19   it might lead to something that may have something

13:15:30  20   to do with the case.  One of the issues that I

13:15:34  21   would ask you about is to what your income has been

13:15:36  22   and the sources of that income.  You've told me

13:15:40  23   that you're in business with your husband, own two

13:15:42  24   businesses.  So I'm simply trying to get

13:15:46  25   information about his background, and that's simply

13:15:46   1  what it is.

13:15:48   2      A.   Well, I understand you're asking about the

13:15:52   3  financial background, but I don't understand your

13:15:54   4  asking about his medical conditions.  And I'm very

13:15:58   5  uncomfortable talking about his medical conditions

13:16:00   6  without his permission.  I'm here for the

13:16:00   7  deposition, not him.  When you -- when you have

13:16:02   8  your opportunity to -- to take a deposition from

13:16:06   9  him, you may ask him about his medical at that

           10  time.

13:16:08  11      Q.   If you want to refuse to answer any

13:16:10  12  questions, you may do so.  If --

13:16:12  13      A.   I'm just telling you, sir, that I'm

13:16:16  14  uncomfortable answering it, because it's not my

13:16:16  15  medical to relate.

13:16:20  16      Q.   If you will, I'll let you finish your

13:16:20  17  answer before I ask you another question.  If

13:16:22  18  you'll let me finish my question before you give

13:16:26  19  another answer, it will help the court reporter.

13:16:28  20  It doesn't bother me personally, but it will help

13:16:32  21  the court reporter get the transcript correct.  If

13:16:34  22  there's anything you don't want to answer, you're

13:16:36  23  free not to answer it.  We'll then discuss it with

13:16:40  24  the judge whether you have to answer the question

13:16:40  25  or not.  Okay?

13:16:42  1      A.   That's fine.  That's fine with me.  I just
13:16:44  2  wanted to tell you that I was uncomfortable with it
13:16:46  3  because it's not my medical.
13:16:50  4      Q.   I understand.  Your husband had surgery
13:16:52  5  prior to January of 1999.  And my question was,
13:16:54  6  what was the nature of those surgeries?
13:16:56  7      A.   Abdominal surgeries.
13:16:58  8      Q.   Okay.
13:17:00  9      A.   He had major abdominal surgeries.  He had
13:17:04 10  one in February of '97 before we moved back down,
13:17:12 11  had one, again, I believe, in December of '97, and
13:17:16 12  another one, I believe, in the spring of -- of --
13:17:18 13  spring of '98.  And this is very hard.  The dates
13:17:20 14  are very hard for me to recall.
13:17:24 15      Q.   And I appreciate that.  And I'll just
13:17:26 16  accept your testimony as that being those dates to
13:17:32 17  the best of your memory.  Did your -- was your
13:17:36 18  husband employed full time, though, prior to the
13:17:36 19  surgeries?
13:17:38 20      A.   Yes, he was.
13:17:40 21      Q.   And which company was he working for?
13:17:44 22      A.   He was working as an insurance adjuster.
13:17:46 23      Q.   Okay.  Was he working for a particular
13:17:46 24  company?
13:17:50 25      A.   No.  I don't believe that he was at the

13:17:54  1    time.  He was a self-employed contractor, just like

13:17:56  2    I am basically now.

13:18:14  3        Q.    Okay.  When you last worked for William

13:18:18  4    Carter Company, who was your immediate supervisor?

13:18:20  5        A.    Nellie Askey.

13:18:22  6        Q.    And about how long had Ms. Askey been your

13:18:24  7    supervisor?

13:18:30  8        A.    This last time or the time before that?

13:18:32  9    She had been my supervisor in previous -- on a

13:18:42 10    previous occasion, as well.  Probably maybe five

13:18:44 11    months, six months.

13:18:44 12        Q.    And prior to Ms. Askey?

13:18:46 13        A.    Alejandra Bailon.

13:18:46 14        Q.    What's her last name?

13:18:48 15        A.    Bailon.

13:18:50 16        Q.    How do you spell it?

13:18:52 17        A.    B-a-i-l-l-o-n?

13:18:56 18            MS. ASKEY:  One L.

13:18:56 19        A.    One L.

13:19:00 20        Q.    And about how long had Ms. Bailon been

13:19:00 21    your supervisor?

13:19:02 22        A.    Perhaps a year and a half.

13:19:04 23        Q.    Okay.  Where was she located?

13:19:08 24        A.    In Griffin, Georgia.

13:19:14 25        Q.    And prior to her, who was your supervisor?

13:19:16  1       A.    Nellie Askey.

13:19:18  2       Q.    And how long was Ms. Askey your supervisor

13:19:20  3   the first time?

13:19:24  4       A.    From the time period I went back to work

13:19:30  5   for Carter's in April of '97.  I don't remember the

13:19:34  6   exact date that Alejandra came on board.  I'm

13:19:34  7   sorry.

13:19:38  8       Q.    From the time you went back -- when you --

13:19:40  9   when you were rehired by William Carter in April

13:19:44 10   1997 until May of 2002 -- 2001, excuse me, there

13:19:46 11   were two different individuals who were your

13:19:48 12   immediate supervisors.

13:19:50 13       A.    That's correct.

13:19:54 14       Q.    And Nellie Askey was one of those persons,

13:19:56 15   and she was your immediate supervisor on two

13:19:56 16   occasions?

13:19:58 17       A.    That's correct.

13:20:06 18       Q.    Okay.  From April of 1997 to May of 2001,

13:20:10 19   you were the occupational health nurse for the

13:20:12 20   Harlingen plant?

13:20:16 21       A.    Harlingen plant and Senatobia,

13:20:18 22   Mississippi, as well.

13:20:22 23       Q.    In the Senatobia, Mississippi plant, what

13:20:24 24   period of time were you the occupational health

13:20:26 25   nurse for that facility?

```
13:20:28  1        A.    For that time period until I came back
13:20:34  2   until the time period that they closed -- bless you
13:20:36  3   -- I don't remember the exact date that they
13:20:36  4   closed.
13:20:36  5        Q.    All right.
13:20:42  6        A.    It may have been in '98 or '99.  I don't
13:20:42  7   remember exactly.
13:20:42  8        Q.    Okay.
13:20:44  9        A.    I'm sorry.  It's been too many years.
13:20:48 10        Q.    I take it, the Mississippi plant being
13:20:50 11   closed for a year and a half, or maybe as long as
13:20:54 12   two years prior to the Harlingen plant being
13:20:54 13   closed?
13:20:56 14        A.    I would say so.
13:20:56 15        Q.    Okay.
13:20:58 16        A.    To my best recollection.
13:21:18 17        Q.    Let me ask you about the Harlingen plant.
13:21:22 18   About how many employees were at that plant prior
13:21:24 19   to its closing?
13:21:30 20        A.    I would say close to 500 right before it
13:21:32 21   closed.  Before that, we were almost up to 600.
13:21:38 22        Q.    And do you recall approximately when the
13:21:42 23   announcement was made that the plant would be
13:21:42 24   closed?
13:21:44 25        A.    I believe it was in March.
```

13:21:46  1      Q.    March of 2001?

13:21:48  2      A.    That's correct.

13:22:02  3      Q.    And Gary Butts was the Plant Manager of

13:22:08  4  the Harlingen plant at the time it was closed; is

13:22:08  5  that correct?

13:22:08  6      A.    Yes, sir.

13:22:14  7      Q.    And reporting to Mr. Butts would have been

13:22:16  8  -- what would the management structure of that

13:22:18  9  facility, what would it have been?

13:22:20 10      A.    He would have been an indirect supervisor.

13:22:22 11      Q.    He would have been your indirect

13:22:22 12  supervisor?

13:22:24 13      A.    My indirect supervisor.

13:22:26 14      Q.    All right.  Who were the other management

13:22:28 15  employees at that plant, starting with those who

13:22:32 16  would have reported directly to Mr. Butts?

13:22:36 17      A.    Clara Perez, Human Personnel

13:22:38 18  Administrator.

13:22:42 19      Q.    Okay.  And what was her last name?

13:22:46 20      A.    Perez.  Perez, P-e-r-e-z.

13:22:48 21      Q.    Okay.

13:22:52 22      A.    Luis Nunez.

13:22:54 23      Q.    And her position?

13:22:56 24      A.    His position was Production

13:23:12 25  Superintendent.  Frank Pena, Plant Engineer; Nora

13:23:22  1    Barrios, Cost Analyst; Rosa Lee Mason, Payroll

13:23:30  2    Supervisor; Noemi Farias.

13:23:32  3        Q.    I'm sorry.  I didn't understand the name.

13:23:38  4        A.    Noemi Farias, F-a-r-i-a-s.  She was in

13:23:40  5    charge of the warehouse before the plant closed.

13:23:44  6        Q.    Okay.  And --

13:23:46  7        A.    There were -- there were many sewing

13:23:48  8    supervisors.

13:23:48  9        Q.    Okay.

13:23:50 10        A.    I'm sure you have a list of their names,

13:23:50 11    as well.

13:23:58 12        Q.    Those are the primary people who would

13:24:00 13    have been reporting directly to Mr. Butts?

13:24:02 14        A.    The sewing supervisors would have, also.

13:24:06 15        Q.    Yes.  I meant -- but the sewing

13:24:08 16    supervisors and the other individuals you've named?

13:24:08 17        A.    Yes.

13:24:08 18        Q.    Anyone else that you remember?

13:24:12 19        A.    The janitorial staff.

13:24:16 20        Q.    No.  I meant that reported directly to

13:24:18 21    him.

13:24:28 22        A.    Not that I can recall at this time.  I

13:24:36 23    just can't recall everyone's names.  The

13:24:38 24    receptionist.

13:24:44 25        Q.    Who was the receptionist?

13:24:50  1      A.    When I left, I believe it was Mary -- I

13:24:52  2  don't know her last name.

13:24:58  3           Isabel Sanchez.  I'm sorry.  Mary

13:25:02  4  Isabel Sanchez.  She worked in Payroll and as a

13:25:02  5  receptionist.

13:25:24  6      Q.    Now, did I understand that prior to the

13:25:28  7  closing of the plant, that you had worked out of

13:25:28  8  your house?

13:25:32  9      A.    Yes.

13:25:36  10      Q.    I mean, as opposed to working there at the

13:25:36  11  plant.

13:25:38  12      A.    Yes, I did.  I called in on April the 25th

13:25:50  13  and left a message for Ms. Askey.  And I requested

13:25:50  14  to speak with Dave Brown, who I did speak with, and

13:25:50  15  told him that I was -- I felt that my life and the

13:25:54  16  life of my family were being threatened by Gary

13:25:58  17  Butts and I wasn't comfortable going back to the

13:25:58  18  plant.

13:26:02  19      Q.    When you called on April the 25th -- and

13:26:04  20  this was of 2001?

13:26:04  21      A.    Yes, sir.

13:26:06  22      Q.    Okay.  When you called on April the 25th,

13:26:10  23  did you place a call to Nellie Askey?

13:26:12  24      A.    Yes, sir, I left a message on her -- on

13:26:14  25  her voice mail and she returned my call.

```
13:26:16  1        Q.    Okay.
13:26:20  2        A.    Dave Brown returned my call on the 26th.
13:26:22  3        Q.    And when -- did Nellie return your call
13:26:22  4   the same day, that you remember?
13:26:24  5        A.    Yes, sir.
13:26:32  6        Q.    Okay.  And what I want to understand at
13:26:36  7   this point, at least, is what you had told Nellie
13:26:38  8   Askey.
13:26:40  9        A.    I told her that I was being retaliated
13:26:44 10   against by Gary Butts and that he was harassing me
13:26:54 11   daily there at work.  He attempted to run into my
13:26:56 12   husband's truck with his truck while my husband was
13:26:58 13   dropping me off and coming out of the plant
13:27:00 14   entrance.  He was listening to my private phone
13:27:00 15   calls.
13:27:02 16        Q.    Ma'am, I want to -- I apologize for
13:27:04 17   interrupting you.  I have a copy of a document that
13:27:08 18   you had submitted to the company at some point, but
13:27:12 19   I'm really asking you to what you told Nellie Askey
13:27:16 20   in this conversation.  Okay?  If it's something
13:27:20 21   that you were told -- told her later or you wrote
13:27:22 22   -- that you wrote about later, that's fine, but I
13:27:24 23   really want to know what you had told her on this
13:27:26 24   particular conversation to the extent that you can
13:27:28 25   remember that.  Okay?  And I apologize for
```

13:27:30  1    interrupting you.

13:27:32  2        A.   The nature of the conversation, as far as

13:27:36  3    I can remember, was, I -- I told her that I was

13:27:40  4    being threatened and harassed by him on a daily

13:27:44  5    basis, and I felt that my life and my family's

13:27:46  6    lives were in danger, and I did not want to return

13:27:48  7    back to work there.  I was afraid of him.

13:27:48  8        Q.   Okay.

13:27:50  9        A.   I would love to work out of my house to

13:27:52 10    finish out my days.  I wanted to finish my

13:27:56 11    obligation with the company.  And she said she did

13:27:58 12    not think that that would be a problem.

13:28:06 13        Q.   Okay.  And you spoke to Dave Brown.  And

13:28:08 14    Dave Brown, just for the record, is who?

13:28:14 15        A.   The president of Human Resources.  I did

13:28:18 16    not wish to speak with Clyde Stutts.  I requested

13:28:20 17    to speak with Dave Brown, because I had spoken to

13:28:24 18    Clyde Stutts in January and he released my name and

13:28:26 19    the information that I had spoken to him about to

13:28:30 20    Gary Butts, and I was retaliated against at that

         21    time.

13:28:32 22        Q.   Okay.  And when you spoke to Dave Brown,

13:28:36 23    what did you tell -- did you speak to him the week

13:28:38 24    -- within a day or the same day that you called

13:28:40 25    Nellie Askey?

13:28:42  1        A.    He called me back on the 26th of April.

13:28:44  2        Q.    Okay.

13:28:46  3        A.    About the very next day.

13:28:50  4        Q.    And did you tell him that you didn't want

13:28:52  5   to return to the plant?

13:28:54  6        A.    I told him I didn't want to return to the

13:28:56  7   plant.  I told him exactly what I had told Nellie

13:29:00  8   Askey, and I told him, "I understand that you're

13:29:02  9   going to move Gary Butts, and I would like for you

13:29:04 10   to move him and get him away from my family.  I'll

13:29:06 11   give you any information that you want to know

13:29:08 12   about him from what I know about him, his actions,

13:29:12 13   his behaviors.  I think he's very unstable,

13:29:16 14   mentally unstable.  And I think he's under the

13:29:18 15   influence of something, and I want him away from my

13:29:20 16   family.  And I don't want you to approach him with

13:29:24 17   any information, especially not give my name, but

13:29:28 18   don't approach him with any information until he's

13:29:28 19   away from my family."

13:29:32 20        Q.    Okay.  Did he agree with that?

13:29:34 21        A.    Yes, sir.

13:29:38 22        Q.    Okay.  Did I understand that -- that you

13:29:42 23   requested and said that you did not want to return

13:29:44 24   to the plant, you did not want to be around Gary

13:29:48 25   Butts, but as far as all the details of what you

13:29:50  1    would be willing to share with the company, you

13:29:52  2    wanted to wait until Mr. Butts had left Harlingen,

13:29:54  3    Texas?

13:29:56  4        A.    I told Mr. Brown that I would share with

13:29:56  5    him any information --

13:29:58  6        Q.    Okay.

13:29:58  7        A.    -- that there was.  And I did tell him

13:30:02  8    about the harassment and the phone calls.  I shared

13:30:04  9    some information with him at that time, but I told

13:30:06  10   him I didn't want him to approach Mr. Butts until

13:30:10  11   he had already moved him.  And he said the plant

13:30:12  12   was going to close the 8th or the 9th and that he

13:30:14  13   would be moving.  However, he did not move him

13:30:18  14   until July and allowed him to continue to stay

13:30:20  15   where he was and continue his actions.

13:30:30  16       Q.    Did Ms. Askey talk to you about working

13:30:30  17   out of your house?

13:30:32  18       A.    Yes, sir.

13:30:36  19       Q.    Okay.  And was that the same week or the

13:30:38  20   next week?

13:30:38  21       A.    I believe it was the following week.

13:30:46  22       Q.    Okay.  Do you know what date it was?

13:30:48  23       A.    I know that she came to my house on May

13:30:50  24   the 2nd, and I believe that's when she brought all

13:30:52  25   of my -- my work things that I needed, all the

13:30:58  1  insurance forms, names, addresses of all the

13:31:00  2  employees so I could complete all of the COBRA

13:31:04  3  paperwork for their insurance.

13:31:06  4      Q.   After you placed the call on May -- excuse

13:31:10  5  me -- on April the 25th to Ms. Askey, did you work

13:31:12  6  at the Harlingen plant after that?

13:31:16  7      A.   No, sir.  I called to tell her I would not

13:31:18  8  step foot back in that plant, and I did not.

13:31:24  9      Q.   So you basically worked out of your house

13:31:28 10  from the day that you placed the call on April the

13:31:32 11  25th until your last day of work on May 8th or

13:31:32 12  9th?

13:31:34 13      A.   Yes, sir.

13:31:36 14      Q.   Okay.  And have you worked for William

13:31:40 15  Carter Company at all in any capacity, whether on a

13:31:42 16  contract basis, on part-time employment, or

13:31:46 17  otherwise, since May the 8th or 9th of 2001?

13:31:46 18      A.   No, sir.

13:31:54 19      Q.   Okay.  And did -- I understand that you

13:31:56 20  told Ms. Askey and Mr. Brown that you would be

13:31:58 21  willing to share any and all information with them

13:32:02 22  after Mr. Butts had left Harlingen, Texas.

13:32:06 23      A.   I told him I would be willing to give them

13:32:08 24  any information, and I did give them information.

13:32:08 25      Q.   Okay.

13:32:10  1    A.    But I did not want Mr. Butts approached

13:32:12  2  until after he was moved.

13:32:12  3    Q.    Okay.

13:32:14  4    A.    That -- that is what I said.

13:32:16  5    Q.    Okay.  You didn't want him to be

13:32:16  6  approached about anything until --

13:32:18  7    A.    Exactly.  "I'm willing to give you any

13:32:20  8  information, but I don't want him approached with

13:32:24  9  it until he is four states away from my family."

13:32:26  10    Q.    Okay.  At the time you placed the call to

13:32:32  11  Nellie Askey in April of 2001, had you heard Mr.

13:32:36  12  Butts was going to be relocated somewhere with the

13:32:36  13  company?

13:32:40  14    A.    That was the -- whenever they announced

13:32:46  15  that the plant was going to close.  It was common

13:32:46  16  knowledge around the plant that he was being kept.

13:32:48  17    Q.    Okay.

13:32:50  18    A.    That he was going to be moved.

13:32:52  19    Q.    Do you know if anyone else that worked in

13:32:56  20  that plant was kept or moved to another location?

13:32:58  21    A.    I believe he was the only one.

13:33:06  22    Q.    Okay.  After the plant was closed, were

13:33:10  23  you contacted at some point by somebody from

13:33:14  24  William Carter to -- to solicit the additional

13:33:16  25  information from you that you said you'd share with

13:33:16  1    the company?

13:33:20  2        A.   I have been contacted by Ms. Askey on

13:33:22  3    several occasions and by Clyde Stutts on, I

13:33:28  4    believe, two occasions, and by Amy, I believe, Dave

13:33:34  5    Brown's secretary, to reschedule appointments for

13:33:34  6    conference calls.

13:33:36  7        Q.   Well, let me ask you -- and my question

13:33:40  8    may not have been clear.  But after you stopped

13:33:46  9    working for the company in May 8th or 9th, did you

13:33:50  10   contact the company to tell them -- did you

13:33:54  11   initiate the contact with anyone at William Carter

13:33:54  12   to say that "I want to" -- "There's information I

13:33:56  13   want to tell you?"  Or did someone at William

13:34:00  14   Carter call you to say, "Are you now willing to

13:34:02  15   tell us information about Mr. Butts?"

13:34:04  16       A.   I believe that I initiated it.

13:34:08  17       Q.   Okay.  And on what day did you initiate

13:34:08  18   it?

13:34:10  19       A.   I really don't recall the date.

13:34:12  20       Q.   Didn't Ms. Askey call you and tell you

13:34:16  21   that Mr. Butts had now been relocated to Georgia

13:34:18  22   and asked you if you'd share any of your

13:34:18  23   information with her?

13:34:20  24       A.   I really don't remember.

13:34:22  25       Q.   Okay.

13:34:24  1        A.    I know I was asked for the information.

13:34:28  2    We discussed me providing the information, and I

13:34:30  3    had provided some information before, as far as my

13:34:34  4    phone numbers and my pager numbers, and then when I

13:34:36  5    spoke with Mr. Stutts, he requested that I write

13:34:38  6    everything out, which I did.

13:34:40  7        Q.    Okay.

13:35:14  8                    (Exhibit 1 marked.)

13:35:18  9        Q.    Ms. Tate, I'm going to give you a

13:35:26  10   document, which has been marked as Exhibit 1.  And

13:35:30  11   it's a multi-page document.  And are you familiar

13:35:30  12   with that document?

13:35:32  13       A.    Yes, sir.

13:35:34  14       Q.    Okay.  Now, there's some handwriting on

13:35:42  15   the front page, and it says it's addressed to Clyde

13:35:44  16   Stutts.  And under that it has "VP Human Resources,

13:35:48  17   William Carter."  Is any of the handwriting on the

13:35:50  18   first page of that document your handwriting?

13:35:52  19       A.    It looks like my handwriting.

13:35:58  20       Q.    Okay.  It says, "July 16, 2001, sent by

13:36:02  21   e-mail."  Is that -- did you send it to Clyde

13:36:04  22   Stutts by e-mail on or about July 16th, 2001?

13:36:14  23       A.    As far as I can remember.  I would assume.

13:36:16  24       Q.    Okay.  Is this the document -- you had

13:36:18  25   mentioned earlier that you did send information to

13:36:20  1    the company, and I think you may have said --

13:36:24  2    A.    I sent information -- pardon me.  I sent

13:36:28  3    information to Clyde Stutts, to Dave Brown, and

13:36:28  4    Fred Rowan, as well.

13:36:30  5    Q.    Okay.  And my question of you is, is this

13:36:36  6    the document that you did send?

13:36:50  7    A.    Yes.

13:36:54  8    Q.    Okay.  And the next to the last page has a

13:36:58  9    signature of Susan Tate.  And is that your

13:36:58  10   signature?

13:36:58  11   A.    Yes, sir.

13:37:04  12   Q.    Okay.  Is this -- so is July the 16th of

13:37:06  13   2001 the first time that you had put something down

13:37:08  14   on a piece of paper that you sent -- that you sent

13:37:12  15   to the company?  Or not the first time that you put

13:37:14  16   it on a piece of paper, but is this the first time

13:37:16  17   that you'd given the company something in writing?

13:37:18  18   A.    I -- I think so.

13:37:20  19   Q.    Okay.

13:37:22  20   A.    This is when I was asked to provide it in

13:37:22  21   writing.

13:37:26  22   Q.    Okay.  Well, had you ever -- whether you

13:37:30  23   were asked to do so or not, had you ever given to

13:37:32  24   anyone at William Carter Company anything in

13:37:36  25   writing concerning your complaints about Gary

```
13:37:38   1   Butts?
13:37:40   2       A.   No, sir.  I had only had conversations
13:37:42   3   with Clyde Stutts and Tammie Merritt.
13:37:48   4       Q.   Okay.  And in your conversations with
13:37:52   5   Clyde Stutts and with Tammie Merritt, when did
13:37:54   6   those occur?
13:37:56   7       A.   January of 2001.
13:38:00   8       Q.   Okay.  And did both of those conversations
13:38:00   9   occur in January?
13:38:00  10       A.   Yes, sir.
13:38:06  11       Q.   Okay.  And who did you speak to first?
13:38:08  12       A.   Tammie Merritt.
13:38:12  13       Q.   And Tammie Merritt, just for the record,
13:38:12  14   is who?
13:38:14  15       A.   The Director of Human Resources.
13:38:18  16       Q.   Is that somebody that you had known and
13:38:22  17   worked with for -- during your years with William
13:38:22  18   Carter?
13:38:22  19       A.   Yes, sir.
13:38:26  20       Q.   Okay.  And where was she located?
13:38:26  21       A.   Griffin, Georgia.
13:38:32  22       Q.   And did you call Tammie Merritt?
13:38:34  23       A.   Yes, sir, I did.
13:38:36  24       Q.   Okay.  And what was the purpose of calling
13:38:40  25   Tammie Merritt in January of 2001?
```

| | | |
|---|---|---|
| 13:38:44 | 1 | A.   I had a question.  Actually, I had called |
| 13:38:48 | 2 | wanting to speak with Lawson Farmer.  I had a |
| 13:38:50 | 3 | question concerning a rumor that was going around |
| 13:38:54 | 4 | the town about the plant closing, which had not |
| 13:39:00 | 5 | been announced.  And she relayed my concerns to |
| 13:39:00 | 6 | Clyde Stutts. |
| 13:39:04 | 7 | Q.   Okay.  When you called Tammie Merritt or |
| 13:39:08 | 8 | attempted to call Lawson -- is it Farmer? |
| 13:39:08 | 9 | A.   Yes, sir. |
| 13:39:12 | 10 | Q.   Was that to report anything on Gary |
| 13:39:16 | 11 | Butts?  Or was it simply to find out if the rumor |
| 13:39:18 | 12 | about the plant closing was true? |
| 13:39:20 | 13 | A.   I wanted to know if the rumor about the |
| 13:39:24 | 14 | plant closing was true.  And I -- I had to tell him |
| 13:39:26 | 15 | how I had heard -- I came about hearing about it, |
| 13:39:28 | 16 | because it was going around the community.  He was |
| 13:39:32 | 17 | telling people, evidently, at his church, and they |
| 13:39:32 | 18 | were, of course, going out -- and someone |
| 13:39:36 | 19 | approached me that goes to church there and was |
| 13:39:38 | 20 | asking me about what plans I had for employment |
| 13:39:40 | 21 | afterwards, because they own a rehab business. |
| 13:39:44 | 22 | Q.   Well, just -- specifically, my question |
| 13:39:48 | 23 | is, were you calling -- or did call you Tammie |
| 13:39:52 | 24 | Merritt or anyone else initially for the purpose of |
| 13:39:56 | 25 | asking about the rumor about the plant closing or |

| | | |
|---|---|---|
| 13:40:00 | 1 | were you calling to report some misconduct by Gary |
| 13:40:00 | 2 | Butts? |
| 13:40:04 | 3 | A.    I called to ask about the rumor about the |
| 13:40:04 | 4 | plant closing initially. |
| 13:40:08 | 5 | Q.    Okay.  Okay.  And then -- |
| 13:40:12 | 6 | A.    On -- however, on that same day after -- |
| 13:40:16 | 7 | after I got off the phone with Tammie Merritt, she |
| 13:40:20 | 8 | called Clyde Stutts and told him -- informed him of |
| 13:40:22 | 9 | the nature of our conversation.  He called Gary |
| 13:40:26 | 10 | Butts at the plant -- and all of this happened |
| 13:40:28 | 11 | within probably -- approximately 10 minutes of the |
| 13:40:32 | 12 | time I talked to Tammie Merritt, and Gary Butts |
| 13:40:34 | 13 | called me up yelling at me over the phone.  And |
| 13:40:38 | 14 | when I got home, there were three messages on the |
| 13:40:38 | 15 | answering machine at home from Tammie Merritt |
| 13:40:42 | 16 | apologizing, wanting me to call her at her home |
| 13:40:44 | 17 | because she said she did not want me to feel that |
| 13:40:46 | 18 | she was the one that gave out my name. |
| 13:40:50 | 19 | Q.    Okay.  You called Tammie Merritt to ask |
| 13:40:54 | 20 | about the rumor about the plant closing? |
| 13:40:54 | 21 | A.    Correct. |
| 13:40:56 | 22 | Q.    And shortly after that conversation, Gary |
| 13:41:00 | 23 | Butts jumped on you, so to speak, verbally? |
| 13:41:00 | 24 | A.    Yes, sir. |
| 13:41:04 | 25 | Q.    Okay.  I mean -- I know you weren't |

13:41:08  1    present to hear what Tammie Merritt told Clyde and

13:41:12  2    what Clyde said to Gary -- Gary Butts, but Mr.

13:41:14  3    Butts said something to you about it?

13:41:16  4        A.    He called me over the phone and screamed

13:41:16  5    at me and yelled at me.

13:41:18  6        Q.    Okay.  And what did he say?

13:41:22  7        A.    He wanted to know why I called up there.

13:41:22  8        Q.    Okay.

13:41:26  9        A.    If I had any questions about that plant, I

13:41:26 10    could have asked him.

13:41:32 11        Q.    Okay.  Why you called the corporate

13:41:32 12    office?

13:41:32 13        A.    Exactly.

13:41:34 14        Q.    Okay.

13:41:38 15        A.    But he knew why I wouldn't have asked him,

13:41:42 16    because he had been harassing me, and I was not

13:41:42 17    going to ask him anything.

13:41:48 18        Q.    Okay.  The -- did you then speak to Clyde

13:41:50 19    Stutts in January separately?

13:41:50 20        A.    Yes, sir.

13:41:54 21        Q.    Okay.  And did you call Mr. Stutts or did

13:41:56 22    he call you?  How did that --

13:42:00 23        A.    I believe -- I'm sorry -- I called Mr.

13:42:04 24    Stutts.  I left a message requesting that he call

13:42:04 25    me.

13:42:06  1      Q.    Okay.  And this was after your

13:42:08  2  conversation with Tammie Merritt?

13:42:08  3      A.    Yes, sir.

13:42:16  4      Q.    Okay.  And why did you call Clyde Stutts?

13:42:16  5      A.    Because I wanted to let him know what type

13:42:16  6  of treatment I had gotten from Gary Butts

13:42:18  7  afterwards, and I wanted to let him know that I

13:42:22  8  didn't appreciate him giving out my name and

13:42:24  9  discussing what I had talked to him about

13:42:30  10  confidentially.  There were many ways it could have

13:42:32  11  been handled without disclosing my name.

13:42:34  12      Q.    And I understand that.  But let me ask

13:42:38  13  you.  Did you say something to Tammie Merritt about

13:42:40  14  "Don't say anything about the fact that I'm the

13:42:42  15  one that called and asked about this?"

13:42:48  16      A.    Did I not say that to her?  Well -- she --

13:42:52  17  she asked me -- I believe she asked me why I did

13:42:54  18  not ask Gary Butts, and I told her I was not going

13:42:56  19  to ask Gary Butts.

13:42:58  20      Q.    Well, my question is, did you tell Tammie

13:43:00  21  Merritt, "Don't tell anybody that I called" or

13:43:04  22  "Don't let Gary Butts find out that I called?"

13:43:06  23      A.    No, sir, I don't believe that I told

13:43:08  24  Tammie Merritt that.  I took that as usually when

13:43:12  25  you speak to someone about a rumor that's going

13:43:14  1    around and being started by that person, you expect

13:43:16  2    confidentiality.

13:43:18  3         Q.   Okay.  And I understand that may be a

13:43:22  4    reasonable expectation and reasonably what you

13:43:24  5    expected, but my question is, whether you had asked

13:43:26  6    her to keep your conversation with her

13:43:26  7    confidential.

13:43:26  8         A.   No, sir.

13:43:32  9         Q.   Okay.  I assume that you called Clyde

13:43:34  10   Stutts the same day within one or two days of Mr.

13:43:36  11   Butts --

13:43:36  12        A.   Yes, sir.

13:43:38  13        Q.   -- saying something to you about calling

13:43:40  14   corporate office?

13:43:40  15        A.   Yes, sir.

13:43:44  16        Q.   Did -- and I didn't understand, quite

13:43:48  17   frankly, if you had spoken to Clyde Stutts or if

13:43:50  18   you left him a message.

13:43:50  19        A.   I left him a message.

13:43:52  20        Q.   Okay.

13:43:52  21        A.   And he returned my call --

13:43:52  22        Q.   Okay.

13:43:56  23        A.   -- I believe, on another day.

13:44:00  24        Q.   Okay.  And the gist of that was -- is that

13:44:06  25   you were upset that -- that he had spoken to Gary

3:44:08  1   Butts about your telephone call?  It --

3:44:10  2     A.  I was upset.

3:44:10  3     Q.  I'm sorry.

3:44:12  4     A.  Excuse me.  I was upset because he had

3:44:14  5   released my name to him.

3:44:14  6     Q.  Okay.

3:44:18  7     A.  And I wanted to tell him how I was being

3:44:18  8   treated afterwards.

3:44:24  9     Q.  Okay.  And what did you tell Clyde Stutts

3:44:28 10  in your conversation with him about how you were

3:44:30 11  being treated by Gary Butts or anyone else?

3:44:34 12     A.  I told Mr. Stutts that Gary Butts had

3:44:36 13  called me within five minutes of his conversation

3:44:40 14  with him screaming and yelling at me, and I was

3:44:44 15  already afraid of him.  I packed up my things, and

3:44:46 16  I went home.  I went home that day.

3:44:46 17     Q.  Okay.

3:44:50 18     A.  I was not going to stay in that plant with

3:44:50 19  him.

3:44:56 20     Q.  And what did Mr. Stutts say or do as a

3:44:58 21  result of your conversation with him?

3:45:02 22     A.  Mr. Stutts' reply was, "I told him he

3:45:04 23  shouldn't be angry with you."

3:45:10 24     Q.  Is the next time that you had any

3:45:14 25  conversation with anyone in a management position

13:46:46  1      A.    Happened to be on a day that she was
13:46:50  2  physically threatened by Gary Butts, as well.
13:46:54  3      Q.    Now, is Connie Mejia somebody that you
13:46:54  4  report to?
13:46:56  5      A.    No, sir, she's a co-worker.
13:47:04  6      Q.    Okay.  Is Tammie Merritt, then, somebody
13:47:08  7  who is more in the position of -- within the
13:47:10  8  organization of William Carter, somebody who you
13:47:16  9  report to, either directly or indirectly?
13:47:18  10     A.    I would not say that I report to her
13:47:22  11  directly or indirectly.  She would be above me.
13:47:24  12  She's in upper management.
          13     Q.    Okay.
13:47:26  14     A.    She has been my supervisor in the past
13:47:28  15  when I worked there prior.
13:47:30  16     Q.    Her position is different, though, than
13:47:32  17  Connie Mejia's position?
13:47:32  18     A.    Yes, sir.
13:47:34  19     Q.    Okay.  Let me ask you about the
13:47:36  20  conversation, then, in the -- when the plant
13:47:38  21  closing was announced.  That would have been in
13:47:40  22  March of 2001?
13:47:42  23     A.    Yes, sir.
13:47:48  24     Q.    And Tammie Merritt was in Harlingen,
13:47:48  25  Texas --

13:47:48  1    A.    Yes, sir.

13:47:52  2    Q.    -- in connection with that announcement?

13:47:54  3    A.    I -- I do not recall if it was the very

13:47:56  4  first announcement or the second -- the second week

13:47:58  5  -- the second visit, but she did come down at one

13:48:00  6  point, and she and I had a conversation.

13:48:06  7    Q.    Okay.  And to the extent that you can,

13:48:10  8  tell me what you had told Tammie Merritt on the

13:48:16  9  occasion that you discussed with her in March of

         10  2001.

13:48:20 11    A.    I told her that I avoided Gary Butts as

13:48:22 12  much as I could.  And she -- her response was that

13:48:26 13  Clyde Stutts didn't know how he was, but she did.

13:48:34 14    Q.    Did you discuss any of the details, as far

13:48:36 15  as with Tammie Merritt, that are outlined in the

13:48:38 16  document, Exhibit No. 1?

13:48:42 17    A.    I don't believe I -- I spoke to her about

13:48:44 18  anything other than the phone call and the

13:48:48 19  retaliation, the shouting at me.  These things had

13:48:48 20  happened in January.

13:48:54 21    Q.    Okay.  When you talk about the shouting

13:49:00 22  and the retaliation against you, is the retaliation

13:49:02 23  in January you're talking about the shouting at

13:49:04 24  you?  Or is there something separate from that?

13:49:08 25    A.    The shouting at me, the gentleman -- I

13:49:12  1    shouldn't call him a gentleman.  Mr. Butts was

13:49:14  2    already harassing me, because I had -- I had

13:49:18  3    confronted him.  Initially, it began he made a

13:49:22  4    comment concerning my husband and I's sex life.

13:49:24  5    And my husband and I -- my husband confronted him

13:49:26  6    about it.

13:49:26  7        Q.    Okay.

          8        A.    Okay?

13:49:28  9        Q.    And I realize that that's in here.

13:49:28  10       A.    Okay.

13:49:32  11       Q.    But if I understand correctly, you did not

13:49:34  12   relate those kinds of details to anyone at the

13:49:38  13   company in January of 2001?

13:49:38  14       A.    That's correct.

13:49:42  15       Q.    And you didn't relate any of those kinds

13:49:46  16   of details to Tammie Merritt in March of 2001; am I

13:49:46  17   correct?

13:49:50  18       A.    I related some of the harassment, but not

13:49:52  19   all of it, just basically that he was going into --

13:49:56  20   going through -- my office had two doors, and he

13:49:58  21   would make it a point each day, if I didn't -- I

13:50:00  22   avoided the conference room.  I didn't eat

13:50:04  23   breakfast in the conference room.  I didn't drink

13:50:04  24   coffee in the conference room anymore.  I went to

13:50:08  25   the point of putting my own coffee pot in my

13:50:10  1  office.  I did whatever I could to stay away from

13:50:14  2  him.  And he made it a point to go through my

13:50:14  3  office and go through the two doors just to go

13:50:16  4  through there.

13:50:16  5      Q.   Okay.  Well -- and that's my question.

13:50:20  6  When you -- the word "harassment" can have many

13:50:24  7  different meanings.  So I'm asking you to tell me

13:50:26  8  what it is that after January of 2001 that he --

13:50:32  9  that he did to harass you between the January date

13:50:36 10  and when you called Tammie Merritt and the April

13:50:42 11  25th date of 2001 when you spoke to Nellie Askey.

13:50:44 12      A.   He would go through my office and glare at

13:50:46 13  me.  If my husband came by to pick me up, he would

13:50:48 14  make sure that he would go back there.  He would

13:50:52 15  listen to my phone calls.  He monitored my private

13:50:54 16  phone calls, and he knew when my husband would be

13:50:56 17  coming by to pick me up for lunch.  He would make

13:51:00 18  sure that he was back there.  Or if we went outside

13:51:02 19  to talk, he would go -- he'd even gone to the

13:51:04 20  occasion of going to my office when my husband came

13:51:08 21  in there, and we went outside to talk, and he

13:51:28 22  followed us outside to talk.  My work duties, he --

13:51:32 23  he did not -- the Personnel Administrator, after

13:51:34 24  that point, as far as the company picnic, the --

13:51:40 25  the employee 25-year service awards, he did not --

13:51:44  1    Gary Butts did not make her do anything.  I wound

13:51:48  2    up doing all of that by myself with some help from

13:51:48  3    Connie Mejia.

13:51:52  4        Q.    I'm sorry.  I didn't quite understand what

13:51:54  5    you meant by "work duties."

13:51:56  6        A.    He increased my work duties.

13:51:58  7        Q.    Okay.  And he increased your work duties

13:51:58  8    by doing what?

13:52:04  9        A.    By not -- he didn't have -- he didn't

13:52:08 10    follow up and make -- supervise Clara Perez, the

13:52:12 11    Personnel Administrator, to make her assist me with

13:52:12 12    anything.

13:52:20 13        Q.    And I take it, the primary thing you're

13:52:22 14    talking about is -- you say the family picnic?

13:52:24 15        A.    The family picnic, the Carter's family

13:52:28 16    picnic, the employees 25, 20-year party that was

13:52:32 17    held at Treasure Hills Country Club, he didn't even

13:52:36 18    obtain the check to pay for the bill.  My husband

13:52:42 19    and I paid for that bill, and we were reimbursed by

13:52:44 20    the company probably three weeks later.  He didn't

13:52:44 21    even go to that party.

13:52:46 22        Q.    Well -- and that's what I'm asking you

13:52:48 23    simply is, the -- what were the things that he did

13:52:50 24    to increase your work duties?  Were those -- was

13:52:54 25    the family picnic and the anniversary party, were

13:52:56  1    those things that you had been involved with in the

13:52:56  2    past?

13:53:00  3        A.    I had -- we had never had a family picnic

13:53:00  4    before.

          5        Q.    Okay.

13:53:06  6        A.    I had been assigned to help with Human

13:53:08  7    Resource functions before, but it had not all been

13:53:12  8    dumped on my lap for me to do.

13:53:14  9        Q.    Was it the 20 or 25-year anniversary

13:53:18  10   party, was that something that was -- had been --

13:53:20  11   had occurred in previous years?

13:53:20  12       A.    Yearly.  Yes, sir.  Yearly.  Every --

13:53:20  13   annually.

13:53:22  14       Q.    Is that something that you had helped out

13:53:24  15   with in the past?

13:53:26  16       A.    Not to that degree.

13:53:28  17       Q.    Okay.  But -- well, my question was, is

13:53:32  18   that something that you had helped out with in the

          19   past?

13:53:36  20       A.    Only on one occasion, the year before

13:53:38  21   that, and not to that degree.

13:53:48  22       Q.    Okay.  I take it -- it's not that you were

13:53:50  23   involved in those functions that was different from

13:53:54  24   in the past, but just the fact that the Personnel

13:53:58  25   Administrator was not required to assist you?

| | | |
|---|---|---|
| 13:53:58 | 1 | A.   That's correct. |
| 13:54:00 | 2 | Q.   Is that -- I mean -- |
| 13:54:00 | 3 | A.   It was totally dumped on me.  That's |
| 13:54:02 | 4 | correct. |
| 13:54:02 | 5 | Q.   All right. |
| 13:54:06 | 6 | A.   And I felt an obligation to the employees. |
| 13:54:10 | 7 | Q.   And when was the family picnic? |
| 13:54:12 | 8 | A.   November of 2000. |
| 13:54:20 | 9 | Q.   And that's the only time that it had been |
| 13:54:20 | 10 | held? |
| 13:54:26 | 11 | A.   Yes, sir.  That was the first year, as far |
| 13:54:28 | 12 | as I know.  I don't know about any prior years, but |
| 13:54:32 | 13 | during my employment there, that was the only time. |
| 13:54:56 | 14 | Q.   I'd asked you earlier that Nellie Askey |
| 13:55:00 | 15 | had called you in July sometime and asked if you |
| 13:55:04 | 16 | would talk -- discuss the issues involving Gary |
| 13:55:08 | 17 | Butts now that he was no longer in Texas; is that |
| 13:55:08 | 18 | correct? |
| 13:55:14 | 19 | A.   What was the original statement?  What was |
| 13:55:14 | 20 | the original question? |
| 13:55:20 | 21 | Q.   My question was, did Nellie Askey call you |
| 13:55:24 | 22 | in July of 2001 to tell you that Gary Butts was no |
| 13:55:26 | 23 | longer in Texas, he was located in Griffin, Georgia |
| 13:55:30 | 24 | or somewhere in Georgia, and asked you if you would |
| 13:55:34 | 25 | discuss with them the details involving matters |

13:55:36   1    with Gary Butts?

13:55:38   2        A.    I don't remember exactly when I was

13:55:40   3    called, but I had always told them that I would

13:55:42   4    give them the details.

13:55:46   5        Q.    And it was Nellie Askey that called you

13:55:46   6    and asked you to talk to Dave Brown or somebody

13:55:48   7    about that?

13:55:50   8        A.    I don't remember.   I had spoken to several

13:55:56   9    people within the company, Nellie Askey, Dave

13:55:56  10    Brown, Clyde Stutts.

13:55:58  11        Q.    And then you did have a conversation with

13:56:00  12    Clyde Stutts on or about July 12, 2001?

13:56:04  13        A.    Yes, sir.

13:56:08  14        Q.    And it was after that conversation that

13:56:14  15    you then sent to Mr. Stutts Exhibit No. 1?

13:56:16  16        A.    Yes, sir.

13:56:36  17        Q.    When you spoke to Ms. Askey in April of

13:56:42  18    2001 about not returning to the plant, I understood

13:56:46  19    that you said she brought some work by your house

13:56:46  20    one day.

13:56:48  21        A.    Yes, sir.

13:56:50  22        Q.    Okay.   And that was on May the 2nd?

13:56:50  23        A.    Yes, sir.

13:56:54  24        Q.    And what -- what kind of work did she

13:56:54  25    bring to your house?

13:56:58  1      A.    Insurance forms, COBRA insurance forms and

13:57:00  2  the box that I used.  It had index cards with all

13:57:02  3  the employees' names and addresses and insurance

13:57:06  4  information so that I could complete the forms, as

13:57:08  5  well as my paperwork.

13:57:16  6      Q.    Now, as far as businesswise, from the last

13:57:20  7  week of April until May the 8th or 9th, your last

13:57:22  8  day of work, did you have any business contacts

13:57:24  9  with Gary Butts?

13:57:24  10      A.    No, sir.

13:57:28  11      Q.    And during that period of time, did he

13:57:30  12  call you or do anything else to harass you or

13:57:32  13  retaliate against you?

13:57:34  14      A.    On the 8th, he followed me -- he followed

13:57:36  15  my family through town in the company truck.

13:57:40  16      Q.    Okay.  And is that one of the events as

13:57:42  17  indicated on there?

13:57:44  18      A.    It's indicated in the interrogatories, as

13:57:46  19  well as the allegations, with the date, the actual

13:57:48  20  date and the incidents.

13:57:50  21      Q.    Well, one thing is, I don't have your

13:57:54  22  answers to the interrogatories.  And I think my

13:57:56  23  office had contacted you.  We have not received any

13:57:58  24  documents from you or answers to interrogatories.

13:58:02  25      A.    They were mailed out certified on

13:58:04  1    September the 5th, U.S. mail.  I just received

13:58:06  2    yours today.

13:58:06  3        Q.    Okay.  Well, I don't have yours.

13:58:08  4        A.    Okay.

13:58:10  5        Q.    And I assume you have a copy of what was

13:58:10  6    mailed to us?

13:58:12  7        A.    Yes, I do.

13:58:14  8        Q.    Do you have it with you?

13:58:14  9        A.    No, I don't.

13:58:18 10        Q.    I'll ask you to produce those tomorrow,

13:58:20 11    then, because it's necessary before we can complete

13:58:22 12    the deposition that I have that information from

13:58:22 13    you.

13:58:24 14        A.    That's fine.

13:58:32 15        Q.    Okay.  The information, then, that you had

13:58:38 16    -- that you worked out of your home was completing

13:58:40 17    insurance forms and other paperwork that you

13:58:42 18    completed.  And who did you turn that information

13:58:46 19    over to once you completed all of your paperwork?

13:58:50 20        A.    I took that to either FedEx or whoever we

13:58:52 21    had our -- our account with at the time, and I

13:58:56 22    shipped that back to Lanie Long, the Director of

13:58:56 23    Benefits.

13:59:02 24        Q.    And there was an event, then, you said on

13:59:02 25    May the 8th --

| | | |
|---|---|---|
| 13:59:02 | 1 | A.    Yes, sir. |
| 13:59:06 | 2 | Q.    -- where Mr. Butts had followed you and |
| 13:59:08 | 3 | your family? |
| 13:59:08 | 4 | A.    Yes, sir. |
| 13:59:22 | 5 | Q.    Okay.  Anything else between the April |
| 13:59:28 | 6 | 25th date and May the 8th and 9th that he did that |
| 13:59:32 | 7 | you would consider retaliation or harassment? |
| 13:59:38 | 8 | A.    I received daily harassing phone calls, |
| 13:59:42 | 9 | anonymous phone calls, sometimes six to seven times |
| 13:59:42 | 10 | a day. |
| 13:59:44 | 11 | Q.    I'm asking you specifically during the |
| 13:59:50 | 12 | period of April 25th, 2001 and May the 8th and 9th |
| 13:59:50 | 13 | of 2001. |
| 13:59:54 | 14 | A.    No, I don't believe so during that time. |
| 13:59:56 | 15 | Q.    Okay.  Now, did you -- |
| 14:00:00 | 16 | MR. POWELL:  Let me get this marked. |
| 14:00:20 | 17 | (Exhibit 2 marked.) |
| 14:00:30 | 18 | Q.    Let me show you Exhibit No. 2.  That's a |
| 14:00:32 | 19 | document entitled, I believe, "The William Carter |
| 14:00:38 | 20 | Company Election Form and Agreement for Severance |
| 14:00:40 | 21 | Pay Plan."  And is that your signature? |
| 14:00:40 | 22 | A.    Yes, sir. |
| 14:00:44 | 23 | Q.    When did you sign that?  Or excuse me. |
| 14:00:48 | 24 | Let me -- strike that question.  When did you get |
| 14:00:50 | 25 | the agreement?  Who gave it to you? |

14:00:56  1      A.    I received it on May the 2nd, the day that

14:00:56  2  I signed it from Ms. Askey.

14:01:02  3      Q.    And is that -- did she give it to you when

14:01:04  4  she came to your house to bring you the paperwork

14:01:06  5  for the COBRA forms and other insurance information

14:01:08  6  that you were going to be completing?

14:01:10  7      A.    Yes, sir.

14:01:14  8      Q.    Was anyone else with her that day?

14:01:18  9      A.    Martha Wise.

14:01:20  10     Q.    Martha who?

14:01:20  11     A.    Wise.

14:01:24  12     Q.    Okay.  And who is Martha Wise?

14:01:26  13     A.    She's the other occupational health nurse.

14:01:40  14     Q.    Did Ms. Wise continue to work at the plant

14:01:42  15  until her termination?

14:01:44  16     A.    I have no knowledge of that.  I have no

14:01:46  17  knowledge if she was terminated.

14:01:50  18     Q.    Was she -- did she work in the Harlingen

14:01:50  19  plant?

14:01:52  20     A.    No, sir.

14:01:52  21     Q.    Where did she work?

14:01:54  22     A.    Griffin.

14:01:56  23     Q.    Is that somebody that you had known and

14:02:00  24  dealt with in the years that you have worked with

14:02:00  25  the company?

| | | |
|---|---|---|
| 14:02:00 | 1 | A.   Yes, sir. |
| 14:02:08 | 2 | Q.   How long did Ms. Wise and Ms. Askey visit |
| 14:02:10 | 3 | with you at your house? |
| 14:02:14 | 4 | A.   I don't remember approximately.  We sat |
| 14:02:16 | 5 | down and had coffee and cake.  I don't remember. |
| 14:02:18 | 6 | Q.   Did y'all have lunch or dinner during the |
| 14:02:22 | 7 | time that Ms. Askey and Ms. Wise was in Harlingen, |
| 14:02:22 | 8 | Texas? |
| 14:02:24 | 9 | A.   Yes, sir, we did.  We had lunch one day. |
| 14:02:28 | 10 | I don't remember which day.  It may have been the |
| 14:02:28 | 11 | same day.  I don't remember, though. |
| 14:02:34 | 12 | Q.   Did you read the document when you signed |
| 14:02:36 | 13 | it before you signed it? |
| 14:02:36 | 14 | A.   Briefly. |
| 14:02:42 | 15 | Q.   Okay.  Did you understand that you are |
| 14:02:44 | 16 | getting severance pay in exchange for signing that |
| 14:02:46 | 17 | document? |
| 14:02:46 | 18 | A.   Yes, sir. |
| 14:02:48 | 19 | Q.   Did you understand that you were signing a |
| 14:02:52 | 20 | release of legal claims by signing that document? |
| 14:02:56 | 21 | A.   Yes, sir.  I understood that I was signing |
| 14:02:58 | 22 | a release of legal claims up to that date. |
| 14:02:58 | 23 | Q.   Okay. |
| 14:03:02 | 24 | A.   Known legal claims up to that date. |
| 14:03:04 | 25 | Q.   You understood that you were signing a |

14:03:06  1    release of legal claims?

14:03:08  2        A.    Yeah, up to that date, up to May 2nd, yes,

14:03:10  3    sir, I did.

14:03:12  4        Q.    And did you, in fact, know that on the day

14:03:12  5    that you signed it?

14:03:18  6        A.    I was quite emotionally distressed, but I

14:03:20  7    think that -- I understood that I was wanting to go

14:03:24  8    on with my life, and I wanted to get this man out

14:03:24  9    of my life.

14:03:28 10        Q.    Okay.  Did Ms. Askey tell you that you

14:03:30 11    could take that and mail it back to her at a later

14:03:30 12    day?

14:03:34 13        A.    I don't remember us discussing anything

14:03:34 14    about it.

14:03:38 15        Q.    Okay.  Did she tell you you could go and

14:03:40 16    talk to a lawyer or anybody else you wanted to

14:03:42 17    about it before signing it?

14:03:44 18        A.    I don't believe we discussed the form.

14:03:48 19    The form was given to me and --

14:03:48 20        Q.    Did you sign it and give it back to her

14:03:50 21    that same day?

14:03:50 22        A.    I believe so.

14:03:54 23        Q.    Okay.  Now, at any time after that, have

14:03:58 24    you ever written to the company and said that you

14:03:58 25    wanted to revoke that agreement?

14:04:02  1      A.    I wrote to the company, I believe,

14:04:04  2   sometime in September after I received more phone

14:04:06  3   calls again.   Phone calls started again in July.

14:04:12  4   And I wanted -- I wanted some assistance from the

14:04:12  5   company.

14:04:16  6      Q.    And my question was, did you ever write to

14:04:18  7   the company and say that you wanted to revoke that

14:04:20  8   agreement?

14:04:22  9      A.    No.

14:04:24 10      Q.    And how much money were you paid in

14:04:26 11   severance pay?

14:04:28 12      A.    A little over $2,000.00, I believe.

14:04:34 13      Q.    And I assume that was in a check -- that

14:04:38 14   you were paid by check?

14:04:38 15      A.    Yes, sir.   I'm sure that it was.

14:04:42 16      Q.    Had you ever offered to return any of that

14:04:48 17   money that you received in severance pay?

14:04:50 18      A.    No, sir, I don't believe that I did.   I

14:04:54 19   believe it was sent in from the breakdown that Ms.

14:04:56 20   Askey provided with me.   It was sent in with part

14:04:58 21   of my vacation check, as well, but I did not.

14:05:32 22      Q.    Ms. Tate, I want to direct your attention

14:05:36 23   to Exhibit No. 1.   And on the next to the last page

14:05:50 24   of that document, that large paragraph, last large

14:05:54 25   paragraph says that "Nellie Askey contacted me

14:05:58  1  letting me know that Gary and his family had

14:06:00  2  moved." This is the next to the last page from the

14:06:02  3  page that's containing your signature. Do you see

14:06:02  4  that?

14:06:04  5      A.   Uh-huh. Yes, sir.

14:06:08  6      Q.   It says, "Nellie Askey contacted me

14:06:10  7  letting me know that Gary and his family had moved

14:06:12  8  and asked me if I still wished to speak with Dave

14:06:16  9  Brown and Clyde Stutts, and I replied 'Yes!'"

14:06:18  10     A.   Yes, sir, I see that.

14:06:24  11     Q.   Do you know about when it was that Ms.

14:06:24  12  Askey called you to ask you if you still wanted to

14:06:28  13  speak to Dave Brown and Clyde Stutts about Gary

14:06:28  14  Butts?

14:06:28  15     A.   No, sir. I can't remember at this time.

14:06:32  16     Q.   Would you look at the page prior to that?

14:06:44  17  On the last -- the last paragraph on that page, do

14:06:50  18  you see where it says that "I had no choice but to

14:06:54  19  call Nellie Askey, my supervisor, on Thursday and

14:06:56  20  tell her that I needed to speak with her about a

14:07:00  21  very important matter as soon as possible and that

14:07:02  22  I was unable to return to the Harlingen plant and

          23  would discuss this matter with Dave Brown only, and

14:07:06  24  only after Gary Butts and his family had been moved

14:07:08  25  from this state because I felt that if I came

14:07:08   1   forward at that time with the information, that

14:07:10   2   maybe there would have been a chance that he would

14:07:12   3   not have been relocated back to Griffin?"

14:07:12   4       A.   I see that.

14:07:14   5       Q.   Was that true?

14:07:16   6       A.   I think that I probably made a typo there,

14:07:22   7   because I did speak with Dave Brown on April 26th.

14:07:24   8       Q.   But as far as what is true about that,

14:07:26   9   though, is that you would be willing to talk about

14:07:30  10   the details of your concerns only after Mr. Butts

14:07:32  11   and his family had moved from Texas?

14:07:36  12       A.   I informed Mr. Brown and Ms. Askey some of

14:07:38  13   what was going on, and I told them that I would

14:07:40  14   give them the information, but I did not want Mr.

14:07:42  15   Butts approached till after he was moved.

14:07:46  16       Q.   Okay.  And do you see in there that -- in

14:07:52  17   that paragraph, too, it says, "I want to let you

14:07:54  18   know that the following Monday when Nellie went to

14:07:58  19   the plant after she told Gary that I would not be

14:08:00  20   returning to the plant for personal reasons and

14:08:02  21   Dave Brown was aware and had approved, we have not

14:08:06  22   received another anonymous phone call at our home

14:08:08  23   phone to this day?"

14:08:10  24       A.   Yes, sir.  And as I told you previously,

14:08:12  25   they started towards the end of July again.

14:08:14  1     Q.   Okay.   And that's why I'm asking you, as

14:08:18  2 far as what was in this document.   Of course, this

14:08:20  3 document was sent on July 16th of 2001.

14:08:22  4     A.   Of last year.

14:08:24  5     Q.   And that was true up to the time that you

14:08:26  6 sent the document?

14:08:26  7     A.   Yes, sir.

14:08:26  8     Q.   Okay.

14:08:30  9     A.   The last anonymous call to this date was

14:08:32  10 August 26th, two weeks ago.

14:08:38  11     Q.   Now, what anonymous call did you receive

14:08:42  12 at the end of July of 2001?

14:08:46  13     A.   The same type of calls, sir, that I get --

14:08:48  14 that I have been getting where the person is on the

14:08:52  15 line, they listen, you can hear them breathing, and

14:08:54  16 then they hang up.   They wait for you to speak,

14:08:58  17 they listen, and then they hang up.   Other than in

14:09:04  18 December on the -- Christmas Eve night around 6:08

14:09:08  19 p.m., I received a call -- my husband received a

14:09:10  20 call from Gary Butts who identified himself and

14:09:12  21 said he was coming down there to kill us.

14:09:14  22     Q.   And what year was this?   2001?

14:09:14  23     A.   Yes, sir.

14:09:16  24     Q.   Last Christmas?

14:09:18  25     A.   Yes, sir.   He said that he knew that I was

14:09:20 1    the reason that he lost his job and that he was

14:09:24 2    going to come down and kill all of us, and he had

14:09:26 3    something real special in mind and he'd never know

14:09:30 4    when he was coming or how he was coming.

14:09:32 5        Q.    Did you ever report that to anyone at

14:09:32 6    William Carter Company?

14:09:34 7        A.    That was after the Carter Company closed,

14:09:36 8    sir, and I was --

14:09:40 9        Q.    And I realize that.  But my question was,

14:09:44 10   did you ever report the Christmas of 2001

14:09:46 11   conversation to anyone at William Carter Company?

14:09:50 12       A.    I reported it, I believe, on my EEOC

14:09:52 13   statement with the allegations.  I referred you

14:09:52 14   that on there.

14:09:54 15       Q.    My question is, did you ever call or write

14:10:00 16   and tell anyone at the William Carter Company in

14:10:02 17   writing or verbally about that conversation?

14:10:06 18       A.    I told Connie Mejia, but I have not

14:10:08 19   contacted anyone else.  After Clyde Stutts' last

14:10:08 20   conversation with me, he was not welcome to contact

14:10:10 21   me.

14:10:10 22       Q.    Okay.

14:10:14 23       A.    Nellie Askey was fine, but not Clyde

24   Stutts.

14:10:16 25       Q.    Well, I want to get a direct question to

14:10:20  1   my -- direct answer.  And that is, did you call and

14:10:22  2   tell anyone at the William Carter Company about any

14:10:26  3   kind of death threat or telephone call from Gary

14:10:28  4   Butts in Christmas of 2001?

14:10:32  5       A.   No, sir.

14:10:34  6       Q.   Okay.  Or did you write anybody at the

14:10:36  7   company and tell them about that conversation by

14:10:38  8   Gary Butts in Christmas of 2001?

14:10:48  9       A.   No, sir.  I just included it in my EEOC

14:10:50  10  allegation, which I knew the company would get.

14:10:54  11      Q.   The -- do you have any -- when you talk

14:10:58  12  about Gary Butts making these telephone calls or

14:11:02  13  anonymous calls, how did you satisfy, in your own

14:11:08  14  mind, that he was the person doing it?  Or what

14:11:10  15  kind of documentation is it that would demonstrate

14:11:14  16  that he is the person who's making those calls?

14:11:16  17      A.   Southwestern Bell Mobile Systems, my

14:11:18  18  husband went down there and spoke with one of the

14:11:18  19  technicians and took three numbers down there.  And

14:11:22  20  they identified the William Carter Company cell

14:11:24  21  phone as the number that was calling my phone

14:11:26  22  number and my pager.  You can -- you're able to

14:11:30  23  subpoena those records.  As I've told them, since

14:11:32  24  June of last year, I don't have an attorney.  I

14:11:40  25  can't subpoena them, but you may subpoena them.

| | | |
|---|---|---|
| 14:11:40 | 1 | Q.    Well -- |
| 14:11:42 | 2 | A.    On my home phone, there are Southwestern |

Bell Call Tracing.  That was all included.  You

said you have not gotten my responses to

interrogatories, so I will bring that to you

tomorrow.  The actual phone number and the person

to speak with is there so you can get copies of

that.

        Q.    That's why we have depositions and --

        A.    Exactly.

        Q.    -- ask for information is to obtain it.

        A.    Sure.

        Q.    Now, when is it that you initially

contacted someone at Southwestern Bell and obtained

the information that -- that William Carter Company

telephone lines were -- were where the calls were

coming from to your house?

        A.    I believe that was in November of 2000

when my husband went over there and spoke with --

with the technician over there.  And after he did

find out which number it was, we called -- we

called Gary Butts' residence and spoke with his

wife and asked that she try to speak with him and

have it be stopped.

                I had confronted him earlier about

14:12:40  1   listening to my phone calls, and I told him that I

14:12:44  2   thought that he was the one calling my home.  Of

14:12:48  3   course, he denied it.  And when I told him that I

14:12:50  4   was going to press charges, that I was going to

14:12:54  5   have the phone calls traced and I was going to

14:12:58  6   press charges, he threatened to turn me into Child

14:12:58  7   Protective Services.

          8      Q.    Well, why would he threaten to turn you

          9   into Child Protective Services?  For what?

14:13:02  10     A.    Because he knows that my children are the

14:13:04  11  most important thing to me.  And he says, "You

14:13:06  12  know, they'll just -- they'll call and they'll take

14:13:08  13  your kids while they investigate."

14:13:10  14     Q.    Is there something -- did he say something

14:13:12  15  specifically that he was wanting to accuse you of

14:13:14  16  to Child Protective Services?

14:13:16  17     A.    He relates back to my previous marriage

14:13:20  18  and a comment that he insists that the Personnel

14:13:24  19  Administrator made about me.  And he says, "Well,

14:13:26  20  you're just nothing but a slut or a whore.  And

14:13:28  21  your husband, you know, I don't see him working, so

14:13:30  22  I think he's, you know, probably a drug dealer."

14:13:36  23     Q.    Okay.  Why haven't you sued Gary Butts in

14:13:36  24  this case?

14:13:40  25     A.    Because the police officers told me he may

BRYANT & STINGLEY, INC.
McAllen          Harlingen         Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

14:13:44   1   make good on his promise.  And he may be included.

14:13:46   2   I don't know where he is, and I don't know his

14:13:46   3   address.

14:13:50   4        Q.    Okay.  The -- what information did you

14:13:56   5   obtain from Southwestern Bell in November of 2000?

14:13:58   6   Was there anything that you obtained, any documents

14:14:02   7   that you got from Southwestern Bell at that time?

14:14:04   8   Or is this just verbal information?

14:14:06   9        A.    It was verbal verification.  They

14:14:10  10   indicated that you could get a document, but it

14:14:12  11   would have to be subpoenaed because they've had

14:14:14  12   problems in the past --

14:14:14  13        Q.    Okay.

14:14:16  14        A.    -- with previous lawsuits, I would assume.

14:14:22  15        Q.    And the information -- your -- you or your

14:14:24  16   husband gave Southwestern Bell what kind of

14:14:26  17   information?  I think you said three telephone

14:14:26  18   numbers.

14:14:26  19        A.    Yes, sir.

14:14:26  20        Q.    Okay.

14:14:30  21        A.    He gave them Gary Butts' home phone

14:14:30  22   number.

14:14:32  23        Q.    So he gave him Gary Butts' home phone

14:14:32  24   number?

14:14:34  25        A.    And the plant phone number.

14:14:34  1      Q.    Okay.

14:14:38  2      A.    And the William Carter Company's cell

14:14:38  3  phone number.

14:14:50  4      Q.    And which of those were you told that the

14:14:52  5  calls were coming from to your house?

14:14:56  6      A.    The cell phone.  It was the William Carter

14:15:00  7  Company's cell phone that was calling my cell phone

14:15:10  8  and making the anonymous calls in which Gary Butts

14:15:12  9  later admitted at the company picnic.  My husband

14:15:14 10  approached him there.

14:15:16 11      Q.    Well, I want to ask, first of all, which

14:15:20 12  the numbers were.  Because I thought I'd understood

14:15:20 13  before that you said something about the plant

14:15:22 14  telephone numbers were being used to call

14:15:24 15  somewhere.

14:15:26 16      A.    No, sir.  The plant -- the William Carter

14:15:30 17  Company cell phone that they provided for him.

14:15:32 18      Q.    Do you know if he's the only person who

14:15:34 19  had that or had access to it?

14:15:36 20      A.    As far as I know, he was the only person

14:15:38 21  that ever carried it.

14:15:44 22      Q.    And you learned this in November of 2000?

14:15:44 23      A.    Yes, sir.

14:15:50 24      Q.    Okay.  In the telephone calls that were

14:15:54 25  being made to you, the -- did -- did they ever

14:15:56  1    speak to you?

14:15:56  2        A.    Not at that time.

14:16:00  3        Q.    Okay.  And I'm asking now prior to

14:16:04  4    November of 2000.  Okay?  Were there any kind of

14:16:06  5    threats made prior to November of --

14:16:08  6        A.    Prior -- prior to that time -- excuse me.

14:16:10  7    No, sir.  Prior to that time, it has been just

14:16:14  8    harassing phone calls, six or seven times a day,

14:16:16  9    just listening and hanging up.  It did not matter

14:16:18  10   whether I answered the phone, whether my children

14:16:22  11   answered the phone.  They would just hear him

14:16:22  12   breathing on the other end.

14:16:24  13       Q.    Okay.  I must have misunderstood, because

14:16:28  14   I thought you said that the calls were from a cell

14:16:30  15   phone from William Carter to your cell phone.

14:16:32  16       A.    That's what was identified in November,

14:16:34  17   but he was calling my home phone, as well.

14:16:38  18       Q.    Okay.  And were those calls traced by

14:16:42  19   Southern -- Southwestern Bell?

14:16:42  20       A.    No, sir, not at that time.

14:16:48  21       Q.    Okay.  Were the calls, then, prior to

14:16:50  22   November of 2000, they were calls to your cell

14:16:52  23   phone and they were calls to your house where

14:16:56  24   people were hanging up, listening and hanging up?

14:16:56  25       A.    Yes, sir.

14:17:02  1     Q.   Okay.  But no threats and nobody was

14:17:02  2  making any statements?

14:17:04  3     A.   No, sir, not over the phone.  No.

14:17:06  4     Q.   Okay.  Did it -- did you change your cell

14:17:06  5  phone number?

14:17:08  6     A.   Eventually.

14:17:10  7     Q.   Okay.

14:17:10  8     A.   After -- after November.

14:17:14  9     Q.   Okay.  After November of 2000?

14:17:16 10     A.   After we found that out, we changed the

14:17:16 11  phone number.

14:17:20 12     Q.   Okay.  Changed yours, I guess.  Do you

14:17:20 13  have a personal cell phone?

14:17:20 14     A.   Yes, sir.

14:17:24 15     Q.   Okay.  Do I assume, then, after that, that

14:17:26 16  there were no more calls to your cell phone where

14:17:28 17  they were listening and hanging up?

14:17:32 18     A.   That's correct.  Because I did not give

14:17:32 19  the number out to anyone.

14:17:42 20     Q.   Okay.  As part of your duties as an

14:17:44 21  occupational health nurse at William Carter, were

14:17:48 22  you required to or were you expected to have a cell

14:17:48 23  phone?

14:17:50 24     A.   No, sir.

14:17:50 25     Q.   Okay.

14:17:52  1      A.    It was my personal cell phone.

14:17:56  2      Q.    Okay.  Do I assume that prior to November

14:17:58  3  of 2000, though, that that number would have been

14:18:00  4  something that you would have given out to friends

14:18:04  5  or maybe business acquaintances to contact you if

14:18:06  6  they wanted to?

14:18:08  7      A.    I used it mainly for business contacts.

14:18:10  8  That's the only reason why I kept it on for that

14:18:14  9  long and endured it that long, because I was

14:18:16  10  working as a nurse consultant, also, case manager,

14:18:20  11  and that was the phone that I relied upon.

14:18:22  12      Q.    Okay.  And you say, "Working as a nurse

14:18:26  13  consultant."  And that was with -- case manager.

14:18:26  14  That's with someone else, other --

14:18:30  15      A.    Just contract.  Yes, sir.  Contract, just

14:18:30  16  like I told you.

14:18:32  17      Q.    After November of 2000, did there continue

14:18:36  18  to be anonymous calls to your home phone?

14:18:38  19      A.    After November of 2000, yes, sir.

14:18:42  20      Q.    Okay.  And did that continue all the way

14:18:46  21  up until Nellie Askey had told Gary Butts that it

14:18:48  22  was okay for you to work out of your house?

14:18:50  23      A.    Yes, sir.  It continued up to that point

14:18:54  24  and did not -- at that point, she told them that I

14:18:58  25  was not coming in.  "She was satisfied with my

14:21:04  1   call was coming from, and she was to call us back

14:21:08  2   the following day.  And we asked her to please talk

14:21:10  3   to him and have it stopped, for him to stop,

14:21:12  4   because we knew that he was the only one working,

14:21:16  5   and they have three children.  We really didn't

14:21:18  6   want -- we didn't want to cause hardship for her.

14:21:20  7   We just wanted him to leave us alone.

14:21:24  8        Q.   And what was her response to --

14:21:28  9        A.   Oh, she said -- I'm sorry.  Excuse me.

14:21:32 10   She said she thought that it was outrageous.  She

14:21:36 11   couldn't believe it.  She said, "He has no right to

14:21:38 12   be calling you like that and calling at those hours

14:21:40 13   of night."  And we told her also about the previous

14:21:42 14   sexual comment that he had made to me, and she just

14:21:44 15   could not -- she says, "I can't believe that he

14:21:48 16   would say that."  She said, "He has no right to

14:21:50 17   discuss something like that with you.  That's none

14:21:52 18   of his business."

14:21:52 19        Q.   Okay.

14:21:54 20        A.   We basically let her know everything that

14:21:56 21   he had been doing at that time.

14:22:02 22        Q.   What was the -- did she ever call you

14:22:02 23   back?

14:22:08 24        A.   No, sir, because Gary Butts wouldn't let

14:22:08 25   her call us back.  The next time we saw her was

| | | |
|---|---|---|
| 14:22:10 | 1 | several days later at the company picnic. |
| 14:22:14 | 2 | Q.   Now, did I understand that there was some |
| 14:22:16 | 3 | discussion or confrontation at the company picnic? |
| 14:22:18 | 4 | A.   Yes, sir.  My husband -- |
| 14:22:20 | 5 | Q.   I don't know if you call it a -- I |
| 14:22:22 | 6 | apologize. |
| | 7 | A.   Excuse me. |
| 14:22:24 | 8 | Q.   I'm not trying to characterize it as a |
| 14:22:28 | 9 | confrontation if it's not.  That's why I'm asking |
| 14:22:30 | 10 | you is what did happen at the company picnic. |
| 14:22:34 | 11 | A.   My husband saw Gary Butts out in the |
| 14:22:36 | 12 | parking lot.  My husband drove up.  He did not want |
| 14:22:38 | 13 | to attend the picnic because he didn't want any |
| 14:22:42 | 14 | problems there at the company picnic.  He came very |
| 14:22:44 | 15 | briefly for just a few moments, but he saw Gary |
| 14:22:46 | 16 | Butts out front and he went and talked to him.  And |
| 14:22:50 | 17 | Gary was furious with him, very belligerent with |
| 14:22:54 | 18 | him, "Why did you need to call my wife?  And you |
| 14:22:54 | 19 | needed to call my wife.  And you want my wife to |
| 14:22:56 | 20 | call you back."  And he said, "I didn't mean to" -- |
| 14:23:02 | 21 | Thank you.  "I didn't mean to" -- I'm sorry.  I |
| 14:23:02 | 22 | lost my train of thought. |
| 14:23:06 | 23 | Q.   And that's understandable.  And I mean, if |
| 14:23:12 | 24 | you need to -- and I know Nellie got you some |
| 14:23:12 | 25 | water. |

14:23:12  1      A.    Thank you.

14:23:14  2      Q.    And like I mentioned earlier, that

14:23:16  3  sometimes, you know, I start asking questions and I

14:23:18  4  forget about the time.  If you want to take a

14:23:20  5  break, we'll be glad to take a break.

14:23:24  6      A.    I'm all right for right now.  Let's see.

14:23:26  7  My husband did talk to him, and he told my husband

14:23:28  8  -- he says -- after he initially denied making the

14:23:32  9  calls, then he said, "Well, yes, I have all of my

14:23:34  10 managers' phone numbers in my -- programmed in my

14:23:36  11 phone, and I did call."  And -- I don't know.  My

14:23:38  12 husband told him, he says, "Don't start with your

14:23:40  13 lies, because I know that you're the one calling

14:23:44  14 our house hanging up."  They did have a slight

14:23:46  15 confrontation about it.

14:23:48  16     Q.    Has this confrontation ever become

14:23:50  17 physical or threatened to become any kind of

14:23:52  18 physical altercation?

14:23:56  19     A.    No, sir.  I believe that that's what Gary

14:23:58  20 Butts wanted to provoke.  I think he wanted to

14:24:00  21 provoke that on several occasions at the plant.

14:24:02  22 That was his reason for coming in my office and

14:24:06  23 making it a point to always be back by my office

14:24:06  24 when he knew my husband was coming --

14:24:08  25     Q.    Ms. Tate, I'm sorry.  And I apologize for

| | | |
|---|---|---|
| 14:24:12 | 1 | cutting you off, but if -- and I do apologize for |
| 14:24:16 | 2 | cutting you off.  But to the extent that, you know, |
| 14:24:20 | 3 | I ask you about one thing and you start talking |
| 14:24:22 | 4 | about something else, it will probably |
| 14:24:26 | 5 | unnecessarily lengthen the deposition.  Now, I can |
| 14:24:28 | 6 | -- I can tell you, I will give you -- hopefully |
| 14:24:30 | 7 | will give you a complete, adequate opportunity to |
| 14:24:34 | 8 | say whatever you want.  But it makes it probably a |
| 14:24:38 | 9 | little easier on both of us if you would answer the |
| 14:24:42 | 10 | question, because all I'm really wanting to do is |
| 14:24:46 | 11 | figure out is -- there's a picnic, it's in November |
| 14:24:48 | 12 | of 2000, you and your husband -- your husband and |
| 14:24:52 | 13 | Mr. Butts had a discussion.  I was trying to figure |
| 14:24:54 | 14 | out just, quite frankly, is this a -- was this a |
| 14:24:58 | 15 | scene?  I mean, were they yelling at each other |
| 14:25:02 | 16 | where people who were about 10 feet around could |
| 14:25:04 | 17 | hear him?  And did emotion -- was there a |
| 14:25:08 | 18 | confrontation?  Did they end up pushing one another |
| 14:25:12 | 19 | or almost hitting one another?  And that's really |
| 14:25:14 | 20 | the question I was asking.  And I apologize for |
| 14:25:16 | 21 | making this a lengthy speech, but it would -- it |
| 14:25:20 | 22 | would help if we could sort of identify some of |
| 14:25:22 | 23 | these things one at a time, and then I'll give you |
| 14:25:26 | 24 | plenty of opportunity to say what you want to about |
| 14:25:28 | 25 | those.  If I can, let me just go back and ask you |

14:25:30 1   the question.  When your husband, Mr. Butts, had

14:25:34 2   this discussion at the company picnic in November

14:25:38 3   of 2000, did they -- did they become physical with

14:25:40 4   one another?  Did they push one another?  Did they

14:25:42 5   threaten to push one another?

14:25:42 6       A.    No, sir.

14:25:46 7       Q.    Were you present to hear the conversation

14:25:46 8   itself?

14:25:48 9       A.    No, sir.

14:25:52 10      Q.    Okay.  Were you even within hearing

14:25:54 11  distance to know what they were saying?

14:25:54 12      A.    No, sir.

14:25:58 13      Q.    Okay.  And I realize, of course, your

14:25:58 14  husband told you about the conversation, and I

14:26:04 15  understand that.  Were they any kind of verbal

14:26:08 16  threats by Mr. Butts or your husband to one

14:26:10 17  another, other than "Mind your own business" and

14:26:12 18  "Keep your business out of my business?"

14:26:14 19      A.    There had been verbal threats from -- from

14:26:20 20  Gary Butts before towards him, as far as he told

14:26:22 21  him he didn't want him coming to the plant.

14:26:22 22      Q.    Okay.

14:26:24 23      A.    That he was going to see that he didn't --

14:26:28 24  he wasn't able to come to the plant to pick me up

14:26:30 25  or -- that's why -- excuse me -- but that's why I

14:26:34  1    feel that he was trying to provoke him before,

14:26:36  2    because he wanted the opportunity to tell him he

14:26:36  3    couldn't come to the plant.

14:26:40  4        Q.   Okay.  And I appreciate that.  And I don't

14:26:44  5    mean to cut you off from saying what you want to

14:26:46  6    about that.  But when you say that there had been

14:26:50  7    threats in the past, you know, when we -- when

14:26:52  8    lawyers and judges hear about threats, they want to

14:26:54  9    know, are you talking about a threat that you can't

14:26:56 10    come on the property?  Or are you saying that

14:27:00 11    somebody's threatened to hit someone or shoot

14:27:06 12    someone?  Because a threat to commit violence is

14:27:06 13    different from saying you can't come on the

14:27:06 14    property or something like that.

14:27:10 15        A.   I understand that.  Several months before

14:27:12 16    that, we had received a call.  We had gone out to

14:27:16 17    eat.  We had gone -- come here to McAllen and gone

14:27:20 18    out to eat.  And I guess Gary Butts had heard my

14:27:24 19    phone conversation, and he and his wife and someone

14:27:26 20    else that was with him showed up at the very

14:27:30 21    restaurant where we were eating, sat right next to

14:27:32 22    us and glared at us all night.  And when I got

14:27:36 23    home, probably about an hour, two hours later, we

14:27:38 24    got an anonymous phone call at that time.  And he

14:27:42 25    did speak at that time.  And he tried -- attempted

14:27:44  1    to disguise his voice, and he told my husband, he

14:27:46  2    says, "Are you the guy that drives that white

14:27:50  3    truck?" And he just told him, "You better watch

14:27:50  4    your rear."

14:27:50  5        Q.    Okay.

14:27:52  6        A.    But he didn't use that word.

14:27:54  7        Q.    Yes.  I understand.

14:27:56  8        A.    That's the only other verbal, other than

14:27:58  9    the death threats that he's made.

14:28:04 10        Q.    And the death threats, I assume, are

         11    something that's more recent?

14:28:04 12        A.    Yes, sir.

14:28:06 13              MR. POWELL:  Would this be a good time

14:28:06 14    to take a break?

         15              THE WITNESS:  Yes.

14:34:50 16              (Off record.)

14:34:56 17        Q.    Ms. Tate, let me ask you, you mentioned

14:35:00 18    that when you called -- you and your husband called

14:35:04 19    and spoke to Gary Butts' wife, you said you told

14:35:06 20    her about the things that have been going on.  And

14:35:10 21    I'm assuming what you meant by "The things that

14:35:12 22    have been going on," is the anonymous telephone

14:35:16 23    calls that have been coming to your -- to your cell

14:35:16 24    phone and to your home?

14:35:18 25        A.    Yes, sir.

14:35:20   1      Q.   And you mentioned also something about a

14:35:22   2   sexual comment that he had made.   And what was this

14:35:24   3   sexual comment?

14:35:28   4      A.   He called over the phone one day when he

14:35:32   5   was at -- he was in Georgia, for some reason, and

14:35:34   6   he called in the afternoon, and -- and I happened

14:35:36   7   to answer the phone, as I usually do in the

14:35:38   8   afternoon.

14:35:40   9      Q.   Is this -- this is -- he called at the --

          10   to the --

14:35:42  11      A.   At the plant.

14:35:42  12      Q.   To the office?

14:35:42  13      A.   Yes, sir.

14:35:46  14      Q.   Gary Butts was out of town calling back to

14:35:46  15   the plant?

14:35:46  16      A.   Yes, sir.

14:35:48  17      Q.   Okay.   All right.   I'm sorry.   Go ahead.

14:35:52  18      A.   And I happened to answer the phone.   And

14:35:54  19   he asked me how things were going.   I said,

14:35:56  20   "Everything is going fine."   How safety -- we were

14:36:00  21   in a big safety race at the time, and I related

14:36:02  22   that to him.   You know, we hadn't had any

14:36:04  23   accidents.   And he asked me, "Well, how's Clara"?

14:36:06  24   And I said, "Well, what do you mean 'How's Clara?'

14:36:10  25   Clara is the same way Clara always is.   You know

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

14:36:14 1   how Clara is." And he said, "Well, I just want to

14:36:16 2   let you know, she's not the friend that you think

14:36:18 3   she is." I said, "Yes?" And he said, "The other

14:36:22 4   day when you weren't at the plant, she told me that

14:36:24 5   the reason that you and your first husband split up

14:36:26 6   was because your first husband caught you in bed

14:36:28 7   with your second husband."

14:36:34 8       Q.   Anything -- go ahead and tell me the rest

14:36:34 9   of that conversation.

14:36:38 10      A.   I told him that -- I was shocked. I was

14:36:40 11  shocked when he said that, and I was really

14:36:42 12  humiliated. But I told him -- I said, you know,

14:36:44 13  "That is not true. That's not true. I felt like

14:36:48 14  I had to defend myself." And around that time, my

14:36:50 15  husband walked in. He was there to pick me up from

14:36:52 16  work. It was right before I was going home from

14:36:56 17  work. And my husband saw the look on my face, and

14:36:58 18  he asked me what was wrong. And I told him. And

14:37:00 19  he immediately went outside and called Gary Butts.

14:37:06 20      Q.   Okay. The -- had -- and that's what I

14:37:08 21  wanted to understand, what was the nature of the

14:37:12 22  sexual comment. It was a comment about something

14:37:16 23  to do -- or allegedly what had to do with your

14:37:18 24  first husband and why you got the divorce?

14:37:20 25      A.   Yes, sir.

14:37:24  1      Q.   Okay.  Did -- had he ever made any kind of

14:37:28  2  sexual comment to you before that time?

14:37:28  3      A.   No, sir.

14:37:32  4      Q.   And I think your -- the document that you

14:37:36  5  had put in or I had seen somewhere -- and I don't

14:37:38  6  remember where it is, but I -- I had somewhere that

14:37:44  7  that comment was made in like 1999.  And do you

14:37:48  8  have any memory about when it was?

14:37:52  9      A.   I want to say that that was right around

14:37:54  10 sometime in the fall, I believe, summertime or fall

14:37:56  11 of '99.

14:37:56  12     Q.   Okay.

14:37:58  13     A.   The only other type of -- that type of

14:38:02  14 comment would have been to my husband the night

14:38:06  15 that -- one night when we went out to eat, which I

14:38:08  16 explained to Clyde Stutts.  The comment was made to

14:38:10  17 my husband.  He -- Gary Butts and several of the

14:38:12  18 other Carter's employees were down, as well as an

14:38:16  19 insurance company.  I don't remember if it was Blue

14:38:18  20 Cross/Blue Shield or Prudential.  Someone was down,

14:38:22  21 and Nellie was down, and we went out to eat in

14:38:24  22 Mexico.  And on the way back from Mexico, he called

14:38:28  23 us.  They were all in Connie Mejia's Suburban and

14:38:32  24 we were in a separate car.  My husband and I and

14:38:34  25 Clara Perez and her husband.  And they called my

14:38:42  1    husband on the cell phone, Gary Butts did, and

14:38:42  2    wanted him to go with them to a gentlemen's club.

14:38:44  3    And my husband told him that he did not do that,

14:38:46  4    that his wife wouldn't appreciate that.  And Gary

14:38:48  5    Butts would not take no for an answer.  He kept on

14:38:50  6    and on, "Oh, you need to go.  You need to go.  Your

14:38:54  7    wife won't care."  And my husband said, "No."  He

14:38:56  8    was quite, really, embarrassed.

14:39:00  9        Q.   Okay.  A gentlemen's club being a

14:39:04 10    euphemistic way of saying a strip bar or

14:39:06 11    something --

14:39:06 12        A.   Exactly.

14:39:08 13        Q.   -- of that nature.  Just so that the

14:39:10 14    record is accurate about what we're talking about.

14:39:10 15        A.   Yes, sir.

14:39:12 16        Q.   Did your husband go?

14:39:12 17        A.   No, sir.

14:39:16 18        Q.   Okay.  The -- when we talk about sexual

14:39:20 19    comments, are those the only two times that Gary

14:39:24 20    Butts made some comments to you that were of a

14:39:24 21    sexual nature?

14:39:30 22        A.   Yes, sir, at that time.  When he's called

14:39:34 23    back during the death threats, he uses a lot of

14:39:36 24    profanity and --

14:39:36 25        Q.   Okay.

14:39:38  1      A.    -- relays all types of private things that

14:39:42  2  he overheard my husband and I talking about, but

14:39:42  3  other than that, no.

14:39:52  4      Q.    The -- the comment about -- and I wrote

14:39:56  5  down like the fall of 1999 when he called the plant

14:39:58  6  and you answered the telephone, and he said, "How's

14:40:02  7  Clara," and he was telling you that Clara -- Clara

14:40:04  8  is what position at the plant?

14:40:04  9      A.    The Personnel Administrator.

14:40:08 10      Q.    Okay.  And that Clara is not as good as a

14:40:12 11  friend as you think she is because she related this

14:40:14 12  information about why you and your first husband

14:40:18 13  had divorced.  Do you have -- do you know whether

14:40:22 14  Clara, in fact, gave Gary Butts any kind of

14:40:26 15  information such as that?  Did you ever ask her or

14:40:30 16  confront her or, at any time since that occurred,

14:40:32 17  have reason to think that she either did say that

14:40:34 18  or that she did not say it?

14:40:38 19      A.    I did not think that she would have said

14:40:38 20  that.

14:40:38 21      Q.    Okay.

14:40:42 22      A.    But -- and I believe Ms. Askey did ask her

14:40:44 23  if she said that, and I believe that she told her,

14:40:44 24  "No."

14:40:46 25      Q.    Okay.

14:40:48  1      A.    I was not there when she asked her, but I

14:40:50  2   think Ms. Askey told me later that she denied

14:40:52  3   saying that.

14:40:54  4      Q.    Okay.

14:40:58  5      A.    But I had to work with her on a daily

14:41:00  6   basis, and I did not want to -- I felt like if it's

14:41:02  7   something that she had said, she would have

14:41:04  8   probably denied.   It wouldn't have -- would not

14:41:08  9   have told me, and it really wouldn't have served

14:41:10  10  any purpose but to make a problem between she and

          11  I.

14:41:12  12     Q.    Well, the reason I asked, I didn't know if

14:41:16  13  you got mad one day and went in and said something

14:41:18  14  to her or if the two of you have had some kind of

14:41:20  15  conflicts in the past.   Have you had conflicts or

14:41:22  16  disagreements that would cause one -- cause her to

14:41:26  17  say, you know, things about you that otherwise she

14:41:28  18  might not say?

14:41:30  19     A.    Not to my knowledge.   In fact, Clara was

14:41:34  20  one of the main reasons I came back to work for

14:41:36  21  Carter's, because when I moved to San Antonio, she

14:41:38  22  called me once or twice every week.

14:41:38  23     Q.    Okay.

14:41:42  24     A.    But she -- she is -- I just -- I didn't

14:41:46  25  want to approach her with that, because I just

14:41:48  1    didn't see any purpose in it.

14:41:52  2        Q.   The -- your husband, I assume what you're

14:41:54  3    saying, after that conversation, he called Gary

14:41:58  4    Butts and -- and had some words with him about that

14:42:00  5    conversation?

14:42:00  6        A.   Yes, sir.

14:42:06  7        Q.   Okay.  And what did your husband say to

14:42:10  8    him?  And I realize you're telling me what your

14:42:12  9    husband related to you and not what you necessarily

14:42:14 10    heard firsthand.

14:42:16 11        A.   He -- he confronted him about it.  And

14:42:16 12    initially Gary -- Gary Butts denied -- he denied

14:42:20 13    saying it.  First, he denied even calling me.  And

14:42:22 14    my husband told him, he said, "You can stop lying

14:42:24 15    to me, because I walked in on the conversation.

14:42:26 16    She told me what you said, and I want to know why

14:42:30 17    you're asking her personal questions that are none

14:42:32 18    of your business or none of Carter's business, and

14:42:34 19    why, as a manager, you were discussing with Clara.

14:42:38 20    And if she did say something, why didn't you stop

14:42:40 21    it immediately and say that was not anything that

14:42:44 22    was any of your business or needed to be discussed

14:42:48 23    at this plant?"  It had nothing to do with my work.

14:42:52 24        Q.   The -- the dinner -- as far as that sexual

14:42:54 25    comment about you and your husband, do you know

14:42:58  1   when you related that to the people at the William

14:43:02  2   Carter Company?  Was that in the written document

          3   that you --

14:43:04  4        A.   I believe that was in the written

14:43:06  5   document.  I'd have to look back through, but I'm

          6   sure --

14:43:06  7        Q.   Do you know if you had told anyone about

14:43:10  8   that comment prior to putting it down in writing?

14:43:16  9        A.   I told Clyde Stutts and Nellie, I believe,

14:43:18 10   in April -- April or May when we initially were

14:43:18 11   talking.

14:43:22 12        Q.   Okay.  All right.  The -- now, with regard

14:43:30 13   to the -- Mr. Butts inviting your husband to go to

14:43:32 14   the gentlemen's club with him, this is in

14:43:34 15   connection with the trip that there was a group of

14:43:36 16   you that had gone to dinner in Mexico?

14:43:38 17        A.   Yes, sir.

14:43:40 18        Q.   Do you know about when that occurred?

14:43:44 19        A.   No, sir, I don't.  I don't.  It was prior

14:43:46 20   to that, but I don't remember.

14:43:48 21        Q.   Would it have been prior to --

         22        A.   I would say --

14:43:48 23        Q.   I'm sorry.

14:43:54 24        A.   It was probably maybe five or six months

14:43:54 25   before that, but I am guessing, because I don't

| 14:43:54 | 1 | know.  I did not write it down. |
| 14:43:56 | 2 | Q.    Well -- and I apologize.  But five or six |
| 14:43:58 | 3 | months prior to what? |
| 14:44:00 | 4 | A.    Prior to the sexual comment. |
| 14:44:00 | 5 | Q.    Okay.  So we're saying that that would |
| 14:44:04 | 6 | have occurred earlier in 1999 sometime? |
| 14:44:06 | 7 | A.    Yes, sir. |
|  | 8 | Q.    Okay. |
| 14:44:08 | 9 | A.    The time period was when we were changing |
| 14:44:10 | 10 | over to a different insurance company, and I |
| 14:44:12 | 11 | believe that is why everyone -- Nellie was down, |
| 14:44:16 | 12 | and there were, I think, a representative from |
| 14:44:20 | 13 | Delta Dental, and maybe a representative from the |
| 14:44:22 | 14 | group medical insurance company that went with us, |
| 14:44:24 | 15 | as well.  And that was the reasoning for that.  And |
| 14:44:26 | 16 | that's why I want to say it was probably five or |
| 14:44:28 | 17 | six months prior to that. |
| 14:44:32 | 18 | Q.    Well, both of these comments that -- and |
| 14:44:34 | 19 | I'm going to label it just "The sexual comments." |
| 14:44:38 | 20 | Both of these sexual comments occurred in 1999; am |
| 14:44:40 | 21 | I correct? |
| 14:44:40 | 22 | A.    Yes, sir. |
| 14:44:46 | 23 | Q.    Okay.  Any sexual comments after the fall |
| 14:44:46 | 24 | of 1999? |
| 14:44:50 | 25 | A.    During the phone calls, no. |

14:44:52  1        Q.    Okay.   Or even if it wasn't phone calls.
14:44:54  2    At work?
14:44:56  3        A.    No, sir.
14:45:00  4        Q.    Okay.   What Mr. Butts was doing and saying
14:45:04  5    towards you, that, I take it, was not so much that
14:45:12  6    he was sexual towards you as much as it was he was
14:45:14  7    being punitive or retaliatory towards you because
14:45:18  8    you had called the plant -- excuse me -- called the
14:45:22  9    corporate office and because you had confronted him
14:45:24  10   or your husband had confronted him about these
14:45:26  11   anonymous telephone calls?  Is that -- I mean, am I
14:45:28  12   saying that correctly?
14:45:28  13       A.    Yes, sir.
14:45:28  14       Q.    Okay.
14:45:34  15       A.    It was menial things that he wanted me to
14:45:38  16   do.  Like he told my husband -- my husband told
14:45:40  17   him, he says, "Well, you know, she doesn't need to
14:45:44  18   be in there."  He had -- I always made coffee for
14:45:46  19   people.  That was just my thing.  I'm a big coffee
14:45:50  20   drinker.  And he -- he made a point of telling my
14:45:54  21   husband, "If I want your wife to make my coffee,
14:45:58  22   she'll make my coffee.  She'll bring it into my
14:46:02  23   office.  She'll do whatever I tell her to do.  I'm
14:46:02  24   the Plant Manager here."  And he made a point
14:46:06  25   telling my husband, "Well, you get to be Plant

14:46:06  1   Manager.  You can do what you want at your

14:46:08  2   facility."  My husband told him, "I don't know who

14:46:08  3   you think you are."

14:46:12  4        Q.    This was in the conversations, I guess, in

14:46:16  5   '99 or either in -- when y'all confronted him

14:46:16  6   about the telephone calls?

14:46:18  7        A.    I think both conversations.  I think it

14:46:20  8   just continued.  It just continued, because the

14:46:26  9   phone calls continued.  If we kept thinking

14:46:28 10   personally that if we -- if we just didn't say

14:46:30 11   anything and just, you know, would hang up,

14:46:32 12   eventually, he'd get tired of it.

14:46:40 13        Q.    Ms. Tate, did he ever -- did Mr. Butts

14:46:42 14   ever make any kind of sexual proposition towards

14:46:42 15   you?

14:46:44 16        A.    No, sir.

14:46:46 17        Q.    Okay.  I mean, asking you out for dates or

14:46:50 18   trying to get you to go out with him?

14:46:50 19        A.    No.

14:46:52 20        Q.    And I assume from what you're saying, he

14:46:56 21   never touched you in any kind of sexual manner, I

         22   mean --

14:46:56 23        A.    No, sir.

14:46:58 24        Q.    -- as far as grabbing you and trying to

14:47:00 25   touch you in private parts of your body or

94

14:47:00   1   anything?

14:47:02   2      A.   No, sir.

14:47:10   3      Q.   Okay.   You are aware, I believe, that

14:47:14   4   there was -- there was some kind of anonymous

14:47:20   5   letter that was written to the company about Gary

14:47:28   6   Butts in like January or February of 2001,

14:47:30   7   sometime, and just in the months prior to the plant

14:47:32   8   being closed.   Were you aware of that?

14:47:34   9      A.   Yes, sir.

14:47:38   10      Q.   Okay.   Did you -- have you ever seen a

14:47:38   11   copy of that?

14:47:40   12      A.   No, sir.   I had heard that there were

14:47:44   13   copies out on the floor, but, no, sir.

14:47:44   14      Q.   Okay.

14:47:48   15      A.   I heard portions of what was involved in

14:47:52   16   it and that they were talking about his drug use

14:47:54   17   and things of that nature.

14:47:58   18      Q.   Okay.   Now, I'm not asking you what you

14:48:02   19   may necessarily know today, but I'm asking you, at

14:48:04   20   the time that this occurred in January or February

14:48:08   21   of 2001, you heard that there was a letter that

14:48:12   22   made some allegations against Gary Butts; am I

14:48:12   23   correct?

14:48:12   24      A.   Yes, sir.

14:48:14   25      Q.   Okay.   And I take it that that kind of

| 14:48:18 | 1 | information probably a lot of people in the plant |
| 14:48:20 | 2 | heard about? |
| 14:48:20 | 3 | A.   Yes, sir. |
| 14:48:22 | 4 | Q.   I mean, does that mean -- and you tell |
| 14:48:24 | 5 | me.  I don't know if it was common knowledge among |
| 14:48:26 | 6 | all the workforce, or if it was common knowledge |
| 14:48:30 | 7 | among probably the salaried staff and the office |
| 14:48:34 | 8 | people, but was it common knowledge among any of |
| 14:48:36 | 9 | those groups that there was a -- some kind of |
| 14:48:38 | 10 | complaint or letter saying that Gary Butts had been |
| 14:48:40 | 11 | doing inappropriate things? |
| 14:48:42 | 12 | A.   I think that it probably was common |
| 14:48:44 | 13 | knowledge. |
| 14:48:46 | 14 | Q.   Was it common knowledge among the office |
| 14:48:48 | 15 | people?  Or was it common knowledge among the whole |
| 14:48:50 | 16 | workforce, as far -- |
|  | 17 | A.   I -- |
| 14:48:50 | 18 | Q.   -- as the plant? |
| 14:48:52 | 19 | A.   Excuse me.  I think that it was pretty |
| 14:48:54 | 20 | much the whole plant. |
| 14:48:54 | 21 | Q.   Okay. |
| 14:48:56 | 22 | A.   I think that they knew something was going |
|  | 23 | on. |
| 14:48:58 | 24 | Q.   That something was going on? |
| 14:49:00 | 25 | A.   They knew something was going on. |

14:49:00  1   Q.   Okay.

14:49:08  2   A.   And there was evidently -- they had a copy

14:49:10  3   of a letter or something, and they were -- it was

14:49:10  4   being talked about on the floor.

14:49:18  5   Q.   Okay.  Were you aware that Nellie Askey

14:49:22  6   came to the plant to investigate some of the

14:49:24  7   allegations that were contained in that letter?

14:49:26  8   A.   I know that she came to the plant.  She

14:49:30  9   did not tell me -- I thought she was there to do a

14:49:32 10   survey or something.  She didn't tell me that

14:49:34 11   that's what she was there for.  But I know that

14:49:36 12   supervisors were called in and out of the

14:49:40 13   conference room by the sewing floor to, you know --

14:49:42 14   that she was talking to them one at a time.

14:49:50 15   Q.   Did you -- was that something that was

14:49:52 16   obvious to you and to other people in the office

14:49:56 17   that supervisors are being asked to come to the

14:49:58 18   conference room to speak to Nellie?

14:50:00 19   A.   I think that they were -- I think the

14:50:02 20   supervisors and the -- the management -- and I

14:50:06 21   think -- I think probably the sewing floor was

14:50:08 22   pretty much aware, because evidently they had this

14:50:10 23   copy or something.  They knew something was going

14:50:12 24   on, and they were watching what was going on,

14:50:12 25   people coming in and out.

14:50:16  1      Q.   Yeah.   Was it -- did you hear at that time

14:50:22  2  that there were questions that one of the things

14:50:26  3  being discussed with the supervisors was whether

14:50:30  4  they knew of any -- and if they had any information

14:50:34  5  about Gary Butts' behavior or treatment of people?

14:50:36  6      A.   No, sir.   I don't know any specifics about

14:50:40  7  it.   I wasn't called in there to --

          8      Q.   Did --

14:50:40  9      A.   -- and asked anything.

14:50:44  10     Q.   Okay.   I apologize.   Did anybody ever tell

14:50:48  11 you what they were asked in those meetings?

14:50:48  12     A.   No, sir.

14:50:54  13     Q.   Okay.   Did -- are you aware -- were you

14:50:58  14 aware that there were allegations made in January

14:51:02  15 or February of 2001 that Gary -- Gary Butts had

14:51:04  16 some kind of relationship with some of the

14:51:06  17 employees, some of the women at the plant?

14:51:08  18     A.   I was aware that there was a letter

14:51:12  19 written -- I know there was a letter written

14:51:14  20 shortly after he arrived there, and it was faxed to

14:51:18  21 him about him showing favoritism.   But I think it

14:51:20  22 was towards Clara Perez or something.   I don't

14:51:24  23 know.   He called several of us in his office and

14:51:26  24 asked us if we knew who wrote the letter and told

14:51:30  25 us he was going to find out who wrote the letter,

14:51:32  1    and when he did, he was going to get rid of whoever

14:51:34  2    wrote it.

14:51:36  3        Q.    Is this separate from a letter written in

14:51:38  4    January, February of 2001?

14:51:40  5        A.    Yes, sir.  This was shortly right after he

14:51:42  6    arrived there.  Maybe six months after he was

14:51:44  7    there.

14:51:46  8        Q.    And I think he came there -- is it

14:51:48  9    consistent with your memory that Gary Butts came to

14:51:52 10    the Harlingen plant like August of 1998 or so?

14:51:54 11        A.    I think it was the summer of '98.

         12        Q.    Summer of 1998?

14:51:56 13        A.    I don't remember exactly which month.

14:52:00 14        Q.    Okay.  And that it was -- so in late '98

14:52:04 15    or early 1999, there was some letter about Gary

14:52:06 16    Butts showing favoritism to employees?

14:52:06 17        A.    Yes, sir.

14:52:10 18        Q.    Okay.  Was that favoritism based on anyone

14:52:12 19    having a sexual relationship with him?

14:52:14 20        A.    Not that I can remember.

14:52:18 21        Q.    Okay.  Just that he -- he was favoring

14:52:18 22    some employees?

14:52:22 23        A.    The one -- the one that he showed us, yes,

14:52:26 24    he was favoring some employees.  Some employees had

14:52:28 25    more privileges than other employees, and that was

14:52:30  1    in '98 or right after he got there.  The other one,

14:52:30  2    I don't know.

14:52:36  3        Q.   Okay.

14:52:38  4        A.   If you're asking me whether I felt he had

14:52:40  5    favoritism, that's a different question.

14:52:42  6        Q.   You're right.  I didn't ask you that.

14:52:42  7        A.   Okay.

14:52:50  8        Q.   I want to ask you first whether it was --

14:52:52  9    whether you understood that the letter in January,

14:52:58 10    February of 2001 alleged that Mr. Butts had a

14:53:00 11    sexual relationship with any of the women who

14:53:04 12    worked at that plant.

14:53:04 13        A.   I was not told that.

14:53:06 14        Q.   Okay.  Whether you were told that or not,

14:53:10 15    was that one of the issues that you understood that

14:53:10 16    was in the letter?

14:53:14 17        A.   Mostly what I understood was about drug

14:53:14 18    use.

14:53:14 19        Q.   Okay.

14:53:16 20        A.   That there was drug use, and that there

14:53:20 21    was talk of drugs being transported or something.

14:53:20 22        Q.   Okay.

14:53:24 23        A.   And him being there late at night -- there

14:53:26 24    was a lot of talk about him being there late at

14:53:30 25    night and that the guy from the cafeteria being

| | | |
|---|---|---|
| 14:53:32 | 1 | there late at night, and that he had access to the |
| 14:53:34 | 2 | trucks and -- |
| 14:53:36 | 3 | Q.   So your understanding about it was is that |
| 14:53:40 | 4 | most of that had to do with possible drug use by |
| 14:53:42 | 5 | Mr. Butts? |
| 14:53:44 | 6 | A.   From what I heard about that letter, yes. |
| 14:53:44 | 7 | Q.   Okay. |
| 14:53:46 | 8 | A.   That's all that I heard. |
| 14:53:46 | 9 | Q.   Now -- |
| 14:53:48 | 10 | A.   I never actually saw. |
| 14:53:50 | 11 | Q.   I will ask you, though, did you feel that |
| 14:53:54 | 12 | Mr. Butts did have some kind of sexual relationship |
| 14:53:54 | 13 | with any of the women at work? |
| 14:54:00 | 14 | A.   I can't say that I saw that he did.  I |
| 14:54:06 | 15 | mean, there -- I heard rumors.  But as far as I saw |
| 14:54:08 | 16 | him, no.  I've had employees tell me that -- you |
| 14:54:12 | 17 | know, they make comments and say they saw his truck |
| 14:54:16 | 18 | at one of the girls' houses.  But -- but as far as |
| 14:54:20 | 19 | real knowledge and saw him with somebody, no, I |
| 14:54:20 | 20 | wouldn't -- |
| 14:54:24 | 21 | Q.   Well, whether you really saw him or not, I |
| 14:54:26 | 22 | guess my question was, did you believe that he |
| 14:54:26 | 23 | did? |
| 14:54:32 | 24 | A.   Did I believe that he did? |
| 14:54:36 | 25 | Q.   Well, you said earlier that I didn't ask |

14:54:38  1    you about what was your personal opinion.  I'm

14:54:40  2    asking you what's your personal opinion.

14:54:44  3        A.   Well, my personal opinion, I think that he

14:54:46  4    may have with one or two of them, because one or

14:54:50  5    two of them were promoted more than one time and

14:54:54  6    were given priority over -- over certain other

14:54:56  7    people.  But that is my personal opinion.  And I

14:54:58  8    don't have proof of that.

14:55:04  9        Q.   Well, I understand.  There's a difference

14:55:06  10   between what you might personally know and what you

14:55:10  11   might feel and -- but who are the people?  Who are

14:55:12  12   the two people, the one or two people that you feel

14:55:14  13   that he may have had some kind of sexual

14:55:14  14   relationship with?

14:55:20  15       A.   One of them was a sewing -- a girl that

14:55:22  16   was -- and I don't remember her name.  She was a

14:55:26  17   girl that was promoted to -- to a sewing instructor

14:55:30  18   several months after he got there.  And she came

14:55:34  19   out and told -- told people on the floor that she

14:55:36  20   -- that's how she got that position.  And I don't

14:55:38  21   remember her name.  But I'm sure if you look in the

14:55:42  22   records -- Clara Perez would probably remember.

14:55:48  23   The other one would have to be Belinda Jimenez.

14:55:52  24       Q.   And who's Belinda Jimenez?

14:55:54  25       A.   She was working -- she was a sewing

14:55:58  1    machine operator, and then she was moved to

14:56:02  2    payroll.  From payroll, she was moved to the

14:56:06  3    warehouse.  And then the last -- before the plant

14:56:08  4    closed, she was given a position over -- I don't

14:56:12  5    know what position it is, Santos' position, over

14:56:16  6    the -- is it Planning?  I guess it's Planning.  I

14:56:36  7    don't know.  And the only reason I say that is

14:56:40  8    because there was a big -- there was something said

14:56:44  9    from the Personnel Administrator about how she kept

14:56:50 10    getting pay raises and that no one else was allowed

14:56:52 11    to apply for the position.

14:56:58 12        Q.   Was Clara the one that was the Personnel

14:57:00 13    Administrator?

14:57:00 14        A.   Yes, sir.

14:57:02 15        Q.   Okay.  I mean, did -- what did Clara tell

14:57:06 16    you that -- did she basically express to you her

14:57:08 17    opinion that she must be sleeping with Gary Butts

14:57:10 18    because of how she keeps getting promoted or

14:57:12 19    getting these pay raises?

14:57:14 20        A.   No, sir.  I think that was just the

14:57:18 21    general -- the general conversation of people there

14:57:20 22    in front, because there were people that had been

14:57:22 23    there for years that weren't being promoted up the

14:57:24 24    way she was.

14:57:40 25        Q.   Okay.  Let me ask.  Is there anyone other

14:57:46 1    than Gary Butts that you're claiming this lawsuit

14:57:48 2    did something -- said or did something that you're

14:57:50 3    complaining about in this lawsuit?

14:57:56 4        A.    No, sir.  Clyde Stutts was very rude to me

14:58:00 5    when he called me on the phone.  And I felt that --

14:58:04 6    I felt that he attacked me verbally, the second

14:58:06 7    time that he called me.  And that's when I told him

14:58:10 8    not to call me back.  I felt like he pretty much

14:58:14 9    picked up the harassment where Gary Butts left off.

14:58:16 10       Q.    And what did he say to you during this

14:58:18 11   conversation that you felt was harassing to you?

14:58:22 12       A.    He asked me first when I answered the

14:58:24 13   phone if I was alone.  And I told him that I was.

14:58:28 14   And he said that he did not want to talk to my

14:58:30 15   husband another time whenever he called, he only

14:58:34 16   wanted to talk to me.  And he said, "I just want to

14:58:38 17   know.  If things were so bad for you, why didn't

14:58:40 18   you just leave your job?  Why didn't you just

14:58:42 19   quit?"  And he says, "I heard a rumor."  He says,

14:58:46 20   "I heard a rumor that you were the one having an

14:58:48 21   affair with Gary Butts.  And if I start this

14:58:50 22   investigation, that's all going to come out."  And

14:58:52 23   he says, "You know, what was your relationship with

14:58:56 24   him?"  And I told him we were co-workers.  And I

14:58:58 25   told him, I said, "I don't have anything to hide

14:59:00  1  from you."  I said, "And furthermore, I am not the

14:59:04  2  one that's making a problem, and I'm not leaving my

14:59:04  3  job."

14:59:08  4      Q.    Are you aware that -- did he tell you that

14:59:12  5  there had been a rumor that you -- that there was a

14:59:14  6  relationship between you and Gary Butts?

14:59:18  7      A.    He told me that he had heard a rumor.

        8      Q.    Okay.

14:59:20  9      A.    That's what he told me.  He didn't say

14:59:22  10  anything else to me.  But after he said that, I

14:59:26  11  told him -- and told me I should have left my job,

14:59:30  12  basically.  I didn't appreciate that very much.

14:59:36  13      Q.    Well, did you not tell Mr. Stutts that one

14:59:38  14  reason that you had called Tammie Merritt in

14:59:42  15  January of 2001 about the rumor of the plant being

14:59:46  16  closed is because you had had a job offer?

14:59:58  17      A.    I did -- I did tell him that.  And I did

14:59:58  18  tell him two weeks later or a week later when I

14:59:58  19  talked to him.  He asked me if I decided to take

14:59:58  20  it.  And I told him that I had decided that I

14:59:58  21  wanted to just wait and not rush into anything.

15:00:02  22      Q.    And is that not the context in which Mr.

15:00:04  23  Stutts was asking you that if you had a job offer

15:00:08  24  in hand from someone, and things were that bad at

15:00:12  25  the William Carter Company with Mr. Butts, why had

15:00:14  1    you not taken the job offer?

15:00:16  2        A.   No, sir.  That's not what he meant.

15:00:18  3        Q.   Well, I'm not asking you if that's what he

15:00:20  4    meant, but is that not the context in which he

15:00:20  5    asked you --

15:00:22  6        A.   No, sir.  He asked --

15:00:24  7        Q.   -- about why he did not -- did he ask you,

15:00:26  8    though, why you had not taken the job?

15:00:28  9        A.   No, sir, that's not the way he asked me.

15:00:30  10   He specifically stated to me -- and I did

15:00:32  11   tape-record his conversation.  He specifically

15:00:36  12   stated to me, "If things were so bad at Carter's,

15:00:40  13   why didn't you just leave and quit your job and go

15:00:40  14   somewhere else?"

15:00:42  15       Q.   In the materials that you mailed to us,

15:00:46  16   did you include a copy of the tape-recording?

15:00:48  17       A.   I will include a copy of both recordings.

15:00:50  18   I recorded both of his conversations, and I'm in

15:00:52  19   the process of making copies of that for you.

15:00:54  20       Q.   Well, I would have to have those

15:00:54  21   tomorrow.  I would like to complete your

15:01:00  22   deposition.  The information -- you were under an

15:01:04  23   obligation to provide this information before, and

15:01:10  24   we sent out interrogatories.  And if we have to

15:01:12  25   adjourn early today so you can go do so -- I want

15:01:14   1    to make sure that I receive a copy of the

15:01:18   2    tape-recording tomorrow morning.  Have you already

15:01:22   3    had a copy of it made?  I'm not talking about it

15:01:24   4    transcribed.  I'm talking about a copy of the

15:01:24   5    tape.

15:01:28   6         A.   No, sir, I haven't already had it done.

15:01:30   7         Q.   And have you made arrangements to have it

15:01:30   8    copied?

15:01:32   9         A.   No, sir.  I was going to have to do it

15:01:32  10    myself.

15:01:34  11         Q.   Okay.

15:01:36  12         A.   And I'm looking -- I have them on two

15:01:38  13    separate tapes, and I'm looking for the other

15:01:44  14    tape.  As far as the copy of the voice recording of

15:01:46  15    Tammie Merritt, I -- I -- that was on my answering

15:01:50  16    machine.  And I can try to retrieve that, but I

15:01:52  17    don't think that I can retrieve it.

15:01:56  18         Q.   Well, how many -- how many people at

15:01:58  19    Carter have you tape-recorded?

15:02:02  20         A.   Just Clyde Stutts.  Tammie Merritt, she

15:02:04  21    left a voice mail.

15:02:06  22         Q.   Which voice mail?  When was that?

15:02:06  23         A.   January 2001.

15:02:08  24         Q.   2001.  And did you specifically retain

15:02:10  25    that tape?

```
15:02:14   1        A.   I thought that I had, but I have children.
15:02:16   2        Q.   Well, did you take the tape out of the --
15:02:18   3   is this a tape on a voice message machine?
15:02:20   4        A.   Yes, sir.  It's on an answering machine.
15:02:22   5        Q.   Did you remove the tape from the message
15:02:26   6   machine the same week that it was left there?
15:02:30   7        A.   Yes, sir, I believe that I did.
15:02:32   8        Q.   Did you install another tape?
15:02:32   9        A.   I installed another tape.
15:02:40  10        Q.   Okay.  And then the tape-recording of
15:02:42  11   Clyde Stutts, was this two conversations?
15:02:44  12        A.   It was two conversations.
15:02:46  13        Q.   Were both of those conversations after you
15:02:48  14   had left employment with the company?
15:02:48  15        A.   Yes, sir.
15:02:52  16        Q.   Did you tell him that you had
15:02:52  17   tape-recorded the conversation?
15:02:56  18        A.   I told him the last time that I talked to
15:02:58  19   him, another conversation.
15:03:00  20        Q.   Okay.  Did you tell him at the time that
15:03:02  21   you taped the first conversation?
15:03:04  22        A.   No, sir, I don't believe that I did.  He
15:03:08  23   had me on speaker phone and we were talking, but I
15:03:08  24   don't believe that I did.
15:03:12  25        Q.   And what kind of tape-recording device did
```

15:03:12  1    you use to tape-record that conversation?

15:03:16  2        A.    Just a small microphone that attached to

15:03:16  3    the phone.

15:03:18  4        Q.    Okay.

15:03:18  5        A.    Nothing high quality.

15:03:34  6        Q.    The -- in January or February of 2001, who

15:03:36  7    did you have a job offer from?

15:03:40  8        A.    It was Lori Saldana.

15:03:42  9        Q.    Who?

15:03:44  10       A.    Lori Saldana.

15:03:50  11       Q.    And what kind of job offer was this?

15:03:54  12       A.    It was -- she just asked me what my future

15:03:58  13   plans were, because they have a rehab -- a rehab

15:04:00  14   business.  It wasn't a formal, formal offer, but

15:04:02  15   something she discussed with me.

15:04:04  16       Q.    Okay.

15:04:06  17       A.    There's no formal documents or paperwork.

15:04:08  18       Q.    And what -- what's -- what kind of

15:04:10  19   business does she have?  What's the name of it?

15:04:12  20   Where is it located?

15:04:14  21       A.    It's a physical therapy business.  Total

15:04:14  22   Rehab.

15:04:16  23       Q.    Total Rehab?

15:04:16  24       A.    Uh-huh.

15:04:18  25       Q.    And where is it located?

15:04:18  1    A.    Brownsville.

15:04:26  2    Q.    And what kind of position was she

15:04:30  3  discussing that you -- of interest to you?

15:04:36  4    A.    They weren't real specific, as far as what

15:04:38  5  I would be doing.  They needed a lot of collections

15:04:44  6  work, as far as Medicare.  Collecting Medicare

15:04:46  7  payments, Medicare, Medicaid payments for the

15:04:48  8  therapy.

15:04:58  9    Q.    How -- did you discuss what your

15:05:00  10  compensation might be?

15:05:02  11    A.    No, sir.  We never -- we never got to that

15:05:02  12  point.

15:05:08  13    Q.    Had you had discussions with anyone else

15:05:10  14  in January or February of 2001 about possible

15:05:14  15  jobs?

15:05:16  16    A.    No, sir, I wasn't aware that I was looking

15:05:18  17  for a job.

15:05:24  18    Q.    The -- have you ever worked with Lori

15:05:26  19  Saldana before?

15:05:26  20    A.    No, sir.

15:05:28  21    Q.    How did you know her?  Is this through

15:05:30  22  personal acquaintances or --

15:05:30  23    A.    Oh, yes, sir.

15:05:32  24    Q.    -- through business contacts?

15:05:34  25    A.    Just personal acquaintance.

15:05:46  1      Q.    After —— Exhibit No. 1 is the information

15:05:50  2  you sent to the company in July 16, 2001.  Now,

15:05:52  3  after that, you've indicated that there have been

15:05:56  4  some telephone calls from Mr. Butts and some other

15:06:00  5  kind of contacts from him.  What I want to do is

15:06:02  6  talk about the things that have happened after,

15:06:08  7  after you sent the company this document on July

15:06:16  8  16, 2001.  Okay.  Tell me the kind of things,

15:06:18  9  contacts you've had and if they are specific or if

15:06:22  10  they are anonymous telephone calls or whatever they

15:06:22  11  are.

15:06:26  12      A.    I believe I told you about May 8th when he

15:06:30  13  followed us all through town.

15:06:36  14      Q.    That was before.  That was before July

15:06:36  15  16th, 2001.

15:06:38  16      A.    Okay.

15:06:40  17      Q.    What I want you to do, I want to focus on

15:06:46  18  the things which occurred after July 16, 2001,

15:06:50  19  which is the day that you sent this Exhibit No. 1

15:06:52  20  to Clyde Stutts.  Okay?

15:06:58  21      A.    The anonymous phone calls.  Anonymous

15:07:04  22  phone calls and the death threats.  The day that I

15:07:08  23  filed the suit, there were gunshots at my

15:07:12  24  daughter's —— at my youngest daughter's school on

15:07:16  25  the playground where she was two hours after I ——

15:07:18  1    when I went to pick her up.

15:07:26  2         Q.    Okay.  As far as the anonymous telephone

15:07:30  3    calls go, have you made any attempt to trace those?

15:07:34  4         A.    Yes, sir.  Detective Turner from the

15:07:38  5    Harlingen Police Department would have all of that

15:07:38  6    information.

15:07:40  7         Q.    And were you able to trace any of those?

15:07:42  8         A.    I believe that he was able to trace

15:07:44  9    several of them.

15:07:44  10        Q.    To where?

15:07:50  11        A.    They're going back to calling centers off

15:07:54  12   the calling card, those calling cards that he's

15:07:56  13   buying at convenience stores.  But I know that he

15:08:00  14   had a conversation with the police in Opp, Alabama

15:08:02  15   where Mr. Butts is from during Christmas time when

15:08:04  16   he made the death threats and spoke with the

15:08:08  17   sheriff there, as far as his background and --

15:08:14  18        Q.    As far as the -- on the telephone calls

15:08:18  19   where the anonymous hanging up -- and I take it

15:08:20  20   that you're saying it's the same kind of thing,

15:08:22  21   there were calls and they were listening to you and

15:08:26  22   breathing and hanging up, but nobody is saying

15:08:26  23   anything to you?

15:08:28  24        A.    That's correct.

15:08:30  25        Q.    Those were traced to these calling cards

15:08:32  1   you could buy like at convenience stores?

15:08:32  2       A.   Yes, sir.

15:08:34  3       Q.   Okay.

15:08:38  4       A.   And you have to have -- you call the

15:08:40  5   tracing center, and they trace it back, and they

15:08:44  6   tell you that they -- it goes back to a long

15:08:46  7   distance carrier, and the long distance carrier,

15:08:50  8   you must have so many calls per day before they

15:08:54  9   will -- they will divulge the number.  But

15:08:56 10   Detective Turner would have all of that

15:08:56 11   information.

15:09:00 12       Q.   Well -- and I realize that, you know, you

15:09:04 13   may not be able to prove it was Gary Butts, but you

15:09:06 14   certainly feel that way, and I understand why -- I

15:09:10 15   understand that.  But what information have you

15:09:12 16   ever received that he, in fact, has purchased

15:09:16 17   calling cards out of convenience stores?

15:09:18 18       A.   What personal knowledge do I have?

15:09:20 19       Q.   Yeah.  Or any -- I mean, who's told you

15:09:22 20   that he's purchased any?

15:09:28 21       A.   The police officer in Opp, Alabama told

15:09:30 22   Detective Turner that his brother was stocking a

15:09:34 23   girl in town, as well, and basically she was going

15:09:34 24   through basically the same thing.

15:09:38 25       Q.   That Gary Butts' brother was stocking

15:09:38  1    someone?

15:09:38  2        A.   Yes.

15:09:40  3        Q.   Not Gary Butts, but his brother?

15:09:40  4        A.   Yes, sir.

15:09:42  5        Q.   Okay.  What's his brother's name or --

15:09:42  6        A.   I don't know.

15:09:44  7        Q.   Okay.

15:09:50  8        A.   And Detective Cano from Harlingen Police

15:09:50  9    Station, as well.

15:09:52  10       Q.   I'm sorry?

15:09:56  11       A.   Detective Cano, as well, knows, as well as

15:09:58  12   the gentleman I spoke with with the FBI.

15:10:02  13       Q.   And who did you speak to at the FBI?

15:10:06  14       A.   I cannot remember his name.  If I go back

15:10:08  15   on my notes, I can find that for you.  He's out of

15:10:12  16   the Brownsville office.  I think his name is Mr.

15:10:12  17   Garcia.

15:10:16  18       Q.   Well, my question, I think specifically

15:10:24  19   was, who or what have you been told -- has anybody

15:10:28  20   told you that Gary Butts has bought calling cards

15:10:30  21   at convenience stations or somewhere else?

15:10:32  22       A.   No, sir, no one's told me that.

15:10:36  23       Q.   And has anybody been able to trace where

15:10:40  24   the calls came from that came to your house,

15:10:42  25   whether they were from Connecticut, or whether

15:10:44   1   they're from Alabama, or they're from Georgia or

15:10:44   2   they're from California?

15:10:48   3       A.   Southwestern Bell Call Trace will not give

15:10:52   4   me the actual paperwork.  It goes directly to the

15:10:54   5   police department.  The police detective would be

15:10:58   6   able to tell you exactly the number and what he's

15:10:58   7   gotten.

15:11:00   8       Q.   Has anyone at the police department told

15:11:02   9   you that those calls -- where those calls

15:11:02   10  originated?

15:11:08   11      A.   I believe Detective Turner told me they

15:11:14   12  were coming back to a long distance calling -- a

15:11:18   13  long distance calling company.  As far as the ones

15:11:20   14  at Christmas time, we know where they were coming

15:11:22   15  from.  He identified himself.

15:11:24   16      Q.   You're talking about December 24th, 2001?

15:11:26   17      A.   And 25th.

15:11:26   18      Q.   Huh?

15:11:30   19      A.   December 24th and 25th.

15:11:30   20      Q.   Okay.  I didn't know that there was one on

15:11:32   21  the 25th.

15:11:34   22      A.   Oh, no, sir.  There have been two death

15:11:36   23  threats, two separate calls.

15:11:38   24      Q.   And the first one was on December 24th,

15:11:40   25  and the second one was when?

| | | |
|---|---|---|
| 15:11:40 | 1 | A.    Christmas morning. |
| 15:11:46 | 2 | Q.    Okay.  And both occasions, did Gary Butts |
| 15:11:46 | 3 | identify himself? |
| 15:11:48 | 4 | MR. POWELL:  Would you like to take a |
| 15:11:48 | 5 | break? |
| 15:11:50 | 6 | THE WITNESS:  Please. |
| | 7 | MR. POWELL:  Let's go off the record. |
| 15:11:50 | 8 | (Off record.) |
| 15:20:42 | 9 | Q.    Ms. Tate, I need to ask you about the |
| 15:20:48 | 10 | telephone calls on December 24th and 25th of 2001, |
| 15:20:50 | 11 | and I realize that this is something that may be |
| 15:20:56 | 12 | very upsetting to you.  And before I ask you any |
| 15:20:58 | 13 | questions, let me just tell you, I'll need to have |
| 15:21:02 | 14 | an understanding of, you know, the calls and what |
| 15:21:10 | 15 | was said, who -- if it was Mr. Butts and he |
| 15:21:14 | 16 | identified himself, and who he spoke to.  And I'd |
| 15:21:16 | 17 | like to take those one at a time.  Now, if this |
| 15:21:20 | 18 | becomes upsetting to you and you need to take a |
| 15:21:22 | 19 | break, I understand that, and we'll be glad to do |
| 15:21:26 | 20 | so.  But unfortunately, because of the lawsuit, |
| 15:21:28 | 21 | it's necessary for me to ask you those questions, |
| 15:21:32 | 22 | and I hope you understand that I'm not trying to |
| 15:21:36 | 23 | embarrass you, I'm not trying to upset you, but |
| 15:21:38 | 24 | it's some of my responsibility to obtain the |
| 15:21:42 | 25 | information that's necessary to represent William |

| | | |
|---|---|---|
| 15:21:44 | 1 | Carter Company in this case.  And to the extent |
| 15:21:46 | 2 | that you're saying that William Carter is |
| 15:21:48 | 3 | responsible for those telephone calls, then I'll |
| 15:21:52 | 4 | have to ask you those questions.  And I'll say that |
| 15:21:56 | 5 | just by way of explanation.  The -- the first call |
| 15:22:02 | 6 | of any kind of threatening nature, I assume, |
| 15:22:06 | 7 | occurred on December the 24th, 2001.  I understand |
| 15:22:08 | 8 | from what you said earlier that that came in at |
| 15:22:14 | 9 | 6:08 p.m.  And who -- who -- who received the call |
| 15:22:16 | 10 | or who spoke to Mr. Butts and what did Mr. Butts |
| 15:22:16 | 11 | say? |
| 15:22:18 | 12 | A.   My husband received that call. |
| 15:22:26 | 13 | Q.   And did you listen in on another line or |
| 15:22:26 | 14 | anything? |
| 15:22:28 | 15 | A.   No, sir, I was preparing dinner. |
| 15:22:32 | 16 | Q.   Okay.  About how long did that |
| 15:22:34 | 17 | conversation last?  Was it just a matter of a |
| 15:22:36 | 18 | minute or so? |
| 15:22:44 | 19 | A.   I think it was probably several minutes. |
| 15:22:50 | 20 | He told him we wanted to call and wish him a merry |
| 15:22:52 | 21 | freaking Christmas, but he didn't use those words. |
| 15:22:54 | 22 | And he started -- he started with profanities and |
| 15:23:00 | 23 | he told him, he says, you know, "I know -- I know I |
| 15:23:02 | 24 | lost my job because of your wife, and I'm coming |
| 15:23:06 | 25 | down there, and I'm going to come kill y'all.  I'm |

15:23:10  1    going to come kill all of you, and I have something

15:23:12  2    real special in mind for you." He repeats

15:23:16  3    everything when he calls.

4        Q.    Did --

15:23:22  5        A.    "I know where your children go to school."

15:23:38  6        Q.    Do you have any kind of tracing device on

15:23:38  7    your telephone?

15:23:42  8        A.    They did not trace -- trace that call.

15:23:48  9        Q.    Or do you have Caller ID on your

15:23:48  10   telephone?

15:23:52  11       A.    We have Caller ID. We've always had

15:23:56  12   Caller ID, but all that shows up is "Out of Area."

15:23:58  13       Q.    I take it Mr. Butts identified himself.

15:24:02  14       A.    He identified himself. He told him, he

15:24:02  15   says, "This is Gary Butts."

15:24:06  16       Q.    Was Mr. Butts apparently drunk at the time

15:24:06  17   or --

15:24:14  18       A.    I -- I didn't talk to him, but I don't --

15:24:16  19   I really -- I really don't know. I wouldn't say

15:24:16  20   that he was drunk.

15:24:22  21       Q.    The -- and then -- anything else about

15:24:26  22   that telephone call that you can tell me about?

15:24:38  23       A.    Not right now.

15:24:42  24       Q.    Was that -- was that telephone call

15:24:44  25   tape-recorded?

15:24:44  1        A.    No, sir.

15:24:48  2        Q.    On December the 25th, Mr. Butts called

15:24:48  3  again?

15:24:52  4        A.    Yes, sir.  He called Christmas morning.

15:24:54  5        Q.    Okay.  Do you want to take a break?

15:24:56  6        A.    No.  I'll be all right.

15:24:58  7        Q.    Okay.  And who did he speak to on

15:25:00  8  Christmas morning?

15:25:04  9        A.    He initially spoke to my husband, and then

15:25:06 10  I got on the phone, because I heard my husband

15:25:10 11  talking and I didn't know what was going on, and I

15:25:14 12  got on the phone.  And he told me, he says, "I lost

15:25:18 13  my job because of you, and I'm coming down there to

15:25:22 14  kill your kids."  And he said, "You're never going

15:25:24 15  to know when I'm coming or how I'm going to be

15:25:28 16  coming.  You'll never know."  And he says, "I know

15:25:30 17  the layout of your house."

15:25:48 18        Q.    The -- now, has Mr. Butts called,

15:25:52 19  identified himself, or otherwise have you received

15:25:56 20  any kind of threatening telephone calls since

15:25:58 21  December 25th, 2001?

15:26:00 22        A.    A police officer came to my house the

15:26:04 23  following day.  I had already called the police.

15:26:06 24  The officer came to my house the following day, on

15:26:14 25  December 26th.  When we called, we retrieved the

15:26:16  1   phone number from Information for Connie Butts --

15:26:22  2   Connie Butts' father's business in Alabama.  We

15:26:26  3   wanted to see if he was in Alabama or if he was on

15:26:30  4   his way to Texas or where, if they knew where he

15:26:34  5   was so we could be sure that he wasn't anywhere by

15:26:38  6   us.  And the officer got on the phone with Connie

15:26:42  7   Butts, and I talked to her.  And he told her about

15:26:46  8   the situation and what was going on and about the

15:26:50  9   death threats made.  And then after a point, Gary

15:26:54  10  Butts got on the phone.  And the officer had my

15:26:58  11  husband get on the other line to identify his

15:26:58  12  voice.

15:27:04  13      Q.    And what was the substance of that

15:27:04  14  conversation?

15:27:06  15      A.    The officer told him that he needed to

15:27:12  16  cease and desist calling our home and harassing us,

15:27:16  17  and whatever happened at the William Carter Company

15:27:18  18  was in the past, and that he should not make any

15:27:22  19  further contact with us, as we were not contacting

15:27:30  20  him.  And the police report was made.  An addendum

15:27:36  21  to the 25th and the 24th police reports, as well.

15:27:38  22      Q.    And do you have a copy of any of those

15:27:38  23  reports?

15:27:42  24      A.    Yes, sir.  And I'll -- I'll go ahead and

15:27:44  25  provide more copies for you tomorrow.  I did send

15:27:46  1    them initially.

15:27:56  2        Q.    The -- did you say that you spoke to Mrs.

15:27:56  3    Butts?

15:28:00  4        A.    Yes, sir.

15:28:00  5        Q.    Okay.

15:28:04  6        A.    Initially, I spoke with her, as well.  And

15:28:06  7    I told her that her husband had called both days,

15:28:10  8    Christmas Eve and Christmas morning, and threatened

15:28:14  9    our lives, and we just wanted to know where he was.

15:28:16  10       Q.    And what was her reaction?

15:28:20  11       A.    She said that he was there.  "He's here."

15:28:24  12   But first she says, "I think that -- I think that

15:28:26  13   maybe you're mistaken."  And I told her, I said,

15:28:28  14   "No, I'm not mistaken."  Initially after the

15:28:32  15   police officer started talking to her, she resolved

15:28:36  16   that he was -- he was probably involved.  And then

15:28:38  17   after my husband identified -- the officer spoke

15:28:42  18   with Gary Butts and asked him if it was Gary, and

15:28:44  19   he said, "Yes," and got my husband on the phone.

15:28:48  20   My husband identified his voice.  And after --

15:28:52  21   shortly after that, Gary Butts slammed down the

15:28:52  22   phone.

15:28:54  23       Q.    Were the calls traced to some place in

15:28:56  24   Alabama?  Or do you know?

15:29:00  25       A.    I don't know.  I don't remember, but -- we

15:29:04  1    -- we retrieved the number, because I remembered

15:29:10  2    seeing the address on packages that they would send

15:29:14  3    out.  They would send out their packages and bring

15:29:16  4    them to the plant and send them out, I guess, on

15:29:18  5    the plant postage, because I would always see them

15:29:22  6    out there waiting to be picked up.  And it was a

15:29:26  7    business.  It was Covington Pecans.  And the only

15:29:28  8    reason I remember is because -- it's really stupid

15:29:32  9    -- Covington is the name that's on one of the

15:29:36  10   in-hospital claims that I had the address that I

15:29:36  11   had to send something to, and I just remembered

15:29:36  12   that name.

15:29:42  13       Q.    Have there been any kind of telephone

15:29:46  14   calls from Gary Butts since December 25th, 2001?

15:29:50  15       A.    Just the same anonymous phone calls.

15:29:54  16       Q.    And then you've had other anonymous

15:29:56  17   telephone calls where they were hanging up?

15:30:00  18       A.    There was one on May 25th or May 26th to

15:30:02  19   my pager, which I no longer carry for that reason.

15:30:06  20   And it was a -- he had called my pager number and

15:30:10  21   put in a pager number, and it was a phone number

15:30:12  22   that I didn't recognize.  So my husband and I

15:30:14  23   called the pager number.  We called the number, and

15:30:18  24   come to find out it was a pager number belonging to

15:30:22  25   the Crispy Cream Donut Factory in Atlanta.  And I

```
15:30:26   1   have that where I did call and try to -- it's on my
15:30:28   2   long distance bill, and I included that with the
15:30:32   3   stuff that you got.  I was trying to figure out
15:30:34   4   which -- which employee it belonged to.  Whoever it
15:30:36   5   was would not call us back.  When we called the
15:30:40   6   pager number and put our number in, they wouldn't
15:30:44   7   call our number back.  And usually even when it's a
15:30:46   8   wrong number, someone will call you back and
15:30:48   9   acknowledge that it's a wrong number.
15:30:52  10      Q.  And you said something about there were
15:30:56  11   shots at your sister's(sic) school the day the
15:30:58  12   lawsuit was filed.  What day are you talking about?
15:31:02  13      A.  On May the 17th when I went to pick up my
15:31:04  14   youngest daughter, Regan, my 10-year-old --
15:31:06  15      Q.  You're talking about 2002?
15:31:08  16      A.  Yes, sir, this year.  Two hours after I
15:31:10  17   filed this -- this suit, I went to pick her up, and
15:31:14  18   she was hysterical.  She said the police -- the
15:31:16  19   police were still there when I got there.  I didn't
15:31:18  20   know what was going on.  I hadn't gotten there
15:31:22  21   yet.  They had called the police because there were
15:31:24  22   gunshots.  She stays in an after school program, a
15:31:26  23   help program, and they were out there playing on
15:31:32  24   the playground and -- and they heard gunshots, and
15:31:34  25   they took off the kids -- they brought all the kids
```

15:31:38  1   inside.  And I don't know how affected the other

15:31:42  2   children were, but my 10-year-old, because of all

15:31:42  3   of this is very affected.

15:31:46  4       Q.   Was it ever resolved about what the source

15:31:48  5   of those gunshots were at the school?

15:31:54  6       A.   I don't know, sir.  I did not go and get

15:31:54  7   that police report, but I know they were there the

15:31:56  8   next day and they found the shells.

15:31:56  9       Q.   What makes you think Gary Butts had

15:31:58 10   something to do with that?

15:32:00 11       A.   It was filed -- it happened right after I

15:32:02 12   filed this lawsuit, two hours afterwards.  This has

15:32:06 13   never happened before, and it's never happened

15:32:06 14   since.

15:32:08 15       Q.   Well, my -- who -- who would have known

15:32:10 16   that you -- the day that you filed the lawsuit --

15:32:12 17   you're talking about May the 17th is literally the

15:32:14 18   day that you filed the documents at the federal

         19   courthouse?

15:32:16 20       A.   Yes, sir.

15:32:18 21       Q.   Okay.  And which courthouse did you go to

15:32:20 22   to file it?

15:32:22 23       A.   The federal courthouse in Brownsville.

15:32:24 24       Q.   Who did you tell that you were going to go

15:32:26 25   file the lawsuit?

15:32:30  1      A.   I didn't tell anyone, unless someone was

15:32:30  2  following me.

15:32:32  3      Q.   Well, I'm simply trying to understand that

15:32:36  4  how would you -- what basis do you believe that

15:32:40  5  Gary Butts or anybody else fired shots at your

15:32:42  6  children's school the day that you filed your

15:32:44  7  lawsuit?

15:32:48  8      A.   My daughter feels that it was meant for

15:32:50  9  her.  That's what I'm trying to tell you.

15:32:52 10      Q.   I understand.  I'm simply trying to

15:32:54 11  understand -- I mean, the William Carter Company

15:32:58 12  didn't know on May 17th the day you filed your

15:32:58 13  lawsuit.

15:33:00 14      A.   The only way I could think of that he

15:33:02 15  would know is he still has friends there that maybe

15:33:06 16  I'm being followed.  It's not the first time that

15:33:08 17  he would have followed me.  He's followed me

15:33:10 18  before.

15:33:12 19      Q.   Well, has anybody been following you to --

15:33:14 20  have you suspected anybody following you since you

15:33:16 21  left the employment of William Carter Company?

15:33:22 22      A.   I hadn't really noticed.  I haven't gone

15:33:24 23  that many places.  I've pretty much been more of a

15:33:28 24  hermit in my house, but I'm no investigator.

15:33:30 25      Q.   Well, that's not my question.  My question

15:33:32 1    was, have you suspected that anybody was following

15:33:34 2    you at any time since you left the William Carter

15:33:34 3    Company?

15:33:38 4        A.    I felt uneasy since I left the William

15:33:44 5    Carter Company, and I guess -- I'm constantly

15:33:46 6    looking around, as far as wanting to be out

15:33:48 7    somewhere.  It has crossed my mind.  But as far as

15:33:52 8    seeing one car, no.  I have turned around on

15:33:54 9    several occasions and made different turns on my

15:33:56 10   way home, because after he made the comments that I

15:34:00 11   won't know when it's coming or when he's coming or

15:34:04 12   who he's sending if it's not going to be him that's

15:34:04 13   going to kill me or my family, so, yes, I am

15:34:06 14   looking around more.

15:34:10 15       Q.    Has there ever been an occasion where you

15:34:12 16   suspected somebody and you've reported it to the

         17   police?

15:34:14 18       A.    No, sir, I haven't gone that far.

15:34:16 19       Q.    And even if you haven't reported it to the

15:34:18 20   police, has there been any times that you've

15:34:20 21   suspected that there's a car behind you that

15:34:20 22   somebody was following you?

15:34:24 23       A.    No, sir.  I've just attempted to lose --

15:34:26 24   to lose whoever it was.

15:34:44 25       Q.    The -- have you ever known of Gary Butts

15:34:50   1   committing any acts of physical violence against

15:34:52   2   any person at any time?

15:35:08   3       A.   I know of him threatening to kill his wife

15:35:10   4   and his kids.

15:35:10   5       Q.   Okay.

15:35:16   6       A.   I know of him firing gunshots outside his

15:35:22   7   home.  I know that that occurred on a week night

15:35:24   8   when we were still employed with the William Carter

15:35:28   9   Company.  And I know now after looking at the

15:35:30  10   police reports that that's why he wasn't at the

15:35:34  11   20-year service reunion, because he was in jail.

15:35:40  12       Q.   The -- were the gunshots and the issues

15:35:44  13   with his wife and children, were those matters

15:35:52  14   involving family issues?  Excuse me.  Wife and

15:35:54  15   kids, obviously.  But the firing and gunshots, was

15:35:58  16   that in connection with issues involving he and his

15:35:58  17   wife?

15:36:00  18       A.   He and his wife were -- were evidently

15:36:04  19   arguing over something, and he was on drugs.

          20       Q.   Okay.

15:36:06  21       A.   And he was drug tested that night.

15:36:10  22       Q.   And my question is, is that -- other than

15:36:14  23   his -- and I'll ask you what you know about it.

15:36:18  24   But other than the issues involved in domestic

15:36:20  25   matters involving his wife, have you known of Gary

15:36:24  1   Butts to be -- commit any acts of violence against

15:36:26  2   anybody else at any time?

15:36:28  3        A.   I don't have --

15:36:30  4        Q.   Even if you don't know it personally, but

15:36:34  5   you have heard of it or you suspect it.

15:36:36  6        A.   I don't know of it personally, but my

15:36:40  7   personal opinion is he's capable.

15:36:44  8        Q.   Okay.  All right.  What you do know or

15:36:48  9   have heard of is -- is an issue involving his wife

15:36:52 10   and firing gunshots; am I correct?

15:36:52 11        A.   Yes, sir.

15:36:58 12        Q.   Okay.  Was this on one occasion or more

15:36:58 13   than one occasion?

15:37:00 14        A.   On more than one occasion.

15:37:04 15        Q.   Okay.  And -- and what do you know about

15:37:06 16   that, and when did it occur?

15:37:12 17        A.   I think that particular occasion occurred

15:37:14 18   in August of 2000.

15:37:18 19        Q.   August of 2000?

15:37:18 20        A.   Yes, sir.

15:37:18 21        Q.   Okay.

15:37:20 22        A.   I don't remember the exact date, but it

15:37:22 23   will be on the police report.

15:37:24 24        Q.   Do you have a copy of this police report?

15:37:28 25        A.   Yes, sir, I will provide it for you.  I

15:37:28  1    did send it with the documents.

15:37:34  2        Q.    Okay.    But this police report involved,

15:37:40  3    what, he and his wife?

15:37:46  4        A.    He and his wife and his kids and Dr. Ruben

15:37:46  5    Lopez, who was, evidently, a friend of their

15:37:46  6    family's, and another young lady that was a friend

15:37:48  7    of their family's that were called there because

15:37:52  8    they were worried about her.    I guess she called

15:37:52  9    them.

15:37:56  10       Q.    Okay.    And you said that there was more

15:38:00  11   than one occasion?    Is this when the gunshots

15:38:02  12   occurred?

15:38:02  13       A.    Yes, sir.

15:38:04  14       Q.    Okay.    Were the gunshots on more than one

15:38:04  15   occasion?

15:38:08  16       A.    No, sir.    I think the gunshots were only

15:38:10  17   on one occasion.

15:38:10  18       Q.    Okay.

15:38:14  19       A.    But I think he -- another occasion, he

15:38:18  20   kept calling her and -- and she said that he was --

15:38:20  21   she would answer the phone and he was engaging the

15:38:24  22   gun.    And this is what Chief Zimmerman told me from

15:38:28  23   Palm Valley P. D.    And according to the police

15:38:30  24   statement that he gave me, that the police report

15:38:32  25   stated that she told him that he would call her and

15:38:34  1    she would pick up the phone, and he would, like,

15:38:38  2    click the gun and like engage the gun, and he would

15:38:40  3    tell her, his wife, "Do you know what this is?"

15:38:44  4    And she said, "No." And he said, "This is the gun

15:38:46  5    that I'm going to use to blow your brains out

          6    with."

15:38:48  7       Q.    Did he ever -- was he threatening to shoot

15:38:52  8    her? Was he threatening to commit suicide? Or was

15:38:52  9    he threatening both?

15:38:56 10       A.    I think -- I think all of the above. From

15:39:00 11    what Chief Zimmerman told me, that she had put him

15:39:02 12    under peace bond.

15:39:06 13       Q.    Okay. And did you know of this when you

15:39:08 14    were still working at William Carter Company?

15:39:08 15       A.    No, sir.

15:39:12 16       Q.    Okay. This -- as far as anything

15:39:16 17    involving domestic violence issues or gunshots, is

15:39:20 18    that something that you learned only after leaving

15:39:20 19    William Carter Company?

15:39:22 20       A.    Yes, sir.

15:39:22 21       Q.    Okay.

15:39:30 22       A.    I thought that he was capable, and I

15:39:32 23    thought that he was unstable. But only afterwards

15:39:36 24    when I got the -- all of the police reports did I

15:39:40 25    really realize how bad it was.

15:39:42  1      Q.   And these are police reports from where?

15:39:46  2      A.   Harlingen Police Department and Palm

15:39:48  3  Valley Police Department where he lives, or where

15:39:52  4  he lived -- or where he lived.  And there was a

15:39:56  5  personal statement in there, as well, from Police

15:39:58  6  Chief Zimmerman where he had a conversation with

15:40:04  7  him.  It was the end of August or September where

15:40:06  8  Mr. Butts went in to talk to him and told him that

15:40:08  9  -- he acknowledged to him that he had a drug

15:40:12 10  problem, and to the nature of the conversation that

15:40:16 11  he didn't realize how easy it was to buy drugs down

15:40:18 12  here, that it was as easy as going down to the

15:40:20 13  street corner and buying candy.

15:40:24 14      Q.   And Chief Zimmerman is with which police

         15  department?

15:40:28 16      A.   He's the Chief of Police for Palm Valley

         17  Police Department.

15:40:30 18      Q.   And how is it that you were able to obtain

15:40:34 19  those records?  Just by requesting them?

15:40:34 20      A.   When I went to the Harlingen -- because

15:40:38 21  the Harlingen Police Department got them, as well,

15:40:40 22  because when I went to Harlingen Police Department

15:40:42 23  to file my complaint, they knew his name.

15:40:44 24      Q.   Okay.

15:40:46 25      A.   They knew his name and then they knew of

15:40:48  1   another -- another police report, as well,

15:40:52  2   corresponding to his name that was made by Dr.

15:40:56  3   Ruben Lopez, because Mr. Butts had threatened his

15:41:00  4   life, as well, after he had him drug tested.

15:41:02  5       Q.   And where was this drug testing and when

15:41:02  6   was that?

15:41:04  7       A.   That was done in August of 2000.  The

15:41:08  8   exact date would be on -- on the police report, but

15:41:14  9   he was sent to Valley Baptist Medical Center by Dr.

15:41:16  10  Lopez because, I guess, he -- after the threats

15:41:20  11  that he made to his wife and the irrational

15:41:22  12  behavior, he wanted to have him tested.

15:41:28  13      Q.   And what did he test for?  What was the

15:41:30  14  substance?

15:41:32  15      A.   I think they believed they said cocaine.

15:41:36  16  But I think there were other -- I think Police

15:41:40  17  Chief Zimmerman said there was more -- more than

15:41:40  18  that involved.

15:41:54  19      Q.   Okay.  Now, has any other -- has anyone,

15:42:00  20  whether current or former employee of William

15:42:04  21  Carter Company, that you have -- know or suspected

15:42:10  22  as being in touch with Gary Butts to tell him what

15:42:12  23  you were doing and where you were going and to keep

15:42:16  24  Gary Butts informed of your activities?

15:42:20  25      A.   The only person that -- well, whoever his

15:42:24  1    friends were down here.  Maybe David Chapa that

15:42:26  2    still lives down here and owns a restaurant.  We

15:42:30  3    used to share a maid at one time, David Chapa's

15:42:36  4    wife and I.  And they're familiar with -- with my

15:42:42  5    house, where I live.  And he still resides there.

15:42:46  6        Q.    As -- have you suspected that David Chapa

15:42:50  7    has provided information to Gary Butts about you?

15:42:56  8        A.    I don't know.  I've tried not to have any

15:42:58  9    contact with him whatsoever.

15:43:00  10       Q.    Well, is there any individual that you do

15:43:02  11   suspect has informed Gary Butts of your activities

15:43:04  12   since he moved from Texas?

15:43:06  13       A.    No, sir.

15:43:16  14       Q.    Okay.  You've said something about Gary

15:43:20  15   Butts said in a telephone conversation that he was

15:43:22  16   familiar with your house.  Had he ever been in your

15:43:24  17   house on social occasions?

15:43:24  18       A.    No, sir.

15:43:28  19       Q.    Or have you ever been in his house on

15:43:28  20   social occasions?

15:43:30  21       A.    I was in his house one time -- well,

15:43:32  22   actually, I had been in that house before, because

15:43:34  23   I knew the people that lived in that house before.

15:43:36  24       Q.    I'm not asking that.  I'm asking, have you

15:43:38  25   ever visited -- have you ever been any kind of,

15:43:40  1    either, company or other outside of company social

15:43:46  2    occasions where you may have been a visitor in Gary

15:43:50  3    Butts' house or he or his wife or other members of

15:43:54  4    his family may have been guests at your house,

15:43:56  5    either for dinner or for other social events?

15:43:58  6        A.    No, sir, not at my home.  But one time he

15:44:04  7    wanted Clara and Connie and I to see the tile that

15:44:08  8    he had had done in his house, and he -- he wanted

15:44:12  9    us to go over there and see his tile.  And I went

15:44:16 10    in a separate vehicle with Connie, and they walked

15:44:18 11    through his house.  I just stayed in the front part

15:44:24 12    where the front door was.  It was when they -- they

15:44:28 13    had retiled the plant, and he had used the tile

15:44:30 14    man, the same tile man to do tile at his house.

15:45:28 15        Q.    If you'd look at Exhibit No. 1, please,

15:45:48 16    Ms. Tate.  And on page two, at the second

15:45:58 17    paragraph, it talks about that while Gary was in

15:46:00 18    Griffin at a managers' meeting, he called the plant

15:46:02 19    around 4:30 Harlingen time, and you and answered

15:46:06 20    the telephone.  Now, that's the comment you're

15:46:08 21    talking about earlier where he related to you that

15:46:12 22    Clara had told him the reason that you and your

15:46:14 23    first husband was divorced, and he made the

15:46:16 24    comments about that.  And that's what this is

15:46:18 25    referring to; am I correct?

15:46:18  1      A.    Yes, sir.

15:46:20  2      Q.    And your memory about that is that that

15:46:24  3  would have been the fall of 1999?

15:46:24  4      A.    Yes, sir.

15:46:38  5      Q.    Now, later in that paragraph, it refers to

15:46:54  6  your husband saying that your husband said that he

15:46:56  7  was going to ask Clara Perez if she had made those

15:47:00  8  statements about you.  Do you see that towards

15:47:00  9  the --

15:47:00 10      A.    Uh-huh.  Yes, sir.

15:47:06 11      Q.    -- bottom?  And that -- and Gary Butts got

15:47:12 12  angry and told him never to come to the plant, and

15:47:16 13  they have a discussion about that.  Did I

15:47:18 14  understand your husband, in fact, did not talk to

15:47:20 15  Clara Perez?

15:47:22 16      A.    No, sir.  We thought it was best not to

15:47:24 17  because we had to work together.

15:47:26 18      Q.    And I understand that you did not talk to

15:47:26 19  her --

15:47:26 20      A.    That's correct.

15:47:28 21      Q.    -- about that issue?

15:47:28 22      A.    No, sir.

15:47:42 23      Q.    Okay.  Now, on the top of the following

15:47:52 24  page, it says, "A few days later when Gary arrived

15:47:58 25  back at the plant, he tried to apologize and said

| | | |
|---|---|---|
| | 1 | that he had said some things that he regretted |
| 15:48:00 | 2 | saying."  Is that something that Gary Butts said to |
| | 3 | you? |
| 15:48:00 | 4 | A.  Yes. |
| 15:48:08 | 5 | Q.  Okay.  Because it just says that, "My |
| 15:48:10 | 6 | husband left it at that and did not pursue asking |
| 15:48:14 | 7 | question of Clara Perez."  I'm just trying to |
| 15:48:18 | 8 | figure out, did Gary Butts apologize to you for |
| 15:48:20 | 9 | making any of those comments, saying the comments |
| 15:48:24 | 10 | about Clara Perez making statements about you? |
| 15:48:26 | 11 | A.  He just -- basically he was apologizing |
| 15:48:26 | 12 | for telling my husband he couldn't come to the |
| 15:48:28 | 13 | plant.  He didn't say anything about making the |
| 15:48:28 | 14 | comment. |
| 15:48:32 | 15 | Q.  Okay.  Okay.  And that's what I was trying |
| 15:48:34 | 16 | to figure out.  What did he apologize for?  Blowing |
| 15:48:36 | 17 | up at your husband? |
| 15:48:38 | 18 | A.  Yeah, blowing up at my husband and telling |
| 15:48:40 | 19 | him he couldn't come back to the plant. |
| 15:48:54 | 20 | Q.  Okay.  All right.  At the next paragraph, |
| 15:48:58 | 21 | it says that, as far as Gary Butts' listening in on |
| 15:49:04 | 22 | telephone conversations, that Arnold, the telephone |
| 15:49:12 | 23 | technician from ADT confirmed something about him |
| 15:49:14 | 24 | listening to telephone calls.  Help me understand |
| 15:49:16 | 25 | what -- what that was, because it seems to indicate |

15:49:20  1    that you -- Arnold, whoever that is, told you that

15:49:24  2    about the time when the plant was being closed; am

15:49:24  3    I correct?

15:49:24  4         A.    Yes, sir.

15:49:26  5         Q.    Okay.

15:49:30  6         A.    When the work -- Texas Workforce

15:49:32  7    Commission had brought in the computers when they

15:49:36  8    were hooking up the phone lines and the modems,

15:49:38  9    something -- they did something to the actual phone

15:49:40 10    system, and there was a problem.  And Arnold was

15:49:44 11    called out from ADT.  I don't remember his last

15:49:46 12    name.  He's a gentleman that always worked on our

15:49:50 13    phones, on the phone system.  He was the one that

15:49:54 14    originally put that phone system in after Gary

15:49:56 15    Butts arrived.  We had a different system before he

15:49:58 16    arrived.  And we was standing there in the work

15:50:00 17    area, which was like a little closet with a door

15:50:00 18    open.  And when I walked by -- this was out on the

15:50:04 19    sewing floor.  I walked by, and I said, "Arnold,

15:50:06 20    you're here again?"  And he said, "Yes.  The phone

15:50:08 21    lines aren't working."  I said, "Yes."  I said,

15:50:10 22    "Well," I said, "Why don't you just fix them --

15:50:14 23    why don't you fix them the right way this time.  I

15:50:16 24    think he's listened to enough of our

15:50:18 25    conversations."  And he said, "Oh, you finally

15:50:20  1    figured that out, did you?"

15:50:20  2        Q.   Okay.

15:50:24  3        A.   That was probably the last two weeks that

15:50:24  4    we were there.

15:50:24  5        Q.   Okay.

15:50:30  6        A.   I had initially asked him when I had seen

15:50:34  7    him there before, and he would never tell me.  It

15:50:36  8    wasn't the first time I had asked him.  I was

15:50:40  9    trying to confirm it.  My husband and I even went

15:50:42 10    so far as to hook up an ohmmeter to the phone to

15:50:44 11    try to see the -- and there was a drop when he

15:50:46 12    would pick up the line.

15:51:06 13        Q.   If you'll turn to the next page.  It

15:51:10 14    relates to the -- your husband calling Connie Butts

15:51:16 15    and telling her about the -- the telephone calls

15:51:22 16    that were -- that Gary Butts was making.  And I

15:51:24 17    probably asked you this earlier.  But did you tell

15:51:28 18    me that that conversation occurred in like November

15:51:28 19    of 2000?

15:51:28 20        A.   Yes, sir.

15:51:28 21        Q.   Okay.

15:51:32 22        A.   That was just several days before the

15:51:40 23    plant picnic.  Two weeks before.  A week or two

15:51:44 24    before the picnic.  It was shortly before that.

15:51:58 25        Q.   Now, you said that Gary Butts was in jail

15:52:02  1   is the reason he did not attend the picnic in

15:52:06  2   November of 2000.  Did I hear that correctly?

15:52:08  3       A.   That's the way it looks from the -- from

15:52:12  4   what I conferred from the police that he was placed

15:52:16  5   in jail.  He was drug tested and placed in jail and

15:52:18  6   stayed overnight in jail.

15:52:18  7       Q.   Okay.

15:52:22  8       A.   That was the day -- the day of the party

15:52:24  9   or the day right before the party.

15:52:30 10       Q.   The last paragraph on that page says,

15:52:34 11   "There was an anonymous letter about Gary found in

15:52:38 12   the ladies' restroom on the sewing floor."  And,

15:52:40 13   again, you recall that that was in like January,

15:52:40 14   February of 2001?

15:52:42 15       A.   Yes, sir.

15:52:44 16       Q.   Was that right after the rumor about the

15:52:48 17   plant closing where you called --

15:52:50 18       A.   Yes, sir, that was shortly.

15:52:54 19       Q.   But by -- but it had not been officially

15:52:58 20   announced that the plant was going to close?

15:53:00 21       A.   No, sir.  That was not announced until

15:53:10 22   March.  I think the first time that I talked to

15:53:14 23   Clyde Stutts about that was -- I think it was the

15:53:16 24   very first week of January after we -- after we

15:53:20 25   came back, because I think it was around my

15:53:24   1   birthday or around the 8th, or something like that

15:53:24   2   of January.  I don't remember for sure.

15:53:46   3                 MR. POWELL:  Have this marked,

15:53:46   4   please.

15:54:02   5                 (Exhibit 3 marked.)

15:54:04   6        Q.   Let me give you Exhibit No. 3, which is a

15:54:10   7   letter dated September the 24th.  And that's a

15:54:14   8   letter you sent to Fred Rowan at William Carter

15:54:18   9   Company; is that correct?

15:54:18  10        A.   Yes, sir.

15:54:32  11        Q.   Okay.  Ms. Tate, I don't think I had any

15:54:38  12   other letter that you had sent to William Carter

15:54:42  13   Company, other than the document -- I want to make

15:54:44  14   clear about what the documents were that you had

15:54:48  15   sent to the company.  Exhibit No. 1 is the first

15:54:52  16   document, and then this letter.  Were there any

15:54:54  17   other letters that you sent or documents that you

15:54:58  18   sent to the company concerning Gary Butts?

15:55:06  19        A.   Just these three.  Other than the

15:55:08  20   allegations that were on the EEOC.  And I'm sure --

          21        Q.   When you said --

15:55:10  22        A.   -- that you have that somewhere.

15:55:14  23        Q.   And I apologize.  But you said, "These

15:55:16  24   three."  And Exhibit No. 2 is not a --

15:55:16  25        A.   Oh, I'm sorry.  Two.

15:55:20  1      Q.   Just Exhibit No. 1 and No. 3.  Okay.

15:55:40  2           MR. POWELL:  Mark that, please.

15:55:56  3                (Exhibit 4 marked.)

15:55:58  4      Q.   Exhibit No. 4 is a letter dated October 3,

15:56:02  5   2001, addressed to you.  And did you receive that

15:56:04  6   letter from Clyde Stutts?

15:56:04  7      A.   Yes, sir.

15:56:10  8      Q.   Okay.  And did you ever respond to Mr.

15:56:16  9   Stutts' request for information about any sexual

15:56:20 10   harassment incidents and provide copies to the

15:56:24 11   company of the telephone records that was mentioned

15:56:26 12   in your letter of September 24th?

15:56:30 13      A.   No, sir, because I -- they told me that I

15:56:32 14   could obtain them, and then they told me that I

15:56:34 15   couldn't obtain them without an attorney.

15:56:34 16      Q.   Okay.

15:56:36 17      A.   And I didn't want to get an attorney at

15:56:40 18   that time.  I just wanted to protect my family and

15:56:40 19   go on with my life.

15:56:44 20      Q.   When you say, "They told you that you

15:56:46 21   could, and then they told you that you could not

15:56:46 22   obtain them," who are you referring to?

15:56:48 23      A.   Southwestern Bell.

15:56:52 24      Q.   Okay.  At some point told you that you

15:56:56 25   could get copies of these telephone records, and

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

15:56:58  1  then at some point, then, told you that you could

15:57:00  2  not get them without an attorney?

15:57:00  3      A.    That's correct.

15:57:04  4      Q.    Okay.

15:57:08  5      A.    I -- it was my understanding -- I thought

15:57:10  6  that I could get my own records if I called up and

15:57:14  7  wanted my own records.  But they will not let you

15:57:24  8  even get your own records.  That's why I asked

15:57:26  9  Carter's to get their records, because mine would

15:57:30 10  only show incoming calls, anyway.  It would say

15:57:32 11  "incoming," and wouldn't give you the number.

         12                  (Exhibit 5 marked.)

15:57:56 13      Q.    Let me show you Exhibit No. 5, which is a

15:58:00 14  two page document.  And have you ever seen that

15:58:00 15  document before?

15:58:36 16      A.    No, sir.

15:58:38 17      Q.    Assuming that this is the letter that --

15:58:42 18  that you heard about that was in the women's

15:58:46 19  restroom at the Harlingen plant in January of 2001,

15:58:54 20  do you have any idea who wrote this letter?  And if

15:59:00 21  you have not had a chance to read it entirely, I'll

15:59:02 22  -- I'll wait until you've had a chance to read

15:59:02 23  that.

16:00:28 24      A.    I'm sorry.  What was the question?

16:00:30 25      Q.    My question was, had you ever seen this

16:00:30  1    before?

16:00:32  2        A.    No, sir, I'd heard.

16:00:34  3        Q.    And assuming that this is the letter that

16:00:40  4    was found in the restroom at the Harlingen plant in

16:00:44  5    2001, do you have any idea who wrote this letter?

16:00:50  6        A.    No, sir.  But I know there were people

16:00:56  7    talking, because Michelle Gil had left or he had

16:01:00  8    demoted her sometime around the same time, but I

16:01:04  9    couldn't say that she wrote it.  I really don't

16:01:04 10    know.

16:01:06 11        Q.    Did you ever hear a rumor about who did

16:01:08 12    write it?

16:01:10 13        A.    That was just the conversation that they

16:01:14 14    were saying.  That was the rumor that she's the one

16:01:16 15    that had left, and she wasn't allowed to apply for

16:01:16 16    another job.

16:01:18 17        Q.    Okay.

16:01:44 18                    (Exhibit 6 marked.)

16:01:48 19        Q.    Let me show you Exhibit No. 6 and ask you

16:01:52 20    if you've ever seen that document before.

16:01:56 21        A.    No, sir.

16:02:30 22        Q.    Have you ever heard that there was a

16:02:34 23    document such as this that said that Gary Butts was

16:02:38 24    having an affair with you or an affair with

16:02:38 25    Belinda?

16:02:40  1      A.    No, sir.

16:02:46  2      Q.    Okay.  This refers to a confrontation

16:02:52  3  between your husband and Gary Butts.  Was any of

16:02:54  4  that confrontation ever over some notion that you

16:02:58  5  were having some kind of relationship with Gary

16:02:58  6  Butts?

16:03:02  7      A.    No, sir, the confrontation was over him --

16:03:06  8  Gary Butts making the sexual comment, and then him

16:03:08  9  monitoring our phone calls and then the harassment.

16:03:14 10      Q.    Okay.  Had anybody ever told you about the

16:03:18 11  existence of this letter, Exhibit No. 6, which

16:03:18 12  refers to you?

16:03:22 13      A.    No, sir, just Clyde Stutts told me that he

16:03:26 14  had heard a rumor.  Or at least I believe that's

16:03:28 15  what he said, "I heard a rumor."

16:03:36 16      Q.    Have you ever heard of a rumor that Gary

16:03:40 17  Butts was having an affair with Belinda?

16:03:44 18      A.    That was the general rumor, because she

16:03:46 19  was promoted so many times.

16:03:50 20      Q.    What's Belinda's last name?

16:03:54 21      A.    Jimenez, I believe.  And something that

16:03:58 22  they saw his truck at her house or the company

16:03:58 23  truck.

16:04:12 24      Q.    Is she the one who made the statement that

16:04:14 25  she got a job because she had a relationship with

16:04:16  1  Gary Butts?

16:04:20  2      A.    No, sir.    That was -- that was a sewing

16:04:24  3  instructor, someone that was moved up from a sewing

16:04:26  4  machine operator to an instructor, and I know that

16:04:30  5  -- I know Clara Perez would probably -- could tell

16:04:34  6  you the name, but I don't know the name.   I don't

16:04:34  7  remember.

16:04:44  8      Q.    When -- when you were working at the

16:04:48  9  Senatobia, Mississippi plant, was Gary Butts the

16:04:50  10  manager of that plant?

16:04:50  11      A.    Yes, sir.

16:04:54  12      Q.    Did he ever say or do anything to you that

16:04:56  13  was inappropriate when you were working at that

16:04:58  14  plant and he was the manager of that plant?

16:05:04  15      A.    No, sir.   I was only there three times, I

16:05:08  16  think, the whole time period, but, no, sir.   I

16:05:12  17  found out later from Pat Reid that he was upset

16:05:14  18  with me the very first time I went, because I

16:05:16  19  hadn't -- it didn't occur to me that I had to call

16:05:20  20  him and tell him that I was going to be at his

16:05:22  21  plant.   I thought that he knew that I had to go

16:08:14  22  there.

16:08:16  23                 (Exhibit 7 marked.)

16:08:18  24      Q.    Would you look at Exhibit No. 7, which is

16:08:26  25  a charge of discrimination?   Is that your charge of

16:08:32    1    discrimination filed with the Texas Commission on

16:08:32    2    Human Rights?

16:08:34    3        A.    Yes, sir.

16:09:06    4        Q.    Have you filed any other charges of

16:09:08    5    discrimination --

            6        A.    No, sir.

16:09:10    7        Q.    -- against the William Carter Company?

16:09:10    8        A.    No, sir.

16:09:12    9        Q.    Okay.  Have you filed any kind of charges

16:09:14   10    of discrimination against any other company?

16:09:18   11        A.    No, sir.  I've never ever been in this

16:09:32   12    position before.  I never thought that I would be

16:09:34   13    in this position now.  I really just wanted to go

16:09:36   14    on with my life.

16:09:36   15                    (Exhibit 8 marked.)

16:10:18   16        Q.    And I show you Exhibit No. 8.  And do you

16:10:22   17    recognize that as a document that you signed once

16:10:24   18    you were re-employed by the William Carter Company

16:10:26   19    in April of 1997?

16:10:28   20        A.    Yes, sir.

16:11:28   21        Q.    Okay.  Ms. Tate, do you have any part of

16:11:32   22    the records that we had requested, which would be

16:11:34   23    some of your personal medical records?  Have you

16:11:38   24    obtained those medical records, and is that part of

16:11:40   25    the information that you'll have available to give

16:11:40  1  to me tomorrow?

16:11:42  2      A.    No, sir.  I didn't know I was supposed to

16:11:46  3  obtain them.  I gave you all the information where

16:11:50  4  they could be obtained, but there wasn't a release

16:11:52  5  form or anything you wanted me to sign.  I'll be

16:11:52  6  happy to sign one.

16:11:54  7      Q.    What I'll do is, I'll give you a release

16:11:58  8  form to sign.  What -- who have you been treated

16:12:00  9  by?  What physicians have you been treated by

16:12:02  10 concerning any kind of emotional distress or

16:12:06  11 illness that you're claiming the William Carter

16:12:08  12 Company should be responsible for?

16:12:12  13     A.    The only person that I had treated before

16:12:18  14 during that time was Dr. Cano, Abraham Cano.  And

          15 his address and phone number --

16:12:20  16     Q.    How do you spell his last name?

16:12:22  17     A.    C-a-n-o.

16:12:26  18     Q.    And he's located where?

16:12:26  19     A.    On Ed Carey Drive in Harlingen.

16:12:30  20     Q.    Is he a general practitioner?

16:12:30  21     A.    Yes, sir.  He's a family doctor.

16:12:34  22     Q.    Is that somebody that you have seen on a

16:12:34  23 regular basis for a number of years?

16:12:36  24     A.    Yes, sir.

16:12:42  25     Q.    And -- and what has he treated you for in

16:12:44 1   connection with your claims in this case?

16:12:48 2      A.   I had just gone to him, because I couldn't

16:12:48 3   sleep.

16:12:50 4      Q.   And did he give you any prescription

16:12:50 5   medication?

16:12:52 6      A.   Yes, sir.  He gave me a prescription

16:12:54 7   medication.

16:12:54 8      Q.   For what?

16:12:56 9      A.   It was a sleeping pill.

16:13:00 10     Q.   You're a nurse.

16:13:00 11     A.   Xanax.

16:13:06 12     Q.   Okay.  And, approximately, when did you

16:13:08 13  first start taking Xanax?

16:13:14 14     A.   Probably about two years ago when this

16:13:14 15  happened.

16:13:20 16     Q.   And have you been taking Xanax on a

16:13:20 17  regular basis for the past two years or so?

16:13:22 18     A.   No, sir.

16:13:22 19     Q.   Has --

16:13:24 20     A.   I don't like to take medication.

16:13:28 21     Q.   My question is, has it been -- have you

16:13:30 22  taken it at times and not taken it at times then?

16:13:32 23     A.   Yes, sir.

16:13:36 24     Q.   Okay.  Has he prescribed anything else,

16:13:36 25  any other medications?

16:13:40 1      A.    No, sir.  I've not gone back.

16:13:44 2      Q.    Have you had any kind of counseling as a

16:13:46 3  result of any of the events that you've complained

16:13:46 4  about in this lawsuit?

16:13:48 5      A.    No, sir, not yet.

16:13:52 6      Q.    When you say, "Not yet," are you

16:13:54 7  contemplating obtaining counseling?

16:13:56 8      A.    I think that it would be good for my

16:13:58 9  children and me, as well.

16:14:00 10     Q.    And have you yet sought the services of

16:14:04 11 any counselor, physician, psychiatrist or anyone

16:14:06 12 else?

16:14:06 13     A.    Not yet.

16:14:18 14     Q.    Okay.  Now, has -- have you ever been

16:14:22 15 treated for any kind of emotional issues prior to

16:14:26 16 taking Xanax in the past two years?

16:14:28 17     A.    No, sir.

16:14:32 18     Q.    Have there been any other events in your

16:14:36 19 life, your divorce from your first husband or any

16:14:38 20 other tragedies in your family that have caused you

16:14:44 21 to seek any kind of counseling or to take any

16:14:46 22 medication for sleep or anxiety or depression?

16:14:52 23     A.    No, sir.  And I have -- I've never had my

16:14:54 24 -- my prescription refilled.  I only have one --

16:14:58 25 I've only used one -- I still have some from the

16:15:02  1    same bottle.  I'm not taking it.  Now I cannot take

16:15:02  2    it.

16:15:06  3        Q.    The -- just so I make sure I understand.

16:15:12  4    Dr. Canto(sic) gave you a prescription for Xanax

16:15:14  5    one time about two years ago?

16:15:14  6        A.    Yes, sir.

16:15:18  7        Q.    Was it refillable?

16:15:20  8        A.    I don't remember.  I don't think so,

16:15:20  9    though.

          10        Q.    Okay.

16:15:22 11        A.    I think I would have had to go back, and I

16:15:24 12    did not go back.

16:15:26 13        Q.    And so I assume he gave you a prescription

16:15:28 14    for -- you're a nurse, and you're probably much

16:15:32 15    more familiar with this than I am, but he would

16:15:32 16    have given you a prescription that would have --

16:15:36 17    would have lasted -- how many tablets would it have

16:15:38 18    been or capsules would it have been?

16:15:42 19        A.    I think it was about 20 -- 20 tablets.

16:15:44 20        Q.    Okay.  And are you saying that you still

16:15:48 21    have not taken the entire 20 tablets, which is your

16:15:48 22    original prescription?

16:15:50 23        A.    That's correct.

16:15:54 24        Q.    Okay.  And if you took it, are those the

16:15:56 25    kind of tablets that you would take a complete

16:15:58  1   tablet?  Or would you break them in half?

16:16:00  2       A.   No.  You would take a complete tablet.

16:16:04  3       Q.   Okay.  So in the past two years, you have

16:16:10  4   not used -- you have not used it 20 times is what

16:16:10  5   you're saying?

16:16:12  6       A.   That's correct.  I'm sorry.

16:16:12  7       Q.   Okay.

16:16:24  8       A.   At first, I couldn't sleep, and now I'm

16:16:26  9   scared to death to go to sleep.

16:16:34 10       Q.   And is Dr. Canto(sic) -- you're currently

16:16:36 11   pregnant.  Do you see him or do you see some other

16:16:38 12   physician in connection with your pregnancy?

16:16:42 13       A.   I see Estela Sosa, and I wrote out -- I'll

16:16:42 14   give you that information, as well.

16:16:48 15       Q.   Okay.  So when is the last time you would

16:16:52 16   have seen Dr. Canto(sic)?  I said "Canto."

16:16:52 17       A.   Cano.

         18       Q.   Cano.

16:16:54 19       A.   Cano, really.

16:16:54 20       Q.   Cano.

16:16:56 21       A.   It's probably been a couple of years since

16:17:00 22   I went in there.  Around that time.  I did not go

16:17:00 23   back.

16:17:02 24       Q.   Okay.  So you haven't even been to see him

16:17:08 25   on other kind of common colds, infections and flu

16:17:08  1  or anything of that nature?

16:17:10  2      A.    I believe I went to see him for a sinus

16:17:16  3  infection when I was still working -- when I was

16:17:18  4  still working for Carter's.  And that was probably

16:17:22  5  -- it may have been early in 2001.

16:17:28  6      Q.    Now, I understand from some of the

16:17:30  7  materials I've read that Gary Butts had called you

16:17:36  8  about getting medication, either for himself or his

16:17:38  9  children, if I understood that correctly.  Is that

16:17:40  10  -- did I understand that correctly?

16:17:44  11      A.    Right.  When they had first moved here,

16:17:48  12  when their -- on a couple of occasions when their

16:17:50  13  children were sick, they called like 9:00 or 10

16:17:54  14  o'clock at night and his wife was needing some

16:17:58  15  Phenergan suppositories.  My husband and I took

16:18:02  16  them over and gave them to her.  That was for their

16:18:08  17  -- either their little boy or their little girl.

16:18:08  18  I don't remember.

16:18:08  19      Q.    Was it anything unusual -- did you

16:18:10  20  consider it unusual at the time or do you consider

16:18:12  21  it unusual now that Gary Butts may call -- would

16:18:16  22  call you for some kind of medical assistance?

16:18:20  23      A.    I didn't really understand it at the time,

16:18:22  24  but I felt kind of intimidated not to -- not to

16:18:24  25  take it to them.  I'm a person that would help

16:18:26  1    anybody, but I thought that it was odd that he

16:18:30  2    didn't just take them into the night clinic and let

16:18:32  3    them be seen.

16:18:36  4        Q.   And did that occur frequently that he

16:18:38  5    would call you for some type of medication for him

16:18:40  6    or his family?

16:18:42  7        A.   It occurred, I think, twice for the

16:18:44  8    children.  And one time he had called our home and

16:18:48  9    got my husband's pager number off the answering

16:18:52  10   machine, and I was at a party, a family party.  And

16:18:54  11   he asked my husband to bring him some medication to

16:18:56  12   the emergency room, something about he had broken

16:19:00  13   his arm.  And that was during the time, I think, my

16:19:02  14   husband had broken his back.  And he said that he

16:19:04  15   was in tremendous pain and he needed something for

16:19:08  16   pain.  And I think he had a question about an

16:19:10  17   orthopedic doctor that he asked my husband about.

16:19:14  18       Q.   The two times for the children, I assume

16:19:16  19   that was nonprescription medication that he was

16:19:16  20   asking for?

16:19:18  21       A.   It was, yes, sir.

16:19:22  22       Q.   Okay.  The one time for medication for

16:19:26  23   himself, meaning Gary Butts wanted medication for

16:19:28  24   himself, was he basically asking your husband to

16:19:34  25   loan him some of his pain medication?

16:19:36  1      A.   I believe that's what he was asking him,

16:19:40  2   that, and he wanted to know which orthopedic doctor

16:19:42  3   that my husband had had.  I think he was wanting to

16:19:44  4   -- I think he had a choice of doctors, and he

16:19:46  5   wanted to know who my husband thought was the

16:19:46  6   better doctor.

16:19:50  7      Q.   And did Mr. Butts have a broken arm or an

16:19:54  8   arm injury during the time he was Plant Manager in

16:19:54  9   Texas?

16:19:58 10      A.   I believe he had a broken arm or broken

16:19:58 11   wrist twice while he was Plant Manager.

16:20:00 12      Q.   I mean, that's something you would have

16:20:02 13   known about through your dealings with him, I

16:20:04 14   assume?

16:20:04 15      A.   Well, through the medical claims, because

16:20:06 16   I had to do all the medical claims.

16:20:44 17              MR. POWELL:   Okay.  Ms. Tate, I would

16:20:48 18   -- I think it would probably be more productive if

16:20:50 19   I could obtain the records from you before we

16:20:54 20   resume your deposition.  I could ask you questions

16:20:58 21   about, you know -- I could continue to ask you

16:21:00 22   questions today, but I think, quite frankly, it

16:21:06 23   would be easier, both on you and me, if I obtain

16:21:10 24   the records and could ask you questions after I've

16:21:12 25   had a chance to look at those records.  I would

16:21:16  1   think that it would -- your deposition would be

16:21:20  2   shortened, and it would suit me if we adjourn the

16:21:24  3   deposition at this point today, because what I

16:21:28  4   would like to do is to obtain from you copies of

16:21:32  5   those records which you've mailed to us, but, you

16:21:34  6   know, for whatever reason we just haven't gotten

16:21:38  7   them.  I can tell you that we've received one

16:21:40  8   package of information that you sent us, and I

16:21:42  9   understand that you've mailed both packages about

16:21:44 10   the same time.

16:21:44 11               THE WITNESS:  Same day.

16:21:46 12               MR. POWELL:  You know, I understand

16:21:50 13   that those issues, they occurred, and sometimes

16:21:54 14   mail just doesn't get there and things get lost.

16:21:56 15   But it would probably expedite things if we could

16:22:00 16   resume the deposition tomorrow.  Now, I think we

16:22:04 17   have to be in Brownsville for a court pretrial

16:22:08 18   matter with the judge tomorrow.  And I forget if

16:22:10 19   it's one o'clock or 1:30.

16:22:12 20               THE WITNESS:  It's 1:30, I believe.

16:22:12 21               MR. POWELL:  1:30, which means we're

16:22:16 22   going to travel from here to Brownsville tomorrow.

16:22:18 23   That's at least an hour drive, isn't it?

16:22:20 24               THE WITNESS:  Yes, sir.  It's probably

16:22:22 25   about an hour and 15 minutes, at least.

16:22:24  1          MR. POWELL:  Okay.  We -- we would not

16:22:28  2  -- we would want to stop the deposition tomorrow

16:22:32  3  by 11:30, then.  I don't think there's any reason

16:22:36  4  for us to go beyond that.  That gives us all two

16:22:40  5  full hours to get there.  What is -- what is a

16:22:44  6  reasonable time for us to start the deposition

16:22:48  7  tomorrow?  From your point of view, what's

16:22:48  8  reasonable?

16:22:54  9          THE WITNESS:  Maybe 10:00.

16:23:00 10          MR. POWELL:  I was hoping we could

16:23:04 11  start a little earlier than that, because -- but I

16:23:08 12  realize you're traveling to get here.

16:23:08 13          THE WITNESS:  That, and I have to make

16:23:12 14  copies, again, of everything and provide copies for

16:23:14 15  you.  And quite frankly, I have a daughter that has

16:23:16 16  a game this evening.

16:23:18 17          MR. POWELL:  That's understandable.

16:23:22 18  Let's resume at ten o'clock tomorrow.

16:23:22 19          THE WITNESS:  If that's all right.

16:23:24 20          MR. POWELL:  Okay.  Thank you very

16:23:28 21  much.  We'll adjourn the deposition until tomorrow

16:23:28 22  at ten o'clock.  Thank you.

23          (Deposition to be continued.)

24

25

1
          IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2
                BROWNSVILLE DIVISION

3
SUSAN TATE,                    )(
           Plaintiff      )(
4
                  )(
VS.                            )(   CASE NO. B-02-103
5
                  )(
WILLIAM CARTER COMPANY,        )(
6
           Defendant      )(

7

                ORAL DEPOSITION OF
8
                  SUSAN TATE
            SEPTEMBER 16, 2002
9
                  VOLUME 1

10
    I, ELIZABETH F. TORRES, Certified Court
Reporter in and for the State of Texas, hereby
11
certify that the witness, SUSAN TATE, was duly
sworn by me, and that the transcript of the oral
12
deposition is a true and correct record of the
testimony given by the witness on SEPTEMBER 16,
13
2002; that the deposition was reported by me in
stenograph and was subsequently transcribed under
14
my supervision.

15
    I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the
16
parties, nor a relative or employee of such
attorney or counsel, nor am I financially or
17
otherwise interested in the outcome of the action.

18
    WITNESS MY HAND on this the __23rd day of
__September__ 2002.
19

20
               _Elizabeth F. Torres_
21
    ELIZABETH F. TORRES, Texas CSR 5516
    Expiration Date:  12-31-02
22
    Bryant & Stingley, Inc.
    4900 North 10th Street
23
    Building A, Suite 3
    McAllen, Texas  78504
24
    Phone:  (956)618-2366

25

Deposition(s) of: *Susan Tate*

Cause No.: *B-02-103*     Style: *Susan Tate*

Date: *9-16-02* Trial Date: —     vs. *William Carter Company*

*9-15-02*

1.  This deposition is taken pursuant to:
    - ✓ A.  Notice
    - ___ B.  Notice and Subpoena
    - ___ C.  Agreement
    - ___ D.  Court Order

2.  Objections:
    - ✓ A.  Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
    - ___ B.  All objections are reserved.
    - ___ C.  All objections will be made at the time of taking the deposition.

3.  Signature and Delivery:
    - ✓ A.  The original transcript will be sent to *James M. Powell*,
      the Custodial Attorney, and the original signature page, along with a copy of the
      transcript(s), will be submitted to ✓ the witness or _____ the witness' *Susan Tate*
      attorney, who will return the executed signature page, including any changes, to
      Bryant & Stingley, Inc., within *30* days of transmittal.

    - ___ B.  Signature is waived and the reporter will deliver the original transcript and
      exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the
following:

1.  Copy of Transcript: Yes ✗    No _____     Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____    No _____    e-mail address _____

    Signature: *James M Powell*   Representing: _____

2.  Copy of Transcript: Yes _____  No ✓     Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____    No _____    e-mail address _____

    Signature: *Susan Tate*   Representing: _____

3.  Copy of Transcript: Yes _____  No _____     Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____    No _____    e-mail address _____

    Signature: _____   Representing: _____

4.  Copy of Transcript: Yes _____  No _____     Video: (If Applicable) Yes _____  No _____
    *( ASCII Disk and Condensed Transcript included)*

    e-mail   Yes _____    No _____    e-mail address _____

    Signature: _____   Representing: _____

5.   Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


6.   Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


7.   Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


8.   Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


9.   Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


10.  Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


11.  Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____


12.  Copy of Transcript: Yes _____ No _____   Video: (If Applicable) Yes _____ No _____
     *( ASCII Disk and Condensed Transcript included)*

     e-mail  Yes _____  No _____   e-mail address _____

     **Signature:** _____ Representing: _____

```
 1          SUSAN TATE - ERRATA SHEET - VOLUME 1
     Please indicate changes on this sheet of paper,
 2   giving the page and line number, the change and the
     reason therefor.  Please sign each page of changes.
 3   Reasons for changes are to: (1) Clarify the record;
     (2) Conform to the facts; (3) Correct transcription
 4   errors.

 5                                          REASON FOR

 6   PAGE   LINE   CHANGE FROM/CHANGE TO       CHANGE

 7   112    22   Stocking/Stalking      incorrect word

 8   112    25   Stocking/Stalking      incorrect word

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16      I, SUSAN TATE, have read the foregoing
     deposition transcript and hereby affix my
17   signature, stating that same is true and correct,
     except as noted above.
18                            _Susan Tate_____
                              SUSAN TATE
19
     THE STATE OF TEXAS
20   COUNTY OF  Cameron

21          SUBSCRIBED AND SWORN TO BEFORE ME, the
     undersigned authority on this the  28th  day of
22   _____October_____, 2002.

23                            _____
                              Notary Public in and for
24                            The State of Texas

25
```

BRYANT & STINGLEY, INC.

IDOLINA Y. JAUREGUI
MY COMMISSION EXPIRES
April 2, 2006

BRYANT & STINGLEY, INC. **ORIGINAL**
McAllen          Harlingen          Brownsville
(956)618-2366    (956)428-0755      (956)542-1020

10-28-02

BRYANT & STINGLEY, INC.
RECEIVED
10-28-02
DATE

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2                  BROWNSVILLE DIVISION

3    SUSAN TATE,                )(
                  Plaintiff     )(
4                                )(
     VS.                         )(   CASE NO. B-02-103
5                                )(
     WILLIAM CARTER COMPANY,     )(
6                  Defendant     )(
7    ------------------------------------------------------

8                    ORAL DEPOSITION OF
                        SUSAN TATE
9                  SEPTEMBER 17, 2002
                        VOLUME 2
10   ------------------------------------------------------

11       ORAL DEPOSITION OF SUSAN TATE, produced as a

12   witness at the instance of the DEFENDANT, taken in

13   the above styled and numbered cause on SEPTEMBER

14   17, 2002, reported by ELIZABETH F. TORRES,

15   Certified Court Reporter No. 5516, in and for the

16   State of Texas, at the law offices of Meredith,

17   Donnell & Abernethy, Water Tower Centre, 612 Nolana

18   Street, Suite 560, McAllen, Texas, pursuant to the

19   Federal Rules of Civil Procedure.

20

21

22

23

24

25                                   *ORIGINAL*

1                          <u>APPEARANCES</u>

2  PLAINTIFF PRO SE:

3                    SUSAN TATE
                     PLAINTIFF
4                    2925 Jacaranda
                     Harlingen, Texas   78550
5
   COUNSEL FOR DEFENDANT:
6
                     JAMES M. POWELL
7                    HAYNSWORTH, BALDWIN, JOHNSON &
                     GREAVES, L.L.C.
8                    2709 Henry Street
                     Greensboro, North Carolina   27405-3669
9

10  ALSO PRESENT:  NELLIE LUJAN ASKEY

11
                          <u>INDEX</u>
12                                                      <u>PAGE</u>

13  Appearances.................................... 159

14  VOLUME 2
    <u>SUSAN TATE</u>:
15  Continued Examination by Mr. Powell........... 160

16  Errata Sheet/Signature Page................... 197
    Reporter's Certificate....................... 198
17  Attached to the end of the transcript:
    Stipulations
18
            (NO EXHIBITS MARKED ON VOLUME 2.)
19

20

21

22

23

24

25

1                          SUSAN TATE,

2    having been duly sworn, testified as follows:

3                    CONTINUED EXAMINATION

4    BY MR. POWELL:

10:21:28  5        Q.    Thank you.  Good morning, Ms. Tate.  And

10:21:28  6    before we start the deposition, just for the

10:21:28  7    record, you brought me the materials which have

10:21:28  8    been your answers to interrogatories and to the

10:21:32  9    request for production documents which I understand

10:21:34 10    you had mailed to us, to our office, but we had not

10:21:38 11    received them yet.  And I appreciate you bringing

10:21:40 12    those in.  Let me mention one thing about the

10:21:44 13    answers to the interrogatories.  Under court rules,

10:21:48 14    the answers that you have -- when a person makes

10:21:50 15    answers to interrogatories, they're supposed to

10:21:54 16    provide a sworn statement verifying that those

10:21:56 17    answers are true.  And just let me ask you on the

10:22:00 18    record, the answers to the interrogatories that you

10:22:04 19    provided, are you prepared today to verify just for

10:22:06 20    the record that those answers in here are true and

10:22:08 21    correct to the best of your knowledge, information

10:22:10 22    and belief?

10:22:10 23        A.    Yes, sir.

10:22:14 24        Q.    Okay.  And what we may want to do -- and

10:22:18 25    we can talk about whether it's necessary, whether

10:22:20  1    you provided any other verification.  But since

10:22:22  2    you've done it on the record, I think that's

10:22:32  3    probably the only thing that we'll need.  In

10:22:34  4    connection with your interrogatory answers, had you

10:22:40  5    -- I know that it identifies where you work.

10:22:42  6    You've got Bay Brook Home Health, Inc., which is in

10:22:46  7    here.  It indicates that beginning in the fall of

10:22:50  8    2001, that's where you developed your business as

10:22:54  9    being the owner or director of a professional

10:22:56 10    services for a private home health agency.  Did

10:22:58 11    that start in the fall of 2001?

10:23:00 12        A.   Yes, sir.

10:23:04 13        Q.   Okay.  And then it also identifies that

10:23:08 14    you have been a contract case manager for Concentra

10:23:10 15    Integrated Services, Inc., and, again, that's sort

10:23:16 16    of a self-employment business or business in the

10:23:20 17    sense that you do that on a contract basis for

10:23:22 18    Concentra and identifies that you've been working

10:23:24 19    with them since the fall of 2001 to the present.

10:23:26 20        A.   Yes, sir.

10:23:28 21        Q.   Okay.  And I'm not -- I thought I had

10:23:32 22    understood, and I may be mistaken, but were you

10:23:36 23    working for Concentra on a contract basis before

10:23:38 24    the fall of 2001?

10:23:40 25        A.   No, sir.  I was working for Manacorp,

10:23:44 1    Incorporated.  And it's the same -- same type --

10:23:46 2        Q.    Same type of business?

10:23:48 3        A.    The same type of business, and it was

10:23:48 4    contract, also.

10:23:50 5        Q.    And what was the name of that?

10:23:54 6        A.    Manacorp, M-a-n-a-c-o-r-p.  And you will

10:24:00 7    see that on the income tax returns and the W-2s.

10:24:02 8        Q.    Okay.  And had you worked with Manacorp

10:24:04 9    for a number of years?

10:24:10 10       A.    From the summer of 1997.

10:24:12 11       Q.    Until when?

10:24:16 12       A.    Until approximately, I believe, January of

10:24:18 13   2000.

10:24:24 14       Q.    January of 2000.  Okay.  And so you were

10:24:28 15   -- then when you -- when the plant at Harlingen

10:24:34 16   closed in May of 2001, you were working for William

10:24:36 17   Carter Company, obviously, but were you working for

10:24:38 18   anyone else, either self-employed or any other type

10:24:40 19   of business?

10:24:42 20       A.    No, sir.  I was in the process of applying

10:24:46 21   for a license, for a home health license and

10:24:48 22   putting together nursing procedure manuals and

10:24:52 23   administrative manuals for the -- for the home

10:24:54 24   health agency, as well as preparing to attend

10:24:58 25   classes to obtain a home health license.

10:25:00  1      Q.    Okay.  And that's eventually, I assume,

10:25:02  2  what you did and the reason that you got your

10:25:04  3  business up and running in the fall of 2001?

10:25:04  4      A.    Yes, sir.

10:25:08  5      Q.    Okay.  And did you have to take classes,

10:25:10  6  did you understand?

10:25:12  7      A.    Yes, sir.  In San Antonio.

10:25:16  8      Q.    These are daily?  Weekly?  Or is there a

10:25:18  9  number of hours you had to take?  Or how many hours

10:25:20 10  and what did that involve?

10:25:22 11      A.    It involved two days, two days of class

10:25:26 12  study, as well as various applications that I had

10:25:30 13  to fulfill and have notarized regarding my nursing

10:25:34 14  license and capabilities and financial background

10:25:38 15  for Medicare/Medicaid certification.

10:25:40 16      Q.    Okay.  Did you apply for employment

10:25:46 17  anywhere else?  It sounds like you're basically

10:25:48 18  looking at starting your own business.

10:25:48 19      A.    Yes, sir.

10:25:50 20      Q.    Okay.  And I assume that you were not

10:25:52 21  looking to be occupational health nurse for other

10:25:56 22  manufacturing companies like William Carter?

10:25:56 23      A.    That's correct.

10:25:58 24      Q.    Okay.  And I think it indicated in here

10:26:02 25  somewhere that you had -- you had drew unemployment

10:26:06  1    for a certain period of time in the summer of 2001?

10:26:06  2        A.    Yes, sir.

10:26:22  3        Q.    Okay.  Okay.  I do not have -- you have

10:26:26  4    provided for me today, also, a cassette recording,

10:26:30  5    tape-recording, and it's written on it that it's

10:26:36  6    Clyde Stutts.  And I do not have a machine to play

10:26:40  7    this recording at this point.  But just for the

10:26:42  8    record, would you identify for me those

10:26:46  9    conversations that I will find on this recording

10:26:50  10   and when they were made and who participated in

10:26:52  11   those conversations?

10:26:54  12       A.    It was Clyde Stutts and myself and my

10:26:58  13   husband.  These were the July conversations that

10:27:02  14   are mentioned in my allegations and also in the

10:27:06  15   letter to the company.  They're detailed.  The

10:27:08  16   nature of the conversations are detailed in the

10:27:10  17   letters that we went over yesterday.

10:27:12  18       Q.    Okay.  Are these two separate

10:27:14  19   conversations on the tape?

10:27:16  20       A.    Yes, sir.

10:27:18  21       Q.    Okay.  Did you -- have you tape-recorded

10:27:24  22   any conversations which have been erased?

10:27:28  23       A.    I'm sorry.  I don't understand exactly

10:27:28  24   what you mean.

10:27:30  25       Q.    Did you make -- you've given me what -- I

10:27:34  1    assume this tape here today has two conversations

10:27:36  2    with Clyde Stutts.  And that's the only

10:27:36  3    tape-recordings that you have.

10:27:38  4        A.    Yes, sir.

10:27:40  5        Q.    Okay.  My question is, at some time in the

10:27:44  6    past, did you make tape-recordings of conversations

10:27:48  7    with Gary Butts, with any of your co-workers, with

10:27:52  8    anyone at William Carter Company about any of the

10:27:56  9    events that you -- concerning your lawsuit, and

10:28:00  10   then at some point after making that tape, did you

10:28:00  11   erase those tapes?

10:28:02  12       A.    No, sir.  But I wasn't able to retrieve or

10:28:06  13   find the tape with Tammie Merritt on there.  I will

10:28:10  14   have to have her be deposed, I assume.

10:28:12  15       Q.    And that's the one where I think you said

10:28:16  16   Tammie Merritt left a message on your voice

10:28:16  17   machine?

10:28:20  18       A.    Yes, sir.  She left voice messages on my

10:28:20  19   machine at home.

10:28:28  20       Q.    Okay.  Let me review a few matters, if I

10:28:30  21   may.  I understand from the information that you've

10:28:32  22   given me and what you've testified to yesterday,

10:28:38  23   that you had not made any complaints to anyone in

10:28:42  24   the management of William Carter to Gary Butts

10:28:46  25   prior to the year 2001.

10:28:46  1      A.    No, sir.

10:28:48  2      Q.    Is that correct?

10:28:50  3      A.    That's correct.  I was afraid.  I was

10:28:52  4  afraid to say anything.

10:28:54  5      Q.    Okay.  And if I understand correctly, the

10:29:00  6  -- you -- you and your husband had confronted Gary

10:29:02  7  Butts prior to January of 2001 about these

10:29:04  8  conversations?

10:29:06  9      A.    Yes, sir.

10:29:08 10      Q.    And one of those -- and I call it a

10:29:12 11  confrontation.  I don't mean that in the sense that

10:29:16 12  it was a -- a heated dispute or argument.  It may

10:29:18 13  have been, but I'm just saying one of those

10:29:22 14  confrontations apparently occurred between your

10:29:24 15  husband and Gary Butts at a company family picnic

10:29:26 16  in November of 2000; is that correct?

10:29:28 17      A.    Yes, sir, that's correct.

10:29:30 18      Q.    Okay.  And then that you and/or your

10:29:34 19  husband had spoken to Gary Butts' wife in a

10:29:36 20  telephone conversation around November of 2000,

10:29:38 21  also, about those telephone calls?

10:29:40 22      A.    Yes, sir, that's correct.

10:29:40 23      Q.    Okay.

10:29:44 24      A.    And, again, in 2000 -- December of 2001.

10:29:48 25      Q.    That you spoke to --

|  |  |  |
|---|---|---|
|  | 1 | A.    Yes.   To his wife. |
| 10:29:48 | 2 | Q.    You spoke to his wife. |
| 10:29:50 | 3 | A.    And the police report is there. |
| 10:29:52 | 4 | Q.    Right.   But I'm asking about those things |
| 10:29:54 | 5 | that you had done prior to 2001. |
| 10:29:54 | 6 | A.    Sure. |
| 10:30:00 | 7 | Q.    Why was Gary Butts calling you or making |
| 10:30:02 | 8 | these calls to you?  I mean, what's your opinion |
| 10:30:04 | 9 | about why he was doing that? |
| 10:30:06 | 10 | A.    He was harassing me. |
| 10:30:06 | 11 | Q.    I know, but -- |
| 10:30:10 | 12 | A.    He was retaliating for me confronting him |
| 10:30:14 | 13 | about monitoring our personal, private phone calls |
| 10:30:16 | 14 | at work.  And I also confronted him about making |
| 10:30:18 | 15 | the phone calls to my home.  And that just made it |
| 10:30:22 | 16 | worse.  Initially, the -- I believe he initially |
| 10:30:24 | 17 | started retaliating against me because of the |
| 10:30:28 | 18 | sexual comment he made.  And my husband and I |
| 10:30:30 | 19 | confronted him about that. |
| 10:30:34 | 20 | Q.    That sexual comment being in 1999 -- |
|  | 21 | A.    Yes, sir. |
| 10:30:36 | 22 | Q.    -- where he made a reference to you and |
| 10:30:36 | 23 | your first husband? |
| 10:30:38 | 24 | A.    That's correct. |
| 10:30:46 | 25 | Q.    Okay.  The -- is there any other reason |

10:30:48  1  that you know of that he would make calls to you

10:30:52  2  and hang up in the year 1999 or the year 2000?

10:30:52  3      A.    No, sir.

10:31:00  4      Q.    Okay.  But you had not told anyone at the

10:31:04  5  company about those telephone calls being made by

10:31:08  6  Gary Butts until after January of 2001?

10:31:10  7      A.    That's correct.

10:31:12  8      Q.    Okay.

10:31:14  9      A.    I was afraid of him.  I did not want to

10:31:14 10  say anything.

10:31:24 11      Q.    And did I understand you to say that --

10:31:28 12  that Mr. Butts had stopped calling your home phone

10:31:36 13  after November of 2000 from either his cell phone

10:31:40 14  or from a company telephone, as far as you know?

10:31:44 15      A.    No, sir.  What -- what I'm saying and what

10:31:48 16  the police and I discussed is that in all

10:31:50 17  probability what he's doing from the call tracing

10:31:54 18  efforts that they received, is he's using a calling

10:31:58 19  card.  The one phone call that I told you my

10:32:00 20  husband and I received after -- after eating out

10:32:04 21  here in McAllen was made from a pay phone in

10:32:04 22  Harlingen.

10:32:10 23      Q.    Well, that was my question.  Did I

10:32:14 24  understand that Mr. Butts was not using his cell

10:32:20 25  phone or a company phone at the plant to make calls

10:32:22  1    to you after November of 2000?

10:32:26  2        A.    I have no way of knowing that, because

10:32:34  3    he's using -- he's going through a calling card to

10:32:38  4    do that.    But I will tell you that -- that from my

10:32:38  5    conversations with Detective Turner, from his --

10:32:42  6    what he's inferred from Dr. Ruben Lopez, the

10:32:44  7    company cell phone -- because Dr. Lopez had a

10:32:48  8    Sprint phone that had Caller ID.    And the company

10:32:50  9    cell phone was, I guess, the phone that was calling

10:32:52 10    him, as well, harassing him.

10:32:54 11        Q.    Do you -- do you know what that telephone

10:32:54 12    number was?

10:32:58 13        A.    I don't remember offhand, but I could find

10:32:58 14    that.

10:33:00 15        Q.    Is it in the materials that you have given

10:33:00 16    me?

10:33:04 17        A.    I don't -- I don't think so, sir.

10:33:06 18        Q.    How would you find out what number it was

10:33:10 19    that Gary Butts' cell phone number was?

10:33:14 20        A.    I could go back and look.    We did have a

10:33:16 21    listing of the managers, an emergency listing

10:33:20 22    number with phone numbers.    And that was -- his

10:33:24 23    home number was listed there, as well as that.    He

10:33:26 24    gave that out to all of us that worked there in the

10:33:28 25    office.

10:33:30  1    Q.   And do you think you may still have that

10:33:30  2    document somewhere?

10:33:34  3    A.   I may.  I have not seen it recently, but I

10:33:34  4    may.

10:33:38  5    Q.   If you would, then, I'd like for you to --

10:33:40  6    if you'd look for that, and send that to me, if you

10:33:42  7    would, that has any name -- or any telephone

10:33:48  8    numbers of Gary Butts or other managers and whether

10:33:52  9    they're their home numbers or their cell phone

10:33:54  10   numbers.  Okay?

10:33:54  11   A.   Okay.

10:34:02  12   Q.   In your complaint, there's an allegation

10:34:08  13   that you had been offered jobs at the William

10:34:12  14   Carter Company prior to Gary Butts making any

10:34:16  15   telephone calls or taking any kind of retaliatory

10:34:18  16   action against you.  What job offers are you

10:34:18  17   talking about?

10:34:24  18   A.   There was a Benefits position, and also

10:34:26  19   the EEOC Manager position.

10:34:34  20   Q.   And are those positions that you

10:34:38  21   interviewed for?  Or are those jobs offered to

10:34:38  22   you?

10:34:40  23   A.   They were discussed with me and basically

10:34:42  24   offered to me.

10:34:44  25   Q.   Okay.  And where were those positions

10:34:44  1    located?

10:34:46  2        A.    Those were in Griffin.

10:34:50  3        Q.    And were these different times or around

10:34:52  4    the same time that both positions were discussed

10:34:54  5    with you?

10:34:54  6        A.    They were at different times.

10:34:56  7        Q.    Okay.  Would you tell me which one was

10:34:58  8    first?

10:35:00  9        A.    I believed the Benefits.

10:35:00 10        Q.    And when was that?

10:35:04 11        A.    I don't remember exactly offhand.

10:35:10 12        Q.    Well, to the best of your memory?

10:35:18 13        A.    It was after I returned back.  It may have

10:35:20 14    been '98, '99.

10:35:20 15        Q.    Okay.

10:35:22 16        A.    Maybe early '98.

10:35:28 17        Q.    Okay.  And then the EEOC position, when

10:35:30 18    was that discussed with you?

10:35:36 19        A.    I don't remember the exact date.

10:35:40 20        Q.    Can you give me an approximate date?

10:35:44 21        A.    I would say later in '99, as well.

10:35:46 22        Q.    Okay.

10:35:48 23        A.    Really -- I really can't recall the dates

10:35:52 24    at this time.  I can recall where I was when Ms.

10:35:54 25    Askey called me, when she contacted me by phone,

| | | |
|---|---|---|
| 10:35:56 | 1 | but I can't recall what day it was or what year. |
| 10:35:58 | 2 | Q.   And who discussed those positions with |
| 10:35:58 | 3 | you? |
| 10:36:00 | 4 | A.   Ms. Askey. |
| 10:36:00 | 5 | Q.   Both of them? |
| 10:36:06 | 6 | A.   Ms. Askey on the EEOC Manager position and |
| 10:36:08 | 7 | Paul Seal on the Benefits position. |
| 10:36:14 | 8 | Q.   Would that position have required you to |
| 10:36:16 | 9 | relocate to Griffin, Georgia? |
| 10:36:16 | 10 | A.   Yes, sir. |
| 10:36:22 | 11 | Q.   Okay.  And were those jobs offered to you |
| 10:36:26 | 12 | in terms of "This is what it would involve.  And |
| 10:36:30 | 13 | this would be our relocation package.  And this |
| 10:36:30 | 14 | would be your salary?" |
| 10:36:34 | 15 | A.   Yes, sir.  The EEOC package was.  In fact, |
| 10:36:36 | 16 | my husband and I even traveled there and went |
| 10:36:38 | 17 | looking for homes. |
| 10:36:40 | 18 | Q.   And why did you turn it down? |
| 10:36:44 | 19 | A.   Because after I figured out the difference |
| 10:36:48 | 20 | in the salary and -- we have no state tax here. |
| 10:36:50 | 21 | They have state tax there.  By the time I figured |
| 10:36:54 | 22 | that out, moving four states away and having to -- |
| 10:36:56 | 23 | to fly my children back and forth to see their |
| 10:37:00 | 24 | grandparents and my daughter's father, it wasn't |
| 10:37:02 | 25 | feasible for me at the time.  There is a big |

10:37:04  1    difference between being told that you have a job

10:37:06  2    and having a choice of continuing with the job and

3    moving.

10:37:12  4        Q.   Did -- why do you think anything Mr. Butts

10:37:16  5    did would cause you not to be offered other jobs

10:37:18  6    when the plant here in Harlingen closed?

10:37:20  7        A.   Because I think Clyde Stutts was upset

10:37:22  8    with me because I sent the information on to Fred

10:37:26  9    Rowan, which detailed the facts that -- that when I

10:37:30  10   had talked to them before he had given my name up

10:37:34  11   and the information to Gary Butts, because Mr.

10:37:36  12   Stutts was -- I could tell from his conversation

10:37:38  13   that he -- he was pleasant one time, and the next

10:37:42  14   time following that, he was not pleasant to me.

10:37:46  15   And the reason being that I did that was because I

10:37:48  16   wanted to make sure that something was done.

10:37:50  17       Q.   Well, my question is, though, is why you

10:37:52  18   think that you would have been retained by the

10:37:54  19   company had you not done that.

10:37:58  20       A.   I believe that they hired a Human Resource

10:38:00  21   Manager during that time period.

10:38:04  22       Q.   Who took the Benefits position that you

10:38:08  23   were considering and did not take?

10:38:10  24       A.   I do not remember.

10:38:12  25       Q.   Okay.

10:40:14  1    the Benefits position.

10:40:16  2        A.    Just whatever -- whatever positions were

10:40:20  3    -- were done away with when I was there.  I have

10:40:22  4    not kept up with the company since I left.

10:40:24  5        Q.    I understand.  I'm asking you between 1999

10:40:32  6    and May of 2001, the Harlingen plant closed; am I

10:40:34  7    correct?

10:40:34  8        A.    Yes, sir.

10:40:38  9        Q.    And do you know of any other plants that

10:40:42 10    the William Carter Company has closed during that

10:40:42 11    time period?

10:40:42 12        A.    No, sir.

10:40:44 13        Q.    Okay.  Are you aware, though, that prior

10:40:50 14    to 1999, that there were plants that were closed in

10:40:50 15    Georgia?

10:40:52 16        A.    I believe there were.

10:40:54 17        Q.    Okay.

10:40:56 18        A.    I don't know the names of which ones, but

10:40:58 19    I remember something like that happening.

10:41:02 20        Q.    Do you -- can you tell me any position in

10:41:04 21    which you believe that you would have or should

10:41:10 22    have been retained, except for Gary Butts -- the

10:41:12 23    issues with Gary Butts causing you not to be

10:41:12 24    retained?

10:41:16 25        A.    I think that I could have fit into the

10:41:18  1    Human Resource Manager position.

10:41:22  2        Q.    Okay.    And have you done Human Resource

10:41:24  3    Management duties before?

10:41:28  4        A.    No, sir, but I had done -- I had not done

10:41:32  5    EEOC Manager positions before, either, and it was

10:41:36  6    very similar.    And Paul Seal told me that I was

10:41:36  7    qualified.

10:41:40  8        Q.    Did you ever make any application for any

10:41:42  9    kind of position within William Carter Company at

10:41:46  10   any time in 1999, 2000, 2001?

10:41:48  11       A.    Any application?

10:41:52  12       Q.    Did you discuss moving into any position

10:41:54  13   with anyone at William Carter other than the

10:41:58  14   position that you held as occupational health nurse

10:42:00  15   at the Harlingen plant?

10:42:02  16       A.    With Paul Seal and Nellie Askey.    The

10:42:04  17   positions I'm telling you -- I told you previously.

10:42:08  18       Q.    And other than those two positions -- I

10:42:10  19   understand that they -- that they approached you

10:42:12  20   about those positions.    Did --

          21       A.    Yes, sir.

10:42:12  22       Q.    -- misunderstand that?

10:42:14  23       A.    Yes, sir.

10:42:16  24       Q.    And you were not interested at that time

10:42:18  25   in either of those positions?

10:42:22  1      A.    I was interested, but I could not afford

10:42:22  2  to make the move.

10:42:24  3      Q.    Okay.  Well, you turned it down for

10:42:28  4  whatever reason.  My question is, after you turned

10:42:34  5  those positions down in 1988 -- 1998 or 1999, did

10:42:38  6  you, at any time, express interest in other

10:42:40  7  positions within William Carter Company?

10:42:42  8      A.    I wasn't aware that there were any other

10:42:44  9  openings coming up.

         10      Q.    Okay.

10:42:48 11      A.    I wasn't aware of the Human Resource

10:42:50 12  Manager that was placed until after she was placed.

10:42:54 13      Q.    Well, my question is, simply, did you ever

10:42:56 14  express interest in relocating with William Carter

10:42:58 15  or staying on in any other capacity?

10:43:02 16      A.    No, sir.  But had I known that I wouldn't

10:43:02 17  -- I was not going to have a job, I would have

10:43:06 18  definitely considered it.  There's a big difference

10:43:08 19  between being offered a job and keeping a job and

10:43:12 20  moving, rather than leaving a perfectly good job

10:43:14 21  that you have down here and transferring.

10:43:18 22      Q.    In March of 19- -- of 2001 when it was

10:43:20 23  announced that the plant was closed, did you

10:43:22 24  initiate any discussions with anyone at William

10:43:26 25  Carter about staying on in some capacity?

10:43:30  1       A.    No, sir, because handouts were given

10:43:32  2   indicating who was selected to be kept and who was

10:43:34  3   selected to be laid off.

10:43:36  4       Q.    Okay.

10:43:38  5       A.    The decision was already made.

10:43:40  6       Q.    Well, my question was, did you, then, at

10:43:42  7   that point, initiate any discussions or make

10:43:46  8   application for any position within William Carter

10:43:48  9   or pick up the telephone and call anyone to ask if

10:43:52 10   there were other openings in other places in the

10:43:52 11   company?

10:43:54 12       A.    No, sir, I felt that I was a valuable

10:44:00 13   employee, and I felt that they would have -- they

10:44:02 14   would have contacted me as they have done in

10:44:06 15   previous years and try to place me if it not had

10:44:06 16   been for all of this going on.

10:44:12 17       Q.    Has anyone at the company told you that

10:44:14 18   you would have been retained had you not made some

10:44:18 19   kind of complaint against Gary Butts?

10:44:20 20       A.    No, sir, it's -- it's my gut feeling.

10:44:24 21       Q.    And I appreciate that and I understand

10:44:26 22   that.  But I'm just asking you if somebody's told

10:44:28 23   you, given you any indication that that's the

10:44:30 24   reason you were not being retained?

10:44:34 25       A.    No, sir, but I think anyone in my position

| | | |
|---|---|---|
| 10:44:36 | 1 | would feel that way. |
| 10:44:42 | 2 | Q. The -- the lady that you mentioned that |
| 10:44:46 | 3 | got the Human Resources position -- what did you |
| 10:44:48 | 4 | say her name was? Alice? |
| 10:44:48 | 5 | A. Vicky. |
| 10:44:52 | 6 | Q. Vicky. Was this before or after the |
| 10:44:54 | 7 | Harlingen plant closed? |
| 10:44:58 | 8 | A. It was during the -- it had to have been |
| 10:45:00 | 9 | during the time between January and May. I don't |
| 10:45:04 | 10 | remember that name -- her name being linked as |
| 10:45:10 | 11 | Human Resource Manager before that time. And I |
| 10:45:12 | 12 | cannot remember her last name. |
| 10:45:12 | 13 | Q. Was she already working with the company |
| 10:45:14 | 14 | in some capacity? |
| 10:45:18 | 15 | A. I really don't know. I really don't |
| 10:45:22 | 16 | remember. I -- I'm not familiar with her name. |
| 10:45:26 | 17 | Q. And how did you hear that she got a |
| 10:45:28 | 18 | position in Human Resources? |
| 10:45:32 | 19 | A. I believe I saw an announcement on an |
| 10:45:36 | 20 | e-mail or corporate e-mail. It was from corporate |
| 10:45:38 | 21 | documents. It was company documents, and I saw her |
| 10:45:40 | 22 | name. |
| 10:45:42 | 23 | Q. And do you still have any of those |
| 10:45:44 | 24 | documents? |
| 10:45:48 | 25 | A. No, sir. I -- I did not -- I was lucky to |

10:45:52  1    get out with what personal effects that I had in my

10:45:54  2    office.  And, luckily, I had moved them out several

10:45:56  3    days before.  I was gradually moving them out.  But

10:46:00  4    as far as my computer and anything else in there, I

10:46:00  5    was not able to get anything.

10:46:08  6        Q.  Do you know of anyone else who was working

10:46:12  7    at the Harlingen plant, other than Gary Butts, who

10:46:14  8    was retained by the company in some other capacity

10:46:16  9    or in some other position or in some other

10:46:18  10   location?

10:46:20  11       A.  That was working for the Harlingen plant?

10:46:20  12       Q.  Yes.

10:46:22  13       A.  No, sir.  Only Gary Butts.

10:46:26  14       Q.  Your complaint made reference to some --

10:46:30  15   your job responsibilities were increased by Gary

10:46:34  16   Butts.  And I believe you told me that that was in

10:46:36  17   connection with a family picnic -- the family

10:46:42  18   picnic the company conducted in November of 2000;

10:46:42  19   is that correct?

10:46:46  20       A.  That, the company picnic, as well as the

10:46:48  21   Human Resources' -- the 20 or 25-year party that we

10:46:54  22   had for -- for -- it's a service awards that was

10:46:58  23   held at Treasure Hills Country Club.

10:46:58  24       Q.  Treasure Hills?

10:46:58  25       A.  Yes, sir.

10:47:00  1      Q.   Okay.  And where is that located?

10:47:04  2      A.   It was in Harlingen, Texas.  It burned

10:47:04  3  down last week.

10:47:10  4      Q.   And do you recall the approximate time of

10:47:14  5  year that that party would have been held?

10:47:18  6      A.   I believe it was August the 29th.  It was

10:47:20  7  on a Thursday, Thursday night of 2000.

10:47:22  8      Q.   That's the one you made reference to

10:47:24  9  earlier that he missed?

10:47:24 10      A.   Yes, sir.

10:47:30 11      Q.   Were those -- with respect to the -- the

10:47:34 12  20, 25-year anniversary party, that was to

10:47:40 13  celebrate those employees who had 20 or 25 years of

10:47:40 14  service with the company?

10:47:42 15      A.   Yes, sir.

10:47:42 16      Q.   Okay.  Is that -- were you totally

10:47:46 17  responsible for that function?  Or is that a -- is

10:47:48 18  that a committee or group of people who were

10:47:50 19  responsible for planning?

10:47:54 20      A.   I wound up being totally responsible for

10:47:56 21  it.  It's usually the Personnel Administrator that

10:48:00 22  does do that, however, she did not do anything for

10:48:04 23  that party.  I wound up picking the menu,

10:48:08 24  budgeting, even paying for it, getting the flowers,

10:48:12 25  setting the tables, everything.

10:48:20  1      Q.   Okay.  And who was the Personnel

        2  Administrator?

10:48:22  3      A.   Clara Perez.

10:48:24  4      Q.   Okay.  Is that something that you had been

10:48:26  5  involved with prior to the year 2000?

10:48:28  6      A.   No, sir.  I had been involved to

10:48:30  7  participate, but never to -- I'd never had the

10:48:34  8  whole thing be my responsibility.  I was the nurse,

10:48:36  9  not the -- in charge of personnel.

10:48:40 10      Q.   And who asked you to be responsible for

10:48:40 11  that?

10:48:44 12      A.   Gary Butts, basically, just put it on me.

10:48:48 13      Q.   I thought there was some -- some of your

10:48:52 14  documentation said there was somebody else that had

10:48:52 15  asked you to do that.

10:48:56 16      A.   Well, I was always asked by my supervisor

10:49:04 17  to help out with HR functions, but not to -- to be

10:49:04 18  responsible for them totally and complete them

10:49:04 19  totally on my own.

10:49:06 20      Q.   Well, did your supervisor ask you to help

10:49:06 21  out in that function?

10:49:10 22      A.   Yes.  It was Alejandra Bailon, and she did

10:49:14 23  ask me to help out.  And she was down on one

10:49:16 24  occasion.  There was a committee for the picnic,

10:49:20 25  and she was there when everyone was there.  We had

10:49:26  1    a meeting and she asked me to -- to help out.  And

10:49:28  2    I wound up doing everything because Ms. Perez's

10:49:32  3    best line was she was too busy and she had too much

10:49:32  4    work.

10:49:34  5        Q.    Well, I want to ask you, first of all,

10:49:40  6    about the -- the 20, 25-year service award party.

10:49:46  7    And did your supervisor ask you to help out on that

10:49:46  8    party?

10:49:50  9        A.    I was always expected to help out with HR

10:49:54 10    things, as needed, even with her EEOC reports,

10:49:56 11    anything that I could help them out with.  And I

10:49:58 12    helped them out.

10:50:02 13        Q.    And did you -- were you also asked by your

10:50:06 14    supervisor to help out with the family picnic that

10:50:06 15    was held in November of 2000?

10:50:10 16        A.    Yes, sir.  I was asked to help out, but

10:50:12 17    not to be in charge of the entire thing which is

10:50:14 18    what wound up happening.

10:50:18 19        Q.    Was the family picnic -- were there a

10:50:20 20    group of people who were responsible for planning

10:50:24 21    the family picnic?  Was there a committee for that?

10:50:26 22        A.    There was supposed to be a committee for

10:50:30 23    that, but Mr. Butts -- once Alejandra Bailon was

10:50:34 24    gone, Mr. Butts did not supervise anything or -- or

10:50:36 25    make the other people do anything.  He just kept

| | | |
|---|---|---|
| 10:50:38 | 1 | telling me, "You need to have this done.  Do you |
| 10:50:42 | 2 | have everything done?  You need to have everything |
| 10:50:42 | 3 | done." |
| 10:50:44 | 4 | Q.    Who was on the committee? |
| 10:50:54 | 5 | A.    Clara Perez, Luis Nunez, Connie Mejia, |
| 10:50:58 | 6 | Sheila Villarreal. |
| 10:50:58 | 7 | Q.    I'm sorry? |
| 10:51:02 | 8 | A.    Sheila Villarreal. |
| 10:51:04 | 9 | Q.    Okay.  Who else? |
| 10:51:06 | 10 | A.    That's all that I can remember right now. |
| 10:51:08 | 11 | Q.    Are you saying that those individuals did |
| 10:51:12 | 12 | nothing and you ended up doing all of it for the |
| 10:51:12 | 13 | family picnic? |
| 10:51:14 | 14 | A.    I ended up getting all the prices and -- |
| 10:51:16 | 15 | and making all the phone calls. |
| 10:51:18 | 16 | Q.    Well, I understand that you did those |
| 10:51:22 | 17 | functions.  Are you saying, though, that the other |
| 10:51:24 | 18 | individuals did nothing else? |
| 10:51:28 | 19 | A.    They did a very small portion.  Clara |
| 10:51:30 | 20 | Perez should have been in charge of a function for |
| 10:51:34 | 21 | HR, and she did not take an active enrollment in |
| 10:51:38 | 22 | it.  In fact, she told all of the committee members |
| 10:51:42 | 23 | in front of Alejandra Bailon that she just didn't |
| 10:51:44 | 24 | have time, she had too much work and she just |
| 10:51:44 | 25 | didn't have time to do any of that. |

10:51:46  1      Q.   Are you saying that the other three

10:51:48  2  individuals did nothing in connection with that

10:51:52  3  family picnic in November of 2000?

10:51:54  4      A.   They helped only with a small assigned

10:51:56  5  area.  As far as games, they would tend to the

10:51:58  6  games during certain hours.

10:52:00  7      Q.   Who assigned those areas to them?

10:52:04  8      A.   We just decided that.  We discussed it at

10:52:06  9  the first committee meeting when Ms. Bailon was

10:52:08 10  there.  We discussed the food and what type of food

10:52:12 11  and who we were going to go with and the prices.

10:52:16 12      Q.   Well, at the committee meeting, did y'all

10:52:18 13  -- were assignments made or did people volunteer

10:52:22 14  to take responsibility for certain areas?

10:52:22 15      A.   People volunteered to take -- take

10:52:26 16  responsibility for certain areas that they thought

10:52:32 17  that they could help.  Connie Mejia had volunteered

10:52:32 18  and was helping me out tremendously, and then she

10:52:34 19  got upset with Mr. Butts and she refused to help

10:52:38 20  anymore.  She and I were going to get pinatas for

10:52:40 21  the party, and we called.  And she told him that we

10:52:44 22  were leaving the plant to go get pinatas, and he

10:52:44 23  told us that we were not to leave the plant to go

10:52:46 24  get pinatas, and not to do that on company time

10:52:48 25  even though it was a company function.  And she got

10:52:50  1  upset, and she said, "That's fine.  He can do it

10:52:54  2  himself."  And she did not go -- she didn't help

10:52:56  3  any further with the party or attend it.

10:53:00  4      Q.    Okay.  And did Mr. Butts increase your job

10:53:04  5  responsibilities, then, on anything else other than

10:53:10  6  the service award party and the family picnic?

10:53:14  7      A.    The engineers -- most of the engineers'

10:53:16  8  safety reports, I had to maintain all of the safety

10:53:22  9  reports in my office, including -- including things

10:53:26 10  -- the PPE things and things that the engineer,

10:53:28 11  Frank Pena, should have been completing.  But he

10:53:32 12  did not -- he did not supervise Frank Pena and make

10:53:34 13  him -- make him do that.  I had to do that.

10:53:36 14      Q.    And how long had you been doing that?

10:53:40 15      A.    I did that probably for the last year and

10:53:44 16  a half that we were there, as well as when the --

10:53:46 17  the insurance representative came, the loss control

10:53:50 18  specialist.  It became my sole responsibility to

10:53:52 19  take him around the plant and discuss with him what

10:53:58 20  was wrong and -- and accept his recommendations for

10:54:02 21  improvement.  Gary Butts would not even come out.

10:54:02 22  He wouldn't come out of his office.  And Frank

10:54:04 23  Pena, we would page him -- I would page him to come

10:54:08 24  and help me to answer questions, and he would not

10:54:08 25  come.

10:54:12  1      Q.    Are you saying that Frank Pena wouldn't

10:54:16  2  come because he was told by Gary Butts that he

10:54:16  3  should not come?

10:54:16  4      A.    No, sir.  I'm telling you that, in my

10:54:20  5  opinion, Frank Pena is very lazy, and he was only

10:54:24  6  going to do what -- what Gary Butts made him do.

10:54:34  7      Q.    Okay.  Which lawyers have you gone to

10:54:36  8  about handling your case?

10:54:42  9      A.    I've gone to Aaron Pena.  I've gone to

10:54:42 10  Mrs. Taylor.

10:54:46 11      Q.    I'm sorry.  Aaron who?

10:54:46 12      A.    Pena.

10:54:46 13      Q.    And who?

10:54:50 14      A.    Mrs. Taylor.  I can't remember her first

10:54:50 15  name.

10:54:54 16      Q.    And who else?

10:55:02 17      A.    Mr. -- Mr. Phil Harris.  But I was not

10:55:06 18  comfortable enough with either of them.

10:55:08 19      Q.    And who else?

10:55:08 20      A.    That's all at this time.

10:55:12 21      Q.    Okay.  And have you -- did you go to any

10:55:14 22  of those people before you left William Carter?

10:55:16 23      A.    No, sir.

10:55:18 24      Q.    Okay.  Were they all individuals that you

10:55:22 25  have had consultations with since going -- since

```
10:55:24  1    leaving William Carter?
10:55:24  2        A.   Yes, sir.
10:55:26  3        Q.   Okay.  And are those the only three?
10:55:26  4        A.   Yes, sir.
10:55:30  5        Q.   Are they all located in Harlingen?
10:55:36  6        A.   No, sir.  They're in McAllen, and one is
10:55:36  7    in Edinburg.
10:55:38  8        Q.   I'm sorry?
10:55:40  9        A.   One is in Edinburg.  I'm sorry.
10:55:40  10       Q.   And who is that?
10:55:42  11       A.   Mr. Pena.
10:55:54  12       Q.   Okay.  And what are you seeking in this
10:55:54  13   lawsuit?
10:55:58  14       A.   I would like to be reimbursed for the
10:56:00  15   out-of-pocket expenses that I had for the burglar
10:56:04  16   alarms and the guns that we've had to purchase.
10:56:06  17   We've taken the gun safety course and the license
10:56:08  18   to carry, my husband and I, both.  And we've
10:56:10  19   purchased guns, and we do carry -- we do carry
10:56:14  20   pistols to protect ourselves, as well as guns there
10:56:16  21   at the home to protect ourselves.  We have
10:56:20  22   increased transportation costs.  Our kids will not
10:56:22  23   ride the bus anymore.  We can't leave them at the
10:56:24  24   bus.  We drive them to and from school and drop
10:56:26  25   them off.
```

10:56:28  1       Q.    And when did you purchase the guns?

10:56:32  2       A.    It was in the -- I believe the summer --

10:56:34  3    the summertime of 2000.

10:56:36  4       Q.    Summer of 2000?

10:56:36  5       A.    Yes, sir.

10:56:42  6       Q.    And you have given me information about

10:56:44  7    some of the other matters?

10:56:46  8       A.    Yes, sir.  I've given you receipts.

10:56:48  9       Q.    I want --

10:56:50 10       A.    I also -- pardon me.

10:56:50 11       Q.    Sure.

10:56:54 12       A.    I also -- we also would like to relocate.

10:56:58 13    We feel that we're sitting ducks right now.

10:57:02 14       Q.    And why do you think William Carter

10:57:04 15    Company should be responsible for actions that Mr.

10:57:08 16    Butts has been taking against you or your family

10:57:10 17    since he's left and you've left the company?

10:57:12 18       A.    Because Clyde Stutts told me on the taped

10:57:14 19    conversation that -- that he would use the

10:57:16 20    information, he would do everything he could to

10:57:18 21    protect us and he would not release our name, and

10:57:22 22    Gary Butts is telling me over the phone and my

10:57:22 23    husband he knows I was responsible for him -- him

10:57:28 24    losing his job.  And Clyde Stutts in the taped

10:57:30 25    conversation that you will hear, telling me that he

| | | |
|---|---|---|
| 10:57:32 | 1 | would use my name, but he would use maybe one or |
| 10:57:34 | 2 | two other names, as well, and he would not know. |
| 10:57:38 | 3 | And I've never received any other acknowledgment |
| 10:57:40 | 4 | from him, as far as how they approached him or what |
| 10:57:40 | 5 | was done. |
| 10:57:44 | 6 | Q.   Well, do you have -- has Gary Butts ever |
| 10:57:48 | 7 | said that -- that Clyde Stutts or anyone else told |
| 10:57:52 | 8 | him that he lost his job because of you?  Or is |
| 10:57:54 | 9 | that just an assumption that he makes? |
| 10:57:58 | 10 | A.   No.  He says -- he said that he knew. |
| 10:58:00 | 11 | Q.   Okay.  But has he ever said what somebody |
| 10:58:02 | 12 | at the company stated to him? |
| 10:58:06 | 13 | A.   No, sir, he did not.  But I did not ask |
| 10:58:10 | 14 | him.  But I think any prudent person would figure |
| 10:58:10 | 15 | that out. |
| 10:58:24 | 16 | Q.   And Clyde Stutts asked -- sent a letter to |
| 10:58:26 | 17 | you asking you to provide information about the |
| 10:58:28 | 18 | telephone -- the documents that you said you had, |
| 10:58:30 | 19 | and you never responded to that letter, did you? |
| 10:58:32 | 20 | A.   No, sir. |
| 10:58:34 | 21 | Q.   You didn't tell him you didn't have them |
| 10:58:36 | 22 | and you did not send them the documents; am I |
| 10:58:36 | 23 | correct? |
| 10:58:40 | 24 | A.   That's correct.  I did not want to wish to |
| 10:58:42 | 25 | deal with Clyde Stutts to begin with.  And I told |

10:58:44  1   him that, and it is in the taped conversation, "I

10:58:46  2   wish to speak with Dave Brown."

10:58:46  3       Q.   Okay.

10:58:52  4       A.   Dave Brown has never called me back to

          5   this day.

10:58:54  6       Q.   Well, the fact that Dave Brown didn't call

10:58:56  7   you back doesn't make the company responsible for

10:58:58  8   something, does it?

10:58:58  9       A.   The company took no --

10:59:00 10       Q.   I understand that you're upset about it,

10:59:02 11   but how does that make the fact that he did not

10:59:04 12   call you back make the company responsible for

10:59:08 13   something that Gary Butts did or did not do?

10:59:08 14       A.   The company is responsible, because they

10:59:12 15   did not take proper -- proper measures to protect

10:59:12 16   my family.

10:59:16 17       Q.   And what is it that you expected William

10:59:18 18   Carter Company to do to take -- what measures did

10:59:22 19   you expect the William Carter Company to take to

10:59:24 20   protect you and your family?

10:59:30 21       A.   I expected them when they were told that

10:59:30 22   -- you showed me a letter yesterday indicating

10:59:32 23   that they were aware of his drug use in January.

10:59:34 24   We have a drug free policy, workplace policy, as

10:59:36 25   well as a random cause testing policy.  And he

10:59:40  1   could have been random tested, and he could have

10:59:42  2   been terminated for cause when he tested positive,

10:59:44  3   which he would have tested positive.  And then no

10:59:46  4   one's name would have had to have been used.

10:59:50  5       Q.   Ma'am, tell me what you expected the

10:59:54  6   William Carter Company to do to protect you and

10:59:58  7   your family?  You make no complaints or no

11:00:02  8   allegations at William Carter before the year 2001;

11:00:02  9   is that correct?

11:00:04 10       A.   Yes, sir.  And this occurred in January

11:00:06 11   2001 when y'all received the information.

11:00:08 12       Q.   My question is, what actions did you

11:00:12 13   expect the William Carter Company to do to protect

11:00:12 14   you and your family?

11:00:14 15       A.   I expected them to do what they said and

11:00:18 16   protect my family, follow the policies that they

11:00:20 17   have in place.  Because you have a policy and you

11:00:22 18   don't enforce it, you might as well not have a

11:00:26 19   policy.  There is a drug testing, random testing

11:00:26 20   policy at the William Carter Company for cause, and

11:00:30 21   he could have been tested, and he should have been

11:00:30 22   tested.

11:00:32 23       Q.   Is there anything else that you expected

11:00:36 24   the company to do other than to require Gary Butts

11:00:38 25   to undergo a drug test?

11:00:40    1       A.    I also expected them to move him when the

11:00:42    2   plant closed like they told me, instead of allowing

11:00:44    3   him to roam around until July after I had already

11:00:46    4   told them that my life and my family's life was in

11:00:48    5   danger.

11:00:48    6       Q.    Is there --

11:00:48    7       A.    I told them -- excuse me.

11:00:50    8       Q.    Is there anything you expected that the

11:00:54    9   William Carter Company do other than drug test Gary

11:00:56   10   Butts and move Gary Butts before July of 2001?

11:01:00   11       A.    I expected them to supervise him.  He was

11:01:02   12   able to do what he wanted, because he did not get

11:01:04   13   adequate supervision.

11:01:04   14       Q.    Is there anything else?

11:01:06   15       A.    Not that I can remember at this time.

11:01:10   16       Q.    Now, did you make any request of anyone at

11:01:12   17   the company to do any of those two things, that

11:01:14   18   Gary Butts should be drug tested?

11:01:16   19       A.    No, sir, I didn't have to.  Y'all were

11:01:18   20   informed with a letter.

11:01:20   21       Q.    Okay.  Did you ask the company to move

11:01:22   22   Gary Butts?

11:01:24   23       A.    I asked Dave Brown to have him moved as

11:01:28   24   soon as possible and not to approach him with the

11:01:28   25   information I gave him until after he moved him

| | | |
|---|---|---|
| 11:01:30 | 1 | right away.  And he said that the plant was going |
| 11:01:32 | 2 | to close on May the 8th, May the 9th, and that he |
| 11:01:36 | 3 | would be moved, there was no more work for him |
| 11:01:38 | 4 | here.  Yet, he was allowed to stay here. |
| 11:01:40 | 5 | Q.   Well, no one at the company, Dave Brown or |
| 11:01:42 | 6 | anyone else, made any commitment to you that Gary |
| 11:01:46 | 7 | Butts would be moved on May the 10th or May the |
| 11:01:48 | 8 | 11th or June the 1st or July the 2nd or September |
| 11:01:50 | 9 | the 1st, did they? |
| 11:01:52 | 10 | A.   Sir, he made a -- Dave Brown made a |
| 11:01:54 | 11 | commitment to me that he would move him as soon as |
| 11:01:56 | 12 | possible, as there was no reason for him to |
| 11:01:58 | 13 | continue with the plant closed.  There was no work |
| 11:02:00 | 14 | for him here. |
| 11:02:00 | 15 | Q.   Okay.  My question was, did Dave Brown |
| 11:02:04 | 16 | make any commitment that Gary Butts be moved at any |
| 11:02:04 | 17 | specific time? |
| 11:02:06 | 18 | A.   Not on a specific date, but as soon as |
| 11:02:06 | 19 | possible. |
| 11:02:10 | 20 | Q.   Okay.  Are you still willing to execute a |
| 11:02:12 | 21 | release for your medical records? |
| 11:02:12 | 22 | A.   Yes, sir. |
| 11:02:14 | 23 | MR. POWELL:  Okay.  Let's go off the |
| 11:02:18 | 24 | record, and I'll see if I can get the form so we |
| 11:02:18 | 25 | can get that signed. |

| | | |
|---|---|---|
| 11:06:30 | 1 | (Off record.) |
| 11:06:30 | 2 | MR. POWELL: Ms. Tate, those are all |
| 11:06:34 | 3 | the questions I have at this time. I will adjourn |
| 11:06:38 | 4 | the deposition, really, for two things. One is so |
| 11:06:40 | 5 | I'll have an opportunity to have the -- listen to |
| 11:06:44 | 6 | the tape and have that transcribed, and also to |
| 11:06:48 | 7 | obtain your medical records. And we will adjourn |
| 11:06:52 | 8 | the deposition for continuation on those two |
| 11:06:56 | 9 | matters. And we'll -- you know, if necessary, I'll |
| 11:06:58 | 10 | contact you to make sure we can do that at a |
| 11:07:00 | 11 | convenient time. Okay? |
| 11:07:00 | 12 | THE WITNESS: Okay. |
| 11:07:02 | 13 | MR. POWELL: Thank you. |
| | 14 | (Deposition concluded.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   SUSAN TATE,                )(
                  Plaintiff     )(
 4                              )(
     VS.                        )(   CASE NO. B-02-103
 5                              )(
     WILLIAM CARTER COMPANY,    )(
 6                Defendant      )(

 7

                       ORAL DEPOSITION OF
 8                        SUSAN TATE
                      SEPTEMBER 17, 2002
 9                        VOLUME 2

10       I, ELIZABETH F. TORRES, Certified Court
     Reporter in and for the State of Texas, hereby
11   certify that the witness, SUSAN TATE, was duly
     sworn by me, and that the transcript of the oral
12   deposition is a true and correct record of the
     testimony given by the witness on SEPTEMBER 17,
13   2002; that the deposition was reported by me in
     stenograph and was subsequently transcribed under
14   my supervision.

15       I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the
16   parties, nor a relative or employee of such
     attorney or counsel, nor am I financially or
17   otherwise interested in the outcome of the action.

18       WITNESS MY HAND on this the ___22nd__ day of
     _September_ 2002.
19

20       _____Elizabeth F. Torres_____
21       ELIZABETH F. TORRES, Texas CSR 5516
         Expiration Date:  12-31-02
22       Bryant & Stingley, Inc.
         4900 North 10th Street
23       Building A, Suite 3
         McAllen, Texas  78504
24       Phone:  (956)618-2366

25
```

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755     (956)542-1020

Deposition(s) of: _Susan Tate_____

Cause No.: _B-02-103_____ Style: _Susan Tate_____

Date: _9-16-02_ Trial Date: _____ vs. _William Carter Company_

_9-15-02_

1.  This deposition is taken pursuant to:
    - ✓ A.  Notice
    - ___ B.  Notice and Subpoena
    - ___ C.  Agreement
    - ___ D.  Court Order

2.  Objections:
    - ✓ A.  Objections will be made pursuant to the Texas/Federal Rules of Civil Procedure.
    - ___ B.  All objections are reserved.
    - ___ C.  All objections will be made at the time of taking the deposition.

3.  Signature and Delivery:
    - ✓ A.  The original transcript will be sent to _James M. Powell_____, the Custodial Attorney, and the original signature page, along with a copy of the transcript(s), will be submitted to ✓ the witness or _____ the witness' _Susan Tate_ attorney, who will return the executed signature page, including any changes, to Bryant & Stingley, Inc., within _30_ days of transmittal.

    - ___ B.  Signature is waived and the reporter will deliver the original transcript and exhibits to the Custodial Attorney, _____.

I, the undersigned, do hereby agree to the stipulations as indicated above and request the following:

1.  Copy of Transcript: Yes _✗_   No _____   Video: (If Applicable) Yes _____ No _____
    _(ASCII Disk and Condensed Transcript included)_

    e-mail   Yes _____   No _____   e-mail address _____
    Signature: _James M. Powell_ Representing: _____

2.  Copy of Transcript: Yes _____   No _✓_   Video: (If Applicable) Yes _____ No _____
    _(ASCII Disk and Condensed Transcript included)_

    e-mail   Yes _____   No _____   e-mail address _____
    Signature: _Susan Tate_ Representing: _____

3.  Copy of Transcript: Yes _____   No _____   Video: (If Applicable) Yes _____ No _____
    _(ASCII Disk and Condensed Transcript included)_

    e-mail   Yes _____   No _____   e-mail address _____
    Signature: _____ Representing: _____

4.  Copy of Transcript: Yes _____   No _____   Video: (If Applicable) Yes _____ No _____
    _(ASCII Disk and Condensed Transcript included)_

    e-mail   Yes _____   No _____   e-mail address _____
    Signature: _____ Representing: _____

1    SUSAN TATE - ERRATA SHEET - VOLUME 2

2    Please indicate changes on this sheet of paper,
giving the page and line number, the change and the
3    reason therefor.  Please sign each page of changes.
Reasons for changes are to: (1) Clarify the record;
4    (2) Conform to the facts; (3) Correct transcription
errors.

5

6                                           REASON FOR

7    PAGE    LINE    CHANGE FROM/CHANGE TO        CHANGE

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17       I, SUSAN TATE, have read the foregoing
deposition transcript and hereby affix my
18   signature, stating that same is true and correct,
except as noted above.

19   _____
                  SUSAN TATE

20   THE STATE OF TEXAS

21   COUNTY OF  *Cameron*

22            SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _28th_ day of
23   __October_____, 2002.

24                          _____
                  Notary Public in and for
25                  The State of Texas

IDOLINA Y. JAUREGUI
MY COMMISSION EXPIRES
April 2, 2006

BRYANT & STINGLEY, INC.  ORIGINAL
McAllen        Harlingen        Brownsville
(956)618-2366  (956)428-0755  (956)542-1020

BRYANT & STINGLEY, INC.
RECEIVED
10-28-02
DATE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SUSAN TATE,                          )
                                     )
                    Plaintiff,       )
                                     )
v.                                   )          CASE NO. B-02-103
                                     )
WILLIAM CARTER COMPANY,              )
                                     )
                    Defendant.       )
                                     )

BRIEF IN SUPPORT OF

DEFENDANT THE WILLIAM CARTER COMPANY'S

MOTION FOR SUMMARY JUDGMENT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

SUSAN TATE,                          )
                                     )
                                     )
                    Plaintiff,       )          CASE NO. B-02-103
                                     )
v.                                   )
                                     )          **ORDER**
WILLIAM CARTER COMPANY,              )
                                     )
                    Defendant.       )
                                     )

This matter is before the Court on Defendant The William Carter Company's Motion for

Summary Judgment. Plaintiff, proceeding pro se, filed this lawsuit on May 17, 2002. Plaintiff

claims that Defendant is liable for alleged sex discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, and for intentional torts allegedly perpetrated by Gary Butts,

a former manager of the Company. The Company timely answered the Complaint denying

Plaintiff's allegations and plead as an affirmative defense that this lawsuit is barred because

Plaintiff entered a valid and enforceable agreement releasing the Company of liability for these

claims. In addition, the Company asserts a Counterclaim for breach of the release and the

covenant not to sue it contains.

Defendant now moves for summary judgment on all Plaintiff's claims, as well as on its

Counterclaim. Two issues are presented for determination. First, is Defendant entitled to

summary judgment on Plaintiff's state and federal claims where it is undisputed that Plaintiff

entered into an agreement releasing all claims against relating to her employment and covenanted

1